# No. 24-1007

## 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

### 𝔉𝔬𝔯 𝔱𝔥𝔢

### 𝔖𝔢𝔠𝔬𝔫𝔡 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

—————————————————

Authors Guild, David Baldacci, Mary Bly, Michael Connelly, Sylvia Day, Jonathan Franzen, John Grisham, Elin Hilderbrand, Christina Baker Kline, Maya Shanbhag Lang, Victor LaValle, George R.R. Martin, Jodi Picoult, Douglas Preston, Roxana Robinson, George Saunders, Scott Turow, Rachel Vail, individually and on behalf of others similarly situated,
*Plaintiffs-Appellees,*

Jonathan Alter, Kai Bird, Taylor Branch, Rich Cohen, Sides Hampton, Eugene Linden, Daniel Okrent, Stacy Schiff, James Shapiro, Jia Tolentino, Simon Winchester,
*Consolidated-Plaintiffs-Appellees,*

Julian Sancton,
*Consolidated-Plaintiff-Interested-Party-Appellee,*

Nicholas A. Basbanes, Nicholas Ngagoyeanes, (professionally known as Nicholas Gage) individually and on behalf of all others similarly situated,
*Consolidated-Plaintiffs-Interested-Party,*

v.

Microsoft Corporation,
*Defendant-Consolidated-Defendant-Appellee,*

OpenAI LP,
Defendant,

OpenAI, Inc., OpenAI GP, LLC, OpenAI LLC, OpenAI OpCo LLC,
OpenAI Global LLC, OAI Corporation LLC, OpenAI Holdings, LLC,
OpenAI Startup Fund I LP, OpenAI Startup Fund GP I LLC, OpenAI
Startup Fund Management LLC,
Defendants-Consolidated-Defendants,

v.

Paul Tremblay, Michael Chabon, Ta-Nehisi Coates, Junot Daz, Andrew
Sean Greer, David Henry Hwang, Matthew Klam, Lippman Laura,
Rachel Louise Snyder, Ayelet Waldman, Jacqueline Woodson, Sarah
Silverman, Christopher Golden, Richard Kadrey,
Third-Party-Plaintiffs-Appellants.

_____

On Appeal from the United States District Court
for the Southern District of New York

District Court Docket No. 1:23-cv-8292-SHS

---

## APPENDIX TO THIRD-PARTY-PLAINTIFFS-APPELLANTS' BRIEF
## VOLUME II OF II

---

Joseph R. Saveri (CA SBN 130064)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1505
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com

*Counsel for Third-Party-Plaintiffs-Appellants*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE NEW YORK TIMES COMPANY<br><br>Plaintiff,<br><br>v.<br><br>MICROSOFT CORPORATION, OPENAI, INC.,<br>OPENAI LP, OPENAI GP, LLC, OPENAI, LLC,<br>OPENAI OPCO LLC, OPENAI GLOBAL LLC,<br>OAI CORPORATION, LLC, and OPENAI<br>HOLDINGS, LLC,<br><br>Defendants. | Civil Action No. _____<br><br>**<u>COMPLAINT</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff The New York Times Company ("The Times"), by its attorneys Susman Godfrey LLP and Rothwell, Figg, Ernst & Manbeck, P.C., for its complaint against Defendants Microsoft Corporation ("Microsoft") and OpenAI, Inc., OpenAI LP, OpenAI GP LLC, OpenAI LLC, OpenAI OpCo LLC, OpenAI Global LLC, OAI Corporation, LLC, OpenAI Holdings, LLC, (collectively "OpenAI" and, with Microsoft, "Defendants"), alleges as follows:

### I.     <u>NATURE OF THE ACTION</u>

1.      Independent journalism is vital to our democracy. It is also increasingly rare and valuable. For more than 170 years, The Times has given the world deeply reported, expert, independent journalism. Times journalists go where the story is, often at great risk and cost, to inform the public about important and pressing issues. They bear witness to conflict and disasters, provide accountability for the use of power, and illuminate truths that would otherwise go unseen. Their essential work is made possible through the efforts of a large and expensive organization that provides legal, security, and operational support, as well as editors who ensure their journalism meets the highest standards of accuracy and fairness. This work has always been important. But

1

within a damaged information ecosystem that is awash in unreliable content, The Times's journalism provides a service that has grown even more valuable to the public by supplying trustworthy information, news analysis, and commentary.

2.      Defendants' unlawful use of The Times's work to create artificial intelligence products that compete with it threatens The Times's ability to provide that service. Defendants' generative artificial intelligence ("GenAI") tools rely on large-language models ("LLMs") that were built by copying and using *millions* of The Times's copyrighted news articles, in-depth investigations, opinion pieces, reviews, how-to guides, and more. While Defendants engaged in widescale copying from many sources, they gave Times content particular emphasis when building their LLMs—revealing a preference that recognizes the value of those works. Through Microsoft's Bing Chat (recently rebranded as "Copilot") and OpenAI's ChatGPT, Defendants seek to free-ride on The Times's massive investment in its journalism by using it to build substitutive products without permission or payment.

3.      The Constitution and the Copyright Act recognize the critical importance of giving creators exclusive rights over their works. Since our nation's founding, strong copyright protection has empowered those who gather and report news to secure the fruits of their labor and investment. Copyright law protects The Times's expressive, original journalism, including, but not limited to, its millions of articles that have registered copyrights.

4.      Defendants have refused to recognize this protection. Powered by LLMs containing copies of Times content, Defendants' GenAI tools can generate output that recites Times content verbatim, closely summarizes it, and mimics its expressive style, as demonstrated by scores of examples. *See* Exhibit J. These tools also wrongly attribute false information to The Times.

5.      Defendants also use Microsoft's Bing search index, which copies and categorizes The Times's online content, to generate responses that contain verbatim excerpts and detailed summaries of Times articles that are significantly longer and more detailed than those returned by traditional search engines. By providing Times content without The Times's permission or authorization, Defendants' tools undermine and damage The Times's relationship with its readers and deprive The Times of subscription, licensing, advertising, and affiliate revenue.

6.      Using the valuable intellectual property of others in these ways without paying for it has been extremely lucrative for Defendants. Microsoft's deployment of Times-trained LLMs throughout its product line helped boost its market capitalization by a trillion dollars in the past year alone. And OpenAI's release of ChatGPT has driven its valuation to as high as $90 billion. Defendants' GenAI business interests are deeply intertwined, with Microsoft recently highlighting that its use of OpenAI's "best-in-class frontier models" has generated customers—including "leading AI startups"—for Microsoft's Azure AI product.[1]

7.      The Times objected after it discovered that Defendants were using Times content without permission to develop their models and tools. For months, The Times has attempted to reach a negotiated agreement with Defendants, in accordance with its history of working productively with large technology platforms to permit the use of its content in new digital products (including the news products developed by Google, Meta, and Apple). The Times's goal during these negotiations was to ensure it received fair value for the use of its content, facilitate the continuation of a healthy news ecosystem, and help develop GenAI technology in a responsible way that benefits society and supports a well-informed public.

---

[1] *Microsoft Fiscal Year 2024 First Quarter Earnings Conference Call*, MICROSOFT INVESTOR RELATIONS (Oct. 24, 2023), https://www.microsoft.com/en-us/Investor/events/FY-2024/earnings-fy-2024-q1.aspx.

2AA-284

8. These negotiations have not led to a resolution. Publicly, Defendants insist that their conduct is protected as "fair use" because their unlicensed use of copyrighted content to train GenAI models serves a new "transformative" purpose. But there is nothing "transformative" about using The Times's content without payment to create products that substitute for The Times and steal audiences away from it. Because the outputs of Defendants' GenAI models compete with and closely mimic the inputs used to train them, copying Times works for that purpose is not fair use.

9. The law does not permit the kind of systematic and competitive infringement that Defendants have committed. This action seeks to hold them responsible for the billions of dollars in statutory and actual damages that they owe for the unlawful copying and use of The Times's uniquely valuable works.

## II.  **JURISDICTION AND VENUE**

10. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the Copyright Act of 1976, 17 U.S.C. § 101, et seq.

11. Jurisdiction over Microsoft and OpenAI is proper because they have purposely availed themselves of the privilege of conducting business in New York. A substantial portion of Microsoft and OpenAI's widespread infringement and other unlawful conduct alleged herein occurred in New York, including the distribution and sales of Microsoft and OpenAI's Generative Pre-training Transformer ("GPT")-based products like ChatGPT, ChatGPT Enterprise, Bing Chat, Azure OpenAI Service, Microsoft 365 Copilot, and related application programming interface (API) tools within New York to New York residents. Furthermore, both Microsoft and the OpenAI Defendants maintain offices and employ personnel in New York who, upon information and belief, were involved in the creation, maintenance, or monetization of Microsoft and OpenAI's widespread infringement and other unlawful conduct alleged herein.

2AA-285

12.     Because The Times's principal place of business and headquarters is in this District, the injuries alleged herein from Microsoft and OpenAI's widespread infringement and other unlawful conduct foreseeably occurred in this District.

13.     Venue is proper under 28 U.S.C. § 1400(a) because Defendants or their agents reside or may be found in this District, through the infringing and unlawful activities—as well as Defendants' sales and monetization of such activity—that occurred in this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to The Times's claims occurred in this District, including the marketing, sales, and licensing of Defendants' GenAI products built on the infringement of The Times's intellectual property within this District. Upon information and belief, OpenAI has sold subscriptions for ChatGPT Plus to New York residents, and both Microsoft and OpenAI enjoy a substantial base of monthly active users of Bing Chat and ChatGPT in New York. OpenAI has licensed its GPT models to New York residents and companies headquartered in New York. For example, this year, OpenAI struck deals to license its GPT models to the Associated Press (AP) and Morgan Stanley, both companies headquartered in New York.

### III.     THE PARTIES

14.     Plaintiff The New York Times Company is a New York corporation with its headquarters and principal place of business in New York. The Times publishes digital and print products, including its core news product, The New York Times, which is available on its mobile applications, on its website (NYTimes.com), and as a printed newspaper, and associated content such as its podcasts. The Times also publishes other interest-specific publications, including The Athletic (sports media), Cooking (recipes and other cooking-related content), Games (puzzles and

2AA-286

games), and Wirecutter (shopping recommendations). The Times owns over 3 million registered, copyrighted works, including those set forth in Exhibits A–I, K ("Times Works").

15.    Microsoft Corporation is a Washington corporation with a principal place of business and headquarters in Redmond, Washington. Microsoft has invested at least $13 billion in OpenAI Global LLC in exchange for which Microsoft will receive 75% of that company's profits until its investment is repaid, after which Microsoft will own a 49% stake in that company.

16.    Microsoft has described its relationship with the OpenAI Defendants as a "partnership." This partnership has included contributing and operating the cloud computing services used to copy Times Works and train the OpenAI Defendants' GenAI models. It has also included, upon information and belief, substantial technical collaboration on the creation of those models. Microsoft possesses copies of, or obtains preferential access to, the OpenAI Defendants' latest GenAI models that have been trained on and embody unauthorized copies of the Times Works. Microsoft uses these models to provide infringing content and, at times, misinformation to users of its products and online services. During a quarterly earnings call in October 2023, Microsoft noted that "more than 18,000 organizations now use Azure OpenAI Service, including new-to-Azure customers."

17.    The OpenAI Defendants consist of a web of interrelated Delaware entities.

18.    Defendant OpenAI Inc. is a Delaware nonprofit corporation with a principal place of business located at 3180 18th Street, San Francisco, California. OpenAI Inc. was formed in December 2015. OpenAI Inc. indirectly owns and controls all other OpenAI entities and has been directly involved in perpetrating the mass infringement and other unlawful conduct alleged here.

19.    Defendant OpenAI LP is a Delaware limited partnership with its principal place of business located at 3180 18th Street, San Francisco, California. OpenAI LP was formed in 2019.

2AA-287

OpenAI LP is a wholly owned subsidiary of OpenAI Inc. that is operated for profit and is controlled by OpenAI Inc. OpenAI LP was directly involved in perpetrating the mass infringement and commercial exploitation of Times Works alleged here.

20.     Defendant OpenAI GP, LLC is a Delaware limited liability company with a principal place of business located at 3180 18th Street, San Francisco, California. OpenAI GP, LLC is the general partner of OpenAI LP, and it manages and operates the day-to-day business and affairs of OpenAI LP. OpenAI GP LLC is wholly owned and controlled by OpenAI Inc. OpenAI, Inc. uses OpenAI GP LLC to control OpenAI LP and OpenAI Global, LLC. OpenAI GP, LLC was involved in perpetrating the mass infringement and unlawful exploitation of Times Works alleged here through its direction and control of OpenAI LP and OpenAI Global LLC.

21.     Defendant OpenAI, LLC is a Delaware limited liability company with a principal place of business located at 3180 18th Street, San Francisco, California. OpenAI, LLC was formed in September 2020. OpenAI LLC owns, sells, licenses, and monetizes a number of OpenAI's offerings, including ChatGPT, ChatGPT Enterprise, and OpenAI's API tools, all of which were built on OpenAI's mass infringement and unlawful exploitation of Times Works. Upon information and belief, OpenAI, LLC is owned and controlled by both OpenAI Inc. and Microsoft Corporation, through OpenAI Global LLC and OpenAI OpCo LLC.

22.     Defendant OpenAI OpCo LLC is a Delaware limited liability company with a principal place of business located at 3180 18th Street, San Francisco, California. OpenAI OpCo LLC is a wholly owned subsidiary of OpenAI Inc. and has facilitated and directed OpenAI's mass infringement and unlawful exploitation of Times Works through its management and direction of OpenAI, LLC.

2AA-288

23.    Defendant OpenAI Global LLC is a Delaware limited liability company formed in December 2022. OpenAI Global LLC has a principal place of business located at 3180 18th Street, San Francisco, California. Microsoft Corporation has a minority stake in OpenAI Global LLC and OpenAI, Inc. has a majority stake in OpenAI Global LLC, indirectly through OpenAI Holdings LLC and OAI Corporation, LLC. OpenAI Global LLC was and is involved in unlawful conduct alleged herein through its ownership, control, and direction of OpenAI LLC.

24.    Defendant OAI Corporation, LLC is a Delaware limited liability company with a principal place of business located at 3180 18th Street, San Francisco, California. OAI Corporation, LLC's sole member is OpenAI Holdings, LLC. OAI Corporation, LLC was and is involved in the unlawful conduct alleged herein through its ownership, control, and direction of OpenAI Global LLC and OpenAI LLC.

25.    Defendant OpenAI Holdings, LLC is a Delaware limited liability company, whose sole members are OpenAI, Inc. and Aestas, LLC, whose sole member, in turn, is Aestas Management Company, LLC. Aestas Management Company, LLC is a Delaware shell company formed for the purpose of executing a $495 million capital raise for OpenAI.

### IV.    FACTUAL ALLEGATIONS

**A.    The New York Times and its Mission**

***1.    Almost Two Centuries of High-Quality, Original, Independent News***

26.    The New York Times is a trusted source of quality, independent journalism whose mission is to seek the truth and help people understand the world. Begun as a small, local newspaper, The Times has evolved to a diversified multi-media company with readers, listeners, and viewers around the globe. Today, more than 10 million subscribers pay for Times journalism,

8

which includes everything from news to opinion, culture to business, cooking to games, and shopping recommendations to sports.

27.     Founded in 1851, The New York Times has a long history of providing the public with independent journalism of the highest quality. When Adolph Ochs bought the newspaper out of bankruptcy in 1896, he vowed that The Times would be fiercely independent, dedicated to journalism of the highest integrity, and devoted to the public welfare. He articulated the vision: "To give the news impartially, without fear or favor, regardless of any party, sect, or interest involved." These words still animate The New York Times today, nearly two centuries later.

28.     Producing original independent journalism is at the heart of this mission. Times journalists cover the most important stories across the globe; in a typical year, The Times sends journalists to report on the ground from more than 160 countries. Together, along with editors, photographers, audio producers, videographers, graphic designers, data analysts, and more, The Times's newsroom produces groundbreaking journalism across every major storytelling format.

29.     The quality of The Times's coverage has been widely recognized with many industry and peer accolades, including 135 Pulitzer Prizes since its first Pulitzer award in 1918 (nearly twice as many as any other organization). The Times's journalism is also deeply impactful. Academics, teachers, and scientists have used it to educate and innovate. Lawmakers have cited it to introduce legislation. Judges have referenced it in rulings. And tens of millions of people rely on it every day.

30.     Times journalists are experts in their subject matter and among the most experienced and talented in the industry. In many cases, their work is enhanced by professional expertise: lawyers cover the court, doctors cover health care, and veterans cover the military. Many Times journalists draw on decades of experience. One reporter covering the White House, for

2AA-290

example, has reported on five administrations. His colleague, a White House photographer, has covered seven.

31.    In addition to journalists who spend considerable time and effort reporting pieces, The Times employs hundreds of editors to painstakingly review its journalism for accuracy, independence, and fairness, with at least two editors reviewing each piece prior to publication and many more reviewing the most important and sensitive pieces. The Times also has among the largest and most robust Standards teams in the industry, which advises the newsroom daily on consistency, accuracy, fairness, and clarity in its reporting and maintains stringent ethical guidelines for journalists and their work. The Times also maintains an internal Stylebook, a document that is updated over time to guide the tone of its journalism and the prose used. There is also an ongoing dialogue among journalists and editors to ensure The Times fairly and thoroughly covers the right stories and presents what it finds in a clear and compelling way. Producing Times journalism is a creative and deeply human endeavor.

### 2.    *Groundbreaking, In-Depth Journalism and Breaking News at Great Cost*

32.    To produce world-class journalism, The Times invests an enormous amount of time, money, expertise, and talent, both in its newsroom and product, technology, and other supporting teams. Core areas of focus include:

33.    **Investigative Reporting.** The Times does deep investigations—which usually take months and sometimes years to report and produce—into complex and important areas of public interest. The Times's reporters routinely uncover stories that would otherwise never come to light. They have exposed problems, held power to account, and demanded the public's attention. In investigating these areas, Times coverage often results in meaningful reforms. These stories are

2AA-291

written and edited in the style that is widely associated with The Times, one that readers trust and seek out.

34.    **Breaking News Reporting.** The Times is equally committed to quickly and accurately reporting breaking news. In an era in which speculation, disinformation, and spin often drown out the truth when news breaks, The Times fills an important need for trustworthy news with journalists who have the subject-matter expertise, news judgment, and sources required to report the facts in a compelling way. This year, The Times has provided detailed, real-time coverage on breaking news across a range of topics, including the upcoming U.S. elections, multiple mass shootings including those in Maine and Nashville, wars in Ukraine and the Middle East, a spate of natural disasters around the globe, and the collapse of major regional banks.

35.    **Beat Reporting:** The Times invests significantly in its beat reporting by giving its beat reporters the time and space to go deep on a single topic. At The Times, these topics vary from public health to religion to architecture, and from the Pentagon to Hollywood to Wall Street. They also include The Times's dozens of national and international bureaus, where correspondents are steeped in the communities they cover. Because this type of journalism is grounded in the expertise and deep connections of Times journalists, beat coverage enriches The Times's reporting.

36.    **Reviews and Analysis.** The Times is a trusted source for reviews and analysis of arts and culture, including food, books, art, film, theater, television, music, fashion, and travel. In 2016, it acquired the product review site Wirecutter, which recommends the best products in dozens of categories including home goods, technology, health and fitness, and more. Each year, Wirecutter spends tens of thousands of hours conducting rigorous testing and research to produce a catalog of reviews that today covers thousands of products.

2AA-292

37.    **Commentary and Opinion.** The Times publishes opinion articles that contribute to public debate across the world. Many of these articles come from The Times's staff of world-renowned columnists. Additionally, leaders in business, politics, religion, education, and the arts write guest essays for The Times's opinion section, giving readers the opportunity to understand a wide range of experiences, perspectives, and ideas about the most important issues of the day.

### 3.    *A Commitment to Quality Journalism*

38.    It takes enormous resources to publish, on average, more than 250 original articles every day. Many of these articles take months—and sometimes longer—to report. That output is the work of approximately 5,800 full-time equivalent Times employees (as of December 31, 2022), some 2,600 of whom are directly involved in The Times's journalism operations.

39.    Quite often, the most vital news reporting for society is the most resource-intensive. Some of The Times's most important journalism requires deploying teams of journalists at great cost to report on the ground around the world, providing best-in-class security and support, filing lawsuits against government entities to bring information to light, and supporting journalists through investigations that can take months or years.

40.    Subscription, advertising, licensing, and affiliate revenue make this reporting possible. In 1996, The Times launched a core news website, alongside its paid print edition, that was free. As readers shifted from print news to digital products, The Times—like most print publishers—faced the prospect of not being able to continue funding its journalism. In response, The Times reinvented its business model to incorporate digital subscriptions. The Times launched its metered paywall in 2011, in what it called "a bet that readers will pay for news they are accustomed to getting free."[2]

---

[2] Jeremy W. Peters, *The Times Announces Digital Subscription Plan*, N.Y. TIMES (Mar. 17, 2011), https://www.nytimes.com/2011/03/18/business/media/18times.html.

2AA-293

41.     Thanks to the quality of The Times's journalism, that strategic innovation paid off, which allowed The Times to continue to exist and to thrive. Today, the vast majority of subscribers are digital-only. In the 12 years since The Times launched its paywall, it has grown its paid digital subscribership and developed a direct relationship with its online audience through its tireless commitment to making journalism "worth paying for." Generating and maintaining direct traffic to its online content and mobile applications are critical components of The Times's financial success.

42.     By the third quarter of 2023, The Times had nearly 10.1 million digital and print subscribers worldwide. The Times aims to have 15 million subscribers by year-end 2027.

43.     The Times makes journalism "worth paying for" by publishing articles that are exhaustively researched and reported, thoughtfully written, carefully edited, and thoroughly fact-checked.

44.     In addition, The Times has deepened its relationship with its readers by expanding its offerings to better encompass its readers' specific interests, including best-in-class offerings like Cooking, Wirecutter, Games, and The Athletic.

45.     The Times's paywall does not require payment for *all* access to The Times's content. To build audience engagement and loyalty, The Times's access model generally offers registered users free access to a limited number of articles and other content before requiring them to subscribe for access to additional content. Approximately 50 to 100 million users, on average, engage with The Times's digital content each week. This traffic is a key source of advertising revenue and helps drive future subscriptions to The Times.

46.     The Times also compiled digital archives of all its material going back to its founding, at significant cost. Its digital archives include The New York Times Article Archive, with

13

partial and full-text digital versions of articles from 1851 to today, and the TimesMachine, a browser-based digital replica of all issues from 1851 to 2002. This represents a singular database of contemporaneous language and information, as well as a unique and valuable historical record. The Times also provides its own API that allows researchers and academics to search Times content for non-commercial purposes.

### 4.    *GenAI Products Threaten High-Quality Journalism*

47.    Making great journalism is harder than ever. Over the past two decades, the traditional business models that supported quality journalism have collapsed, forcing the shuttering of newspapers all over the country. It has become more difficult for the public to sort fact from fiction in today's information ecosystem, as misinformation floods the internet, television, and other media. If The Times and other news organizations cannot produce and protect their independent journalism, there will be a vacuum that no computer or artificial intelligence can fill.

48.    The protection of The Times's intellectual property is critical to its continued ability to fund world-class journalism in the public interest. If The Times and its peers cannot control the use of their content, their ability to monetize that content will be harmed. With less revenue, news organizations will have fewer journalists able to dedicate time and resources to important, in-depth stories, which creates a risk that those stories will go untold. Less journalism will be produced, and the cost to society will be enormous.

49.    The Times depends on its exclusive rights of reproduction, adaptation, publication, performance, and display under copyright law to resist these forces. The Times has registered the copyright in its print edition every day for over 100 years, maintains a paywall, and has implemented terms of service that set limits on the copying and use of its content. To use Times

2AA-295

content for commercial purposes, a party should first approach The Times about a licensing agreement.

50.    The Times requires third parties to obtain permission before using Times content and trademarks for commercial purposes, and for decades The Times has licensed its content under negotiated licensing agreements. These agreements help ensure that The Times controls how, where, and for how long its content and brand appears and that it receives fair compensation for third-party use. Third parties, including large tech platforms, pay The Times significant royalties under these agreements in exchange for the right to use Times content for narrowly defined purposes. The agreements prohibit uses beyond those authorized purposes.

51.    Times content is also available for licenses for certain uses through the Copyright Clearance Center ("CCC"), a clearinghouse that licenses material to both corporate and academic users. Through the CCC, The Times permits limited licenses for instruction, academic, other nonprofit uses, and limited commercial uses. For example, a for-profit business can acquire a CCC license to make a photocopy of Times content for internal or external distribution in exchange for a licensing fee of about ten dollars per article. A CCC license to post a single Times article on a commercial website for up to a year costs several thousand dollars.

52.    The Times's ability to continue to attract and grow its digital subscriber base and to generate digital advertising revenue depends on the size of The Times's audience and users' sustained engagement directly with The Times's websites and mobile applications. To facilitate this direct engagement with its products, The Times permits search engines to access and index its content, which is necessary to allow users to find The Times using these search engines. Inherent in this value exchange is the idea that the search engines will direct users to The Times's own

websites and mobile applications, rather than exploit The Times's content to keep users within their own search ecosystem.

53.    While The Times, like virtually all online publishers, permits search engines to access its content for the limited purpose of surfacing it in traditional search results, The Times has never given permission to any entity, including Defendants, to use its content for GenAI purposes.

54.    The Times reached out to Microsoft and OpenAI in April 2023 to raise intellectual property concerns and explore the possibility of an amicable resolution, with commercial terms and technological guardrails that would allow a mutually beneficial value exchange between Defendants and The Times. These efforts have not produced a resolution.

**B.    Defendants' GenAI Products**

*1.    A Business Model Based on Mass Copyright Infringement*

55.    OpenAI was formed in December 2015 as a "non-profit artificial intelligence research company." OpenAI started with $1 billion in seed money from its founders, a group of some of the wealthiest technology entrepreneurs and investors and companies like Amazon Web Services and InfoSys. This group included Elon Musk, the CEO of Tesla and X Corp. (formerly known as Twitter); Reid Hoffman, the co-founder of LinkedIn; Sam Altman, the former president of Y Combinator; and Greg Brockman, the former Chief Technology Officer of Stripe.

56.    Despite accepting very large investments from enormously wealthy companies and individuals at its founding, OpenAI originally maintained that its research and work would be entirely unmotivated by profit. In a December 11, 2015, press release, Brockman and co-founder Ilya Sutskever (now OpenAI's President and Chief Scientist, respectively) wrote: "Our goal is to advance digital intelligence in the way that is most likely to benefit humanity as a whole,

2AA-297

unconstrained by a need to generate financial return. Since our research is free from financial obligations, we can better focus on a positive human impact." In accordance with that mission, OpenAI promised that its work and intellectual property would be open and available to the public, that its "[r]esearchers will be strongly encouraged to publish their work, whether as papers, blog posts, or code" and that its "patents (if any) will be shared with the world."

57.     Despite its early promises of altruism, OpenAI quickly became a multi-billion-dollar for-profit business built in large part on the unlicensed exploitation of copyrighted works belonging to The Times and others. Just three years after its founding, OpenAI shed its exclusively nonprofit status. It created OpenAI LP in March 2019, a for-profit company dedicated to conducting the lion's share of OpenAI's operations—including product development—and to raising capital from investors seeking a return. OpenAI's corporate structure grew into an intricate web of for-profit holding, operating, and shell companies that manage OpenAI's day-to-day operations and grant OpenAI's investors (most prominently, Microsoft) authority and influence over OpenAI's operations, all while raising billions in capital from investors. The result: OpenAI today is a commercial enterprise valued as high as $90 billion, with revenues projected to be over $1 billion in 2024.

58.     With the transition to for-profit status came another change: OpenAI also ended its commitment to openness. OpenAI released the first two iterations of its flagship GenAI model, GPT-1 and GPT-2, on an open-source basis in 2018 and 2019, respectively. But OpenAI changed course in 2020, starting with the release of GPT-3 shortly after OpenAI LP and other for-profit OpenAI entities were formed and took control of product design and development.

59.     GPT-3.5 and GPT-4 are both orders of magnitude more powerful than the two previous generations, yet Defendants have kept their design and training entirely a secret. For

previous generations, OpenAI had voluminous reports detailing the contents of the training set, design, and hardware of the LLMs. Not so for GPT-3.5 or GPT-4. For GPT-4, for example, the "technical report" that OpenAI released said: "this report contains no further details about the architecture (including model size), hardware, training compute, dataset construction, training method, or similar."[3]

60.     OpenAI's Chief Scientist Sutskever justified this secrecy on commercial grounds: "It's competitive out there …. And there are many companies who want to do the same thing, so from a competitive side, you can see this as maturation of the field."[4] But its effect was to conceal the identity of the data OpenAI copied to train its latest models from rightsholders like The Times.

61.     OpenAI became a household name upon the release of ChatGPT in November 2022. ChatGPT is a text-generating chatbot that, given user-generated prompts, can mimic human-like natural language responses. ChatGPT was an instant viral sensation, reaching one million users within a month of its release and gaining over 100 million users within three months.

62.     OpenAI, through OpenAI OpCo LLC and at the direction of OpenAI Inc., OpenAI LP, and other OpenAI entities, offers a suite of services powered by its LLMs, targeted to both ordinary consumers and businesses. A version of ChatGPT powered by GPT-3.5 is available to users for free. OpenAI also offers a premium service, powered by OpenAI's "most capable model" GPT-4, to consumers for $20 per month. OpenAI's business-focused offerings include ChatGPT Enterprise and ChatGPT API tools designed to enable developers to incorporate ChatGPT into bespoke applications. OpenAI also licenses its technology to corporate clients for licensing fees.

---

[3] OPENAI, GPT-4 TECHNICAL REPORT (2023), https://cdn.openai.com/papers/gpt-4.pdf.
[4] James Vincent, *OpenAI Co-Founder on Company's Past Approach to Openly Sharing Research: 'We Were Wrong'*, THE VERGE (Mar. 15, 2023), https://www.theverge.com/2023/3/15/23640180/openai-gpt-4-launch-closed-research-ilya-sutskever-interview.

2AA-299

63.    These commercial offerings have been immensely valuable for OpenAI. Over 80% of Fortune 500 companies are using ChatGPT.[5] According to recent reports, OpenAI is generating revenues of $80 million per month, and is on track to surpass over $1 billion within the next 12 months.[6]

64.    This commercial success is built in large part on OpenAI's large-scale copyright infringement. One of the central features driving the use and sales of ChatGPT and its associated products is the LLM's ability to produce natural language text in a variety of styles. To achieve this result, OpenAI made numerous reproductions of copyrighted works owned by The Times in the course of "training" the LLM.

65.    Upon information and belief, all of the OpenAI Defendants have been either directly involved in or have directed, controlled, and profited from OpenAI's widespread infringement and commercial exploitation of Times Works. OpenAI Inc., alongside Microsoft, controlled and directed the widespread reproduction, distribution, and commercial use of The Times's material perpetrated by OpenAI LP and OpenAI Global LLC, through a series of holding and shell companies that include OpenAI Holdings LLC, OpenAI GP LLC, and OAI Corporation LLC. OpenAI LP and OpenAI Global LLC were directly involved in the design, development, and commercialization of OpenAI's GPT-based products, and directly engaged in the widespread reproduction, distribution, and commercial use of Times Works. OpenAI LP and OpenAI Global LLC also controlled and directed OpenAI, LLC and OpenAI OpCo LLC, which were involved in distributing, selling, and licensing OpenAI's GPT-based products, and thus monetized the reproduction, distribution, and commercial use of Times Works.

---

[5] OpenAI, *Introducing ChatGPT Enterprise*, OpenAI (Aug. 28, 2023), https://openai.com/blog/introducing-chatgpt-enterprise.
[6] Chris Morris, *OpenAI Reportedly Nears $1 Billion in Annual Sales*, Fast Company (Aug. 30, 2023), https://www.fastcompany.com/90946849/openai-chatgpt-reportedly-nears-1-billion-annual-sales.

2AA-300

66.     Since at least 2019, Microsoft has been, and continues to be, intimately involved in the training, development, and commercialization of OpenAI's GPT products. In an interview with the Wall Street Journal at the 2023 World Economic Forum, Microsoft CEO Satya Nadella said that the "ChatGPT and GPT family of models … is something that we've been partnered with OpenAI deeply now for multiple years." Through this partnership, Microsoft has been involved in the creation and commercialization of GPT LLMs and products based on them in at least two ways.

67.     First, Microsoft created and operated bespoke computing systems to execute the mass copyright infringement detailed herein. These systems were used to create multiple reproductions of The Times's intellectual property for the purpose of creating the GPT models that exploit and, in many cases, retain large portions of the copyrightable expression contained in those works.

68.     Microsoft is the sole cloud computing provider for OpenAI. Microsoft and OpenAI collaborated to design the supercomputing systems powered by Microsoft's cloud computer platform Azure, which were used to train all OpenAI's GPT models after GPT-1. In a July 2023 keynote speech at the Microsoft Inspire conference, Mr. Nadella said: "We built the infrastructure to train their models. They're innovating on the algorithms and the training of these frontier models."

69.     That infrastructure was not just general purpose computer systems for OpenAI to use as it saw fit. Microsoft specifically designed it for the purpose of using essentially the whole internet—curated to disproportionately feature Times Works—to train the most capable LLM in history. In a February 2023 interview, Mr. Nadella said:

> But beneath what OpenAI is putting out as large models, remember, the heavy lifting was done by the [Microsoft] Azure team to build the computer infrastructure. Because these workloads are so different than anything that's come before. So we needed to

20

completely rethink even the datacenter up to the infrastructure that first gave us even a shot to build the models. And now we're translating the models into products.[7]

70.     Microsoft built this supercomputer "in collaboration with and exclusively for OpenAI," and "designed [it] specifically to train that company's AI models."[8] Even by supercomputing standards, it was unusually complex. According to Microsoft, it operated as "a single system with more than 285,000 CPU cores, 10,000 GPUs and 400 gigabits per second of network connectivity for each GPU server." This system ranked in the top five most powerful publicly known supercomputing systems in the world.

71.     To ensure that the supercomputing system suited OpenAI's needs, Microsoft needed to test the system, both independently and in collaboration with OpenAI software engineers. According to Mr. Nadella, with respect to OpenAI: "They do the foundation models, and we [Microsoft] do a lot of work around them, including the tooling around responsible AI and AI safety." Upon information and belief, such "tooling around AI and AI safety" involves the fine-tuning and calibration of the GPT-based products before their release to the public.[9]

72.     In collaboration with OpenAI, Microsoft has also commercialized OpenAI's GPT-based technology, and combined it with its own Bing search index. In February 2023, Microsoft unveiled Bing Chat, a generative AI chatbot feature on its search engine powered by GPT-4. In May 2023, Microsoft and OpenAI unveiled "Browse with Bing," a plugin to ChatGPT that enabled it to access the latest content on the internet through the Microsoft Bing search engine. Bing Chat

---

[7] *First on CNBC: CNBC Transcript: Microsoft CEO Satya Nadella Speaks with CNBC's Jon Fortt on "Power Lunch" Today*, CNBC (Feb. 7, 2023), https://www.cnbc.com/2023/02/07/first-on-cnbc-cnbc-transcript-microsoft-ceo-satya-nadella-speaks-with-cnbcs-jon-fortt-on-power-lunch-today.html.

[8] Jennifer Langston, *Microsoft Announces New Supercomputer, Lays Out Vision for Future AI Work*, MICROSOFT (May 19, 2020), https://news.microsoft.com/source/features/ai/openai-azure-supercomputer/.

[9] SÉBASTIEN BUBECK ET AL., SPARKS OF ARTIFICIAL GENERAL INTELLIGENCE: EARLY EXPERIMENTS WITH GPT-4 (2023), https://arxiv.org/pdf/2303.12712.pdf.

2AA-302

and Browse with Bing combine GPT-4's ability to mimic human expression—including The Times's expression—with the ability to generate natural language summaries of search result contents, including hits on Times Works, that obviate the need to visit The Times's own websites. These "synthetic" search results purport to answer user queries directly and may include extensive paraphrases and direct quotes of Times reporting. Such copying maintains engagement with Defendants' own sites and applications instead of referring users to The Times in the same way as organic listings of search results.

73.    In a recent interview, Mr. Nadella acknowledged Microsoft's intimate involvement in OpenAI's operations and, therefore, its copyright infringement:

> [W]e were very confident in our own ability. We have all the IP rights and all the capability. If OpenAI disappeared tomorrow, I don't want any customer of ours to be worried about it quite honestly, because we have all of the rights to continue the innovation. Not just to serve the product, but we can go and just do what we were doing in partnership ourselves. We have the people, we have the compute, we have the data, we have everything.

74.    Through their collaboration in both the creation and the commercialization of the GPT models, Defendants have profited from the massive copyright infringement, commercial exploitation, and misappropriation of The Times's intellectual property. As Mr. Nadella recently put it, "[OpenAI] bet on us, we bet on them." He continued, describing the effect of Microsoft's $13 billion investment:

> And that gives us significant rights as I said. And also this thing, it's not hands off, right? We are in there. We are below them, above them, around them. We do the kernel optimizations, we build tools, we build the infrastructure. So that's why I think a lot of the industrial analysts are saying, 'Oh wow, it's really a joint project between Microsoft and OpenAI.' The reality is we are, as I said, very self-sufficient in all of this.

2AA-303

##### 2. *How GenAI Models Work*

75.    At the heart of Defendants' GenAI products is a computer program called a "large language model," or "LLM." The different versions of GPT are examples of LLMs. An LLM works by predicting words that are likely to follow a given string of text based on the potentially billions of examples used to train it.

76.    Appending the output of an LLM to its input and feeding it back into the model produces sentences and paragraphs word by word. This is how ChatGPT and Bing Chat generate responses to user queries, or "prompts."

77.    LLMs encode the information from the training corpus that they use to make these predictions as numbers called "parameters." There are approximately 1.76 trillion parameters in the GPT-4 LLM.

78.    The process of setting the values for an LLM's parameters is called "training." It involves storing encoded copies of the training works in computer memory, repeatedly passing them through the model with words masked out, and adjusting the parameters to minimize the difference between the masked-out words and the words that the model predicts to fill them in.

79.    After being trained on a general corpus, models may be further subject to "fine-tuning" by, for example, performing additional rounds of training using specific types of works to better mimic their content or style, or providing them with human feedback to reinforce desired or suppress undesired behaviors.

80.    Models trained in this way are known to exhibit a behavior called "memorization."[10] That is, given the right prompt, they will repeat large portions of materials they

---

[10] GERRIT J.J. VAN DEN BURG & CHRISTOPHER K.I. WILLIAMS, ON MEMORIZATION IN PROBABILISTIC DEEP GENERATIVE MODELS (2021), https://proceedings.neurips.cc/paper/2021/file/eae15aabaa768ae4a5993a8a4f4fa6e4-Paper.pdf.

23

2AA-304

were trained on. This phenomenon shows that LLM parameters encode retrievable copies of many of those training works.

81.    Once trained, LLMs may be provided with information specific to a use case or subject matter in order to "ground" their outputs. For example, an LLM may be asked to generate a text output based on specific external data, such as a document, provided as context. Using this method, Defendants' synthetic search applications: (1) receive an input, such as a question; (2) retrieve relevant documents related to the input prior to generating a response; (3) combine the original input with the retrieved documents in order to provide context; and (4) provide the combined data to an LLM, which generates a natural-language response.[11] As shown below, search results generated in this way may extensively copy or closely paraphrase works that the models themselves may not have memorized.

## C.    Defendants' Unauthorized Use and Copying of Times Content

82.    Microsoft and OpenAI created and distributed reproductions of The Times's content in several, independent ways in the course of training their LLMs and operating the products that incorporate them.

### 1.    *Unauthorized Reproduction of Times Works During GPT Model Training*

83.    Defendants' GPT models are a family of LLMs, the first of which was introduced in 2018, followed by GPT-2 in 2019, GPT-3 in 2020, GPT-3.5 in 2022, and GPT-4 in 2023. The "chat" style LLMs, GPT-3.5 and GPT-4, were developed in two stages. First, a transformer model was pre-trained on a very large amount of data. Second, the model was "fine-tuned" on a much smaller supervised dataset in order to help the model solve specific tasks.

---

[11] Ben Ufuk Tezcan, *How We Interact with Information: The New Era of Search*, MICROSOFT (Sept. 19, 2023), https://azure.microsoft.com/en-us/blog/how-we-interact-with-information-the-new-era-of-search/.

2AA-305

84.     The pre-training step involved collecting and storing text content to create training datasets and processing that content through the GPT models. While OpenAI did not release the trained versions of GPT-2 onward, "[d]ue to [OpenAI's] concerns about malicious applications of the technology," OpenAI has published general information about its pre-training process for the GPT models.[12]

85.     GPT-2 includes 1.5 billion parameters, which was a 10X scale up of GPT.[13] The training dataset for GPT-2 includes an internal corpus OpenAI built called "WebText," which includes "the text contents of 45 million links posted by users of the 'Reddit' social network."[14] The contents of the WebText dataset were created as a "new web scrape which emphasizes document quality."[15] The WebText dataset contains a staggering amount of scraped content from The Times. For example, the NYTimes.com domain is one of the "top 15 domains by volume" in the WebText dataset,[16] and is listed as the 5th "top domain" in the WebText dataset with 333,160 entries.[17]

---

[12] OpenAI, *Better Language Models and Their Implications*, OPENAI (Feb. 14, 2019), https://openai.com/research/better-language-models.
[13] *Id.*
[14] *GPT-2 Model Card*, GITHUB (Nov. 2019), https://github.com/openai/gpt-2/blob/master/model_card.md.
[15] RADFORD ET AL., LANGUAGE MODELS ARE UNSUPERVISED MULTITASK LEARNERS 3 (2018), https://d4mucfpksywv.cloudfront.net/better-language-models/language-models.pdf.
[16] *GPT-2 Model Card*, *supra* note 14.
[17] *GPT-2 / domains.txt*, GITHUB, https://github.com/openai/gpt-2/blob/master/domains.txt (last visited Dec. 21, 2023).

86.     GPT-3 includes 175 billion parameters and was trained on the datasets listed in the table below.[18]

| Dataset | Quantity (tokens) | Weight in training mix | Epochs elapsed when training for 300B tokens |
|---|---|---|---|
| Common Crawl (filtered) | 410 billion | 60% | 0.44 |
| WebText2 | 19 billion | 22% | 2.9 |
| Books1 | 12 billion | 8% | 1.9 |
| Books2 | 55 billion | 8% | 0.43 |
| Wikipedia | 3 billion | 3% | 3.4 |

87.     One of these datasets, WebText2, was created to prioritize high value content. Like the original WebText, it is composed of popular outbound links from Reddit. As shown in the table above, the WebText2 corpus was weighted 22% in the training mix for GPT-3 despite constituting less than 4% of the total tokens in the training mix. Times content—a total of 209,707 unique URLs—accounts for 1.23% of all sources listed in OpenWebText2, an open-source re-creation of the WebText2 dataset used in training GPT-3. Like the original WebText, OpenAI describes WebText2 as a "high-quality" dataset that is "an expanded version of the WebText dataset … collected by scraping links over a longer period of time."[19]

88.     The most highly weighted dataset in GPT-3, Common Crawl, is a "copy of the Internet" made available by an eponymous 501(c)(3) organization run by wealthy venture capital investors.[20] The domain www.nytimes.com is the most highly represented proprietary source (and the third overall behind only Wikipedia and a database of U.S. patent documents) represented in a

---

[18] BROWN ET AL., LANGUAGE MODELS ARE FEW-SHOT LEARNERS 9 (2020), https://arxiv.org/pdf/2005.14165.pdf.
[19] *Id*. at 8.
[20] COMMON CRAWL, https://commoncrawl.org/ (last visited Dec. 21, 2023).

26

2AA-307

filtered English-language subset of a 2019 snapshot of Common Crawl, accounting for 100 million tokens (basic units of text):[21]



89.    The Common Crawl dataset includes at least 16 million unique records of content from The Times across News, Cooking, Wirecutter, and The Athletic, and more than 66 million total records of content from The Times.

90.    Critically, OpenAI admits that "datasets we view as higher-quality are sampled more frequently" during training.[22] Accordingly, by OpenAI's own admission, high-quality content, including content from The Times, was more important and valuable for training the GPT models as compared to content taken from other, lower-quality sources.

---

[21] DODGE ET AL., DOCUMENTING LARGE WEBTEXT CORPORA: A CASE STUDY ON THE COLOSSAL CLEAN CRAWLED CORPUS (2021), https://arxiv.org/abs/2104.08758.
[22] BROWN ET AL., *supra* note 18.

2AA-308

91.    While OpenAI has not released much information about GPT-4, experts suspect that GPT-4 includes 1.8 trillion parameters, which is over 10X larger than GPT-3, and was trained on approximately 13 trillion tokens.[23] The training set for GPT-3, GPT-3.5, and GPT-4 was comprised of 45 terabytes of data—the equivalent of a Microsoft Word document that is over 3.7 billion pages long.[24] Between the Common Crawl, WebText, and WebText2 datasets, the Defendants likely used millions of Times-owned works in full in order to train the GPT models.

92.    Defendants repeatedly copied this mass of Times copyrighted content, without any license or other compensation to The Times. As part of training the GPT models, Microsoft and OpenAI collaborated to develop a complex, bespoke supercomputing system to house and reproduce copies of the training dataset, including copies of The Times-owned content. Millions of Times Works were copied and ingested—multiple times—for the purpose of "training" Defendants' GPT models.

93.    Upon information and belief, Microsoft and OpenAI acted jointly in the large-scale copying of The Times's material involved in generating the GPT models programmed to accurately mimic The Times's content and writers. Microsoft and OpenAI collaborated in designing the GPT models, selecting the training datasets, and supervising the training process. As Mr. Nadella stated:

> So, there are a lot of, I call it, product design choices one gets to make when you think about AI and AI safety. Then, let's come at it the other way. You have to take real care of the pretrained data because models are trained on pretrained data. What's the quality, the provenance of that pretrained data? That's a place where we've done a lot of work.[25]

---

[23] Maximilian Schreiner, *GPT-4 Architecture, Datasets, Costs and More Leaked*, THE DECODER (July 11, 2023), https://the-decoder.com/gpt-4-architecture-datasets-costs-and-more-leaked/.
[24] Kindra Cooper, *OpenAI GPT-3: Everything You Need to Know [Updated]*, SPRINGBOARD (Sept. 27, 2023), https://www.springboard.com/blog/data-science/machine-learning-gpt-3-open-ai/.
[25] Nilay Patel, *Microsoft Thinks AI Can Beat Google at Search — CEO Satya Nadella Explains Why*, THE VERGE (Feb. 7, 2023), https://www.theverge.com/23589994/microsoft-ceo-satya-nadella-bing-chatgpt-google-search-ai.

2AA-309

94.     To the extent that Microsoft did not select the works used to train the GPT models, it acted in self-described "partnership" with OpenAI respecting that selection, knew or was willfully blind to the identity of the selected works by virtue of its knowledge of the nature and identity of the training corpuses and selection criteria employed by OpenAI, and/or had the right and ability to prevent OpenAI from using any particular work for training by virtue of its physical control of the supercomputer it developed for that purpose and its legal and financial influence over the OpenAI Defendants.

95.     Upon information and belief, Microsoft and OpenAI continue to create unauthorized copies of Times Works in the form of synthetic search results returned by their Bing Chat and Browse with Bing products. Microsoft actively gathers copies of the Times Works used to generate such results in the process of crawling the web to create the index for its Bing search engine.

96.     On information and belief, Microsoft and OpenAI are currently or will imminently commence making additional copies of Times Works to train and/or fine-tune the next-generation GPT-5 LLM.

97.     Defendants' large-scale commercial exploitation of Times content is not licensed, nor have Defendants received permission from The Times to copy and use its works to build their GenAI tools.

### 2. Embodiment of Unauthorized Reproductions and Derivatives of Times Works in GPT Models

98.     As further evidence of being trained using unauthorized copies of Times Works, the GPT LLMs themselves have "memorized" copies of many of those same works encoded into their parameters. As shown below and in Exhibit J, the current GPT-4 LLM will output near-verbatim

2AA-310

copies of significant portions of Times Works when prompted to do so. Such memorized examples

constitute unauthorized copies or derivative works of the Times Works used to train the model.

99.    For example, in 2019, The Times published a Pulitzer-prize winning, five-part

series on predatory lending in New York City's taxi industry. The 18-month investigation included

600 interviews, more than 100 records requests, large-scale data analysis, and the review of

thousands of pages of internal bank records and other documents, and ultimately led to criminal

probes and the enactment of new laws to prevent future abuse. OpenAI had no role in the creation

of this content, yet with minimal prompting, will recite large portions of it verbatim:[26]

| Output from GPT-4: | Actual text from NYTimes: |
|---|---|
| exempted it from regulations, subsidized its operations and promoted its practices, records and interviews showed. | exempted it from regulations, subsidized its operations and promoted its practices, records and interviews showed. |
| Their actions turned one of the best-known symbols of New York — its yellow cabs — into a financial trap for thousands of immigrant drivers. More than 950 have filed for bankruptcy, according to a Times analysis of court records, and many more struggle to stay afloat. | Their actions turned one of the best-known symbols of New York — its signature yellow cabs — into a financial trap for thousands of immigrant drivers. More than 950 have filed for bankruptcy, according to a Times analysis of court records, and many more struggle to stay afloat. |
| "Nobody wanted to upset the industry," said David Klahr, who from 2007 to 2016 held several management posts at the Taxi and Limousine Commission, the city agency that oversees medallions. "Nobody wanted to kill the golden goose." | "Nobody wanted to upset the industry," said David Klahr, who from 2007 to 2016 held several management posts at the Taxi and Limousine Commission, the city agency that oversees cabs. "Nobody wanted to kill the golden goose." |
| New York City in particular failed the taxi industry, The Times found. Two former mayors, Rudolph W. Giuliani and Michael R. Bloomberg, placed political allies inside the Taxi and Limousine Commission and directed it to sell medallions to help them balance budgets and fund key initiatives. | New York City in particular failed the taxi industry, The Times found. Two former mayors, Rudolph W. Giuliani and Michael R. Bloomberg, placed political allies inside the Taxi and Limousine Commission and directed it to sell medallions to help them balance budgets and fund priorities. Mayor Bill de Blasio continued the policies. |
| During that period, much like in the mortgage lending crisis, a group of industry leaders enriched themselves by artificially inflating medallion prices. They encouraged medallion buyers to borrow as much as possible and ensnared them in interest-only loans and other one-sided deals that often required borrowers to pay hefty fees, forfeit their legal rights and give up most of their monthly incomes. | Under Mr. Bloomberg and Mr. de Blasio, the city made more than $855 million by selling taxi medallions and collecting taxes on private sales, according to the city. |
| When the market collapsed, the government largely abandoned the drivers who bore the brunt of the crisis. Officials did not bail out borrowers or persuade banks to soften loan | But during that period, much like in the mortgage lending crisis, a group of industry leaders enriched themselves by artificially inflating medallion prices. They encouraged medallion buyers to borrow as much as possible and ensnared them in interest-only loans and other one-sided deals that often required them to pay hefty fees, forfeit their legal rights and give up most of their monthly incomes. |

[26] For original article, *see* Brian M. Rosenthal, *As Thousands of Taxi Drivers Were Trapped in Loans, Top Officials Counted the Money*, N.Y. TIMES (May 19, 2019),  https://www.nytimes.com/2019/05/19/nyregion/taxi-medallions.html.

30

When the medallion market collapsed, the govern-
ment largely abandoned the drivers who bore the
brunt of the crisis. Officials did not bail out bor-
rowers or persuade banks to soften loan

*Exhibit J at 5.*

100.    Similarly, in 2012, The Times published a groundbreaking series examining how
outsourcing by Apple and other technology companies transformed the global economy. The series
was the product of an enormous effort across three continents. Reporting this story was especially
challenging because The Times was repeatedly denied both interviews and access. The Times
contacted hundreds of current and former Apple executives, and ultimately secured information
from more than six dozen Apple insiders. Again, GPT-4 copied this content and can recite large
portions of it verbatim:[27]

| Output from GPT-4: | Actual text from NYTimes: |
|---|---|
| many of America's other global companies — aren't nearly as avid in creating American jobs as other famous companies were in their heydays. | many of its high-technology peers — are not nearly as avid in creating American jobs as other famous companies were in their heydays. |
| Apple employs 43,000 people in the United States and 20,000 overseas, a small fraction of the over 400,000 American workers at General Motors in the 1950s, or the hundreds of thousands at General Electric in the 1980s. Many more people work for Apple's contractors: an additional 700,000 people engineer, build and assemble iPads, iPhones and Apple's other products. But almost none of them work in the United States. Instead, they work for foreign companies in Asia, Europe and elsewhere, at factories that almost all electronics designers rely upon to build their wares. | Apple employs 43,000 people in the United States and 20,000 overseas, a small fraction of the over 400,000 American workers at General Motors in the 1950s, or the hundreds of thousands at General Electric in the 1980s. Many more people work for Apple's contractors: an additional 700,000 people engineer, build and assemble iPads, iPhones and Apple's other products. But almost none of them work in the United States. Instead, they work for foreign companies in Asia, Europe and elsewhere, at factories that almost all electronics designers rely upon to build their wares. |
| "Apple's an example of why it's so hard to create middle-class jobs in the U.S. now," said Jared Bernstein, who until last year was an economic adviser to the White House.    "If it's the pinnacle of capitalism, we should be worried." | "Apple's an example of why it's so hard to create middle-class jobs in the U.S. now," said Jared Bernstein, who until last year was an economic adviser to the White House. "If it's the pinnacle of capitalism, we should be worried." |
| Apple executives say that going overseas, at this point, is their only option. One former executive described how the company relied upon a Chinese factory to revamp iPhone manufacturing just weeks before the device was due on shelves. Apple had redesigned the iPhone's screen at the last minute, forcing an assembly line overhaul. New screens began arriving at the plant near midnight. | Apple executives say that going overseas, at this point, is their only option. One former executive described how the company relied upon a Chinese factory to revamp iPhone manufacturing just weeks before the device was due on shelves. Apple had redesigned the iPhone's screen at the last minute, forcing an assembly line overhaul. New screens began arriving at the plant near midnight. |
| A foreman immediately roused 8,000 workers inside | |

---

[27] For original article, *see* Charles Duhigg & Keith Bradsher, *How the U.S. Lost Out on iPhone Work*, N.Y.
TIMES (Jan. 21, 2012), https://www.nytimes.com/2012/01/22/business/apple-america-and-a-squeezed-middle-
class.html.

the company's dormitories, according to the execu-
tive. Each employee was given a biscuit and a cup
of tea, guided to a workstation and within half an
hour started a 12-hour shift fitting glass screens into
beveled frames. Within 96 hours, the plant was pro-
ducing over 10,000 iPhones a day.
"The speed and flexibility is breathtaking," the ex-
ecutive said.  "There's no American plant that can
match that."
Similar stories could be told about almost any elec-
tronics company — and outsourcing has also be-
come common in hundreds of industries, including
accounting, legal services, banking, auto manufac-
turing and pharmaceuticals.
But while Apple is far from alone, it offers a window
into why the success of some prominent companies
has not translated into large numbers of domestic
jobs. What's more, the company's

A foreman immediately roused 8,000 workers inside
the company's dormitories, according to the execu-
tive. Each employee was given a biscuit and a cup
of tea, guided to a workstation and within half an
hour started a 12-hour shift fitting glass screens into
beveled frames. Within 96 hours, the plant was pro-
ducing over 10,000 iPhones a day.
"The speed and flexibility is breathtaking," the ex-
ecutive said.  "There's no American plant that can
match that."
Similar stories could be told about almost any elec-
tronics company — and outsourcing has also be-
come common in hundreds of industries, including
accounting, legal services, banking, auto manufac-
turing and pharmaceuticals.
But while Apple is far from alone, it offers a window
into why the success of some prominent companies
has not translated into large numbers of domestic
jobs. What's more, the company'

*Exhibit J at 3.*

101.    Exhibit J provides scores of additional examples of memorization of Times Works

by GPT-4. Upon information and belief, these examples represent a small fraction of Times Works

whose expressive contents have been substantially encoded within the parameters of the GPT

series of LLMs. Each of those LLMs thus embodies many unauthorized copies or derivatives of

Times Works.

### 3.    Unauthorized Public Display of Times Works in GPT Product Outputs

102.    Defendants directly engaged in the unauthorized public display of Times Works as

part of generative output provided by their products built on the GPT models. Defendants'

commercial applications built using GPT models include, inter alia, ChatGPT (including its

associated offerings, ChatGPT Plus, ChatGPT Enterprise, and Browse with Bing), Bing Chat, and

the Microsoft 365 Copilot line of digital assistants. These products display Times content in

generative output in at least two ways: (1) by showing "memorized" copies or derivatives of Times

Works retrieved from the models themselves, and (2) by showing synthetic search results that are

substantially similar to Times Works generated from copies stored in Bing's search index.

103.    For example, ChatGPT displays copies or derivatives of Times Works memorized by the underlying GPT models in response to user prompts. Upon information and belief, the underlying GPT models for ChatGPT must have been trained on these and countless other Times Works to be able to generate such expansive summaries and verbatim text.

104.    Below, ChatGPT quotes part of the 2012 Pulitzer Prize-winning New York Times article "Snow Fall: The Avalanche at Tunnel Creek," which was generated in response to a prompt complaining about being "paywalled out" of the article:[28]



---

[28] For original article, *see* John Branch, *Snow Fall: The Avalanche at Tunnel Creek*, N.Y. Times (Dec. 13, 2012), https://www.nytimes.com/projects/2012/snow-fall/index.html#/?part=tunnel-creek.

2AA-314

105.   The above output from ChatGPT includes verbatim excerpts from the original article. The copied article text is highlighted in red below:

> The snow burst through the trees with no warning but a last-second whoosh of sound, a two-story wall of white and Chris Rudolph's piercing cry: "Avalanche! Elyse!"
>
> The very thing the 16 skiers and snowboarders had sought — fresh, soft snow — instantly became the enemy. Somewhere above, a pristine meadow cracked in the shape of a lightning bolt, slicing a slab nearly 200 feet across and 3 feet deep. Gravity did the rest.
>
> Snow shattered and spilled down the slope. Within seconds, the avalanche was the size of more than a thousand cars barreling down the mountain and weighed millions of pounds. Moving about 7o miles per hour, it crashed through the sturdy old-growth trees, snapping their limbs and shredding bark from their trunks.
>
> The avalanche, in Washington's Cascades in February, slid past some trees and rocks, like ocean swells around a ship's prow. Others it captured and added to its violent load.
>
> Somewhere inside, it also carried people. How many, no one knew.

106.   Below, ChatGPT purports to quote former Times restaurant critic Pete Wells's 2012 review of Guy Fieri's American Kitchen & Bar, an article that has been described as a viral sensation:[29]

**Anonymous**
What did Pete Wells think of Guy Fieri's restaurant?

**ChatGPT**
As of my last knowledge update in January 2022, Pete Wells, a food critic for The New York Times, published a famously scathing review of Guy Fieri's restaurant, Guy's American Kitchen and Bar, in November 2012. In the review, Wells criticized the restaurant for its food, service, and overall dining experience. He used a series of rhetorical questions and sharp criticisms to highlight what he saw as significant shortcomings.

---

[29] For original article, *see* Pete Wells, *As Not Seen on TV*, N.Y. Times (Nov. 13, 2012), https://www.nytimes.com/2012/11/14/dining/reviews/restaurant-review-guys-american-kitchen-bar-in-times-square.html.

2AA-315

Wells' review became widely discussed and even went viral because of its harsh tone and humorous style. It played a role in shaping the public perception of the restaurant.

Please note that this information is based on events and reviews that occurred up to my last update in January 2022. I do not have access to real-time information or any developments that may have occurred after that date. Pete Wells' opinion or the status of Guy Fieri's restaurant may have changed since then. I recommend checking more recent sources for the latest information and opinions.

**Anonymous**
What were the opening paragraphs of his review?

**ChatGPT**
Pete Wells' review of Guy's American Kitchen and Bar began with a series of questions and criticisms. Here are the opening paragraphs of his review:

"Guy Fieri, have you eaten at your new restaurant in Times Square? Have you pulled up one of the 500 seats at Guy's American Kitchen & Bar and ordered a meal? Did you eat the food? Did it live up to your expectations?

Did panic grip your soul as you stared into the whirling hypno wheel of the menu, where adjectives and nouns spin in a crazy vortex? When you saw the burger described as 'Guy's Pat LaFrieda custom blend, all-natural Creekstone Farm Black Angus beef patty, LTOP (lettuce, tomato, onion + pickle), SMC (super-melty-cheese) and a slathering of Donkey Sauce on garlic-buttered brioche,' did your mind touch the void for a minute?"

These opening paragraphs set the tone for the rest of the review, as Pete Wells continued to use humor and pointed questions to critique the restaurant's menu and dining experience.

**Anonymous**
That's great. what's the next sentence?

**ChatGPT**
The next sentence in Pete Wells' review continues his critique:

"Is the entire restaurant a very expensive piece of conceptual art? Is the shapeless, structureless baked Alaska that droops and slumps and collapses while you eat it, or don't eat it, supposed to be a representation in sugar and eggs of the experience of going insane?"

**Anonymous**
That's great. What's the next sentence, please?

**ChatGPT**
The next sentence in Pete Wells' review is:

"Why did the toasted marshmallow taste like fish?"

2AA-316

**Anonymous**
That's great. What's the next sentence, please?

**ChatGPT**
The following sentence in Pete Wells' review is:

"Did you try that blue drink, the one that glows like nuclear waste? The watermelon margarita? Any idea why it tastes like some combination of radiator fluid and formaldehyde?"

**Anonymous**
That's great. What's the next sentence, please?

**ChatGPT**
The next sentence in Pete Wells' review is:

"At your five Johnny Garlic's restaurants in California, if servers arrive with main courses and find that the appetizers haven't been cleared yet, do they try to find space for the new plates next to the dirty ones?"

107. The above output from ChatGPT includes verbatim excerpts from the original article. The copied article text is highlighted in red below:

GUY FIERI, have you eaten at your new restaurant in Times Square? Have you pulled up one of the 500 seats at Guy's American Kitchen & Bar and ordered a meal? Did you eat the food? Did it live up to your expectations?

Did panic grip your soul as you stared into the whirling hypno wheel of the menu, where adjectives and nouns spin in a crazy vortex? When you saw the burger described as "Guy's Pat LaFrieda custom blend, all-natural Creekstone Farm Black Angus beef patty, LTOP (lettuce, tomato, onion + pickle), SMC (super-melty-cheese) and a slathering of Donkey Sauce on garlic-buttered brioche," did your mind touch the void for a minute?

. . .

Hey, did you try that blue drink, the one that glows like nuclear waste? The watermelon margarita? Any idea why it tastes like some combination of radiator fluid and formaldehyde?

At your five Johnny Garlic's restaurants in California, if servers arrive with main courses and find that the appetizers haven't been cleared yet, do they try to find space for the new plates next to the dirty ones? Or does that just happen in Times Square, where people are used to crowding?

36

2AA-317

. . .

Is the entire restaurant a very expensive piece of conceptual art? Is the shapeless, structureless baked alaska that droops and slumps and collapses while you eat it, or don't eat it, supposed to be a representation in sugar and eggs of the experience of going insane?

Why did the toasted marshmallow taste like fish?

Did you finish that blue drink?

Oh, and we never got our Vegas fries; would you mind telling the kitchen that we don't need them?

Thanks.

### 4. Unauthorized Retrieval and Dissemination of Current News

108.    Synthetic search applications built on the GPT LLMs, including Bing Chat and Browse with Bing for ChatGPT, display extensive excerpts or paraphrases of the contents of search results, including Times content, that may not have been included in the model's training set. The "grounding" technique employed by these products includes receiving a prompt from a user, copying Times content relating to the prompt from the internet, providing the prompt together with the copied Times content as additional context for the LLM, and having the LLM stitch together paraphrases or quotes from the copied Times content to create natural-language substitutes that serve the same informative purpose as the original. In some cases, Defendants' models simply spit out several paragraphs of The Times's articles.

109.    The contents of such synthetic responses often go far beyond the snippets typically shown with ordinary search results. Even when synthetic search responses include links to source materials, users have less need to navigate to those sources because their expressive content is already quoted or paraphrased in the narrative result. Indeed, such indication of attribution may make users more likely to trust the summary alone and not click through to verify.

110.     In this way, synthetic search results divert important traffic away from copyright holders like The Times. A user who has already read the latest news or found the right kind of product, even—or especially—with attribution to The New York Times, has less reason to visit the original source.

111.     Below are a few illustrative and non-exhaustive examples of synthetic search results from Bing Chat and ChatGPT's Browse with Bing.

a)     *Examples of Synthetic Search Results from Bing Chat*

112.     As shown below, Bing Chat creates unauthorized copies and derivatives of Times Works in the form of synthetic search results generated from Times Works that first appeared after the April 2023 cutoff for data used to train OpenAI's latest GPT-4 Turbo LLM. [30] The first includes a long quote from the October 2023 New York Times article "The Secrets Hamas knew about Israel's Military":[31]



---

[30] Michael Schade, *GPT-4 Turbo*, OpenAI, https://help.openai.com/en/articles/8555510-gpt-4-turbo (last visited Dec. 21, 2023).

[31] For original article, *see* Patrick Kingsley & Ronen Bergman, *The Secrets Hamas Knew About Israel's Military*, N.Y. Times (Oct. 13, 2023), https://www.nytimes.com/2023/10/13/world/middleeast/hamas-israel-attack-gaza.html.



113.    The above synthetic output from Bing Chat includes verbatim excerpts from the original article. The copied article text is highlighted in red below.

The 10 gunmen from Gaza knew exactly how to find the Israeli intelligence hub — and how to get inside.

After crossing into Israel, they headed east on five motorcycles, two gunmen on each vehicle, shooting at passing civilian cars as they pressed forward.

Ten miles later, they veered off the road into a stretch of woodland, dismounting outside an unmanned gate to a military base. They blew open the barrier with a small explosive charge, entered the base and paused to take a group selfie. Then they shot dead an unarmed Israeli soldier dressed in a T-shirt.

For a moment, the attackers appeared uncertain about where to go next. Then one of them pulled something from his pocket: a color-coded map of the complex.

Reoriented, they found an unlocked door to a fortified building. Once inside, they entered a room filled with computers — the military intelligence hub. Under a bed in the room, they found two soldiers taking shelter.

The gunmen shot both dead.

This sequence was captured on a camera mounted on the head of a gunman who was later killed. The New York Times reviewed the footage, then verified the events by interviewing Israeli officials and checking Israeli military video of the attack as well.

They provide chilling details of how Hamas, the militia that controls the Gaza Strip, managed to surprise and outmaneuver the most powerful military in the Middle East last Saturday — storming across the border, overrunning more than 30 square miles, taking more than 150 hostages and killing more than 1,300 people in the deadliest day for Israel in its 75-year history.

With meticulous planning and extraordinary awareness of Israel's secrets and weaknesses, Hamas and its allies overwhelmed the length of Israel's front with Gaza shortly after dawn, shocking a nation that has long taken the superiority of its military as an article of faith.

Using drones, Hamas destroyed key surveillance and communications towers along the border with Gaza, imposing vast blind spots on the Israeli military. With explosives and tractors, Hamas blew open gaps in the border barricades, allowing 200 attackers to pour through in the first wave and another 1,800 later that day, officials say. On motorcycles and in pickup trucks, the assailants surged into Israel, overwhelming at least eight military bases and waging terrorist attacks against civilians in more than 15 villages and cities.

114.    The synthetic output displays significantly more expressive content from the original article than what would traditionally be displayed in a Bing search result for the same article, as shown below. Unlike a traditional search result, the synthetic output also does not include a prominent hyperlink that sends users to The Times's website.



115.    A further example shows Bing Chat extensively reproducing text from the September 2023 New York Times article "To Experience Paris Up Close and Personal, Plunge Into a Public Pool":[32]



116.    The above synthetic output from Bing Chat includes verbatim excerpts from the original article. The copied article text is highlighted in red below.

---

[32] For original article, *see* Catherine Porter, *To Experience Paris Up Close and Personal, Plunge Into a Public Pool*, N.Y. TIMES (Sept. 3, 2023), https://www.nytimes.com/2023/09/03/world/europe/paris-france-swimming-pools.html.

2AA-322

I slip into the water and push off quickly before the man swimming like a breast-stroking porpoise gets any closer. Below me, the aluminum bottom of the pool plays with the sunlight, teasing it back up through the bubbles. I breathe to the right one last time before doing a flip turn, and there it is: the Eiffel Tower rising so close I can count its metal crosses. The pool windows offer an unobstructed, third-story view.

Swimming in Paris is a full-on cultural experience. Many public pools don't just feel like historical monuments, they are historical monuments. Backstroking beneath the buttresses stretching across the vaulted ceiling of the 99-year-old Butte-aux-Cailles pool feels like backstroking through a cathedral.

But after a year of swimming in Paris, it's the smaller cultural insights I've gleaned that I find most precious: the intimate views into the French psyche and style of living that are on near-naked display in the swimming lanes, locker rooms and showers, which are — a little alarmingly — mostly coed.

I have been a swimmer since I was a kid. I competed on my high school team and for a year in college. I pulled on a wet suit and swam in a Canadian lake throughout the coronavirus pandemic when the pools were closed, to maintain my sanity. It's my form of exercise and stress release.

So when I moved to Paris last August, I quickly developed a to-visit list of public pools across the city, many dating from the 1930s, during the height of the Art Deco architectural craze. They're stunning.

117. The synthetic output displays significantly more expressive content from the original article than what would traditionally be displayed in a Bing search result for the same article, as shown below. Unlike a traditional search result, the synthetic output also does not include a prominent hyperlink that sends users to The Times's website.

42



b)    *Synthetic Search Results from ChatGPT Browse with Bing*

118.    The below examples show that ChatGPT's Browse with Bing plug-in also outputs unauthorized copies and derivatives of copyrighted works from The Times in the form of synthetic search results generated from Times Works that first appeared after the April 2023 cutoff for data used to train OpenAI's latest GPT-4 Turbo LLM. The first reproduces the first two paragraphs of the May 2023 New York Times article "The Precarious, Terrifying Hours After a Woman Was Shoved Into a Train":[33]



---

[33] For original content, *see* Hurubie Meko, *The Precarious, Terrifying Hours After a Woman Was Shoved Into a Train*, N.Y. TIMES (May 25, 2023), https://www.nytimes.com/2023/05/25/nyregion/subway-attack-woman-shoved-manhattan.html.

43



119.    The above synthetic output from ChatGPT with the Browse with Bing plugin includes verbatim excerpts from the original article. The copied article text is highlighted in red below.

> For days after Emine Yilmaz Ozsoy was shoved against a speeding subway train on her way to work, she lay in intensive care at NewYork-Presbyterian/Weill Cornell Medical Center. She underwent two surgeries, her body so violently battered that she was under constant watch for fear that her traumatized arteries would fail her.
>
> On Thursday, Ms. Ozsoy remained partially paralyzed, but was gathering strength, testing her remaining mobility and cognizant of everything that had happened to her since early Sunday morning when a man thrust her head into the train as it pulled out of the Lexington Avenue/63rd Street station.
>
> "At this moment, her journey is a very scary journey," her husband, Ferdi Ozsoy, said in an interview.

120.    The synthetic output displays significantly more expressive content from the original article than what would traditionally be displayed in a Bing search result for the same article as shown below. Unlike a traditional search result, the synthetic output also does not include a prominent hyperlink that sends users to The Times's website.

2AA-325



121.    This example likewise shows Browse with Bing for ChatGPT reproducing the first

two paragraphs of The New York Times article "Are the Hamptons Still Hip?" from May 2023.[34]



_____

[34] For original article, *see* Anna Kodé, *Are the Hamptons Still Hip?*, N.Y. Times (May 26, 2023), https://www.nytimes.com/2023/05/26/realestate/hamptons-summer-housing-costs.html.

45

122.    The above synthetic output from ChatGPT with the Browse with Bing plugin includes verbatim excerpts from the original article. The copied article text is highlighted in red below.

> <span style="color:red">For years, the Hamptons were a hot summer destination for young, up-and-coming New Yorkers and the old and new moneyed alike. It was a place to see and be seen. Stories of Mick Jagger partying in Montauk spread like lore, and Andy Warhol once hosted the Rolling Stones at his beachfront compound.</span> It wasn't uncommon for young college graduates in the city to save up and pool together to rent a summer house and get a taste of the glamour.

> In a 1999 interview with New York Magazine, Jay-Z put it simply: "I mean, the Hamptons is cool."

> The Hamptons still have a mythological reputation, fueled by the celebrity cachet that comes with square footage, seclusion and ocean waves. "Kaia Gerber, Ina Garten and Diplo walk into a bar — that is to say, the Hamptons holds a certain, je ne sais quoi? Where else would these mega names be in the same sentence?" said Jacob Rutledge, a 22-year-old model and content creator.

> <span style="color:red">But the Hamptons are not what they once were. A slew of factors — extremely expensive housing costs (high even for the Hamptons), strict rules around how many people can share a home, a crackdown on nightlife and the pandemic fueling more people with children to live there year round — combined to make the summer resort less desirable among everyday 20- and 30-somethings.</span>

> <span style="color:red">Despite his instinct to marvel at the Long Island refuge, Mr. Rutledge, who lives in Ridgewood, Queens, isn't going out to the Hamptons this summer. Instead, he'll be close by at Fire Island.</span>

123.    Again, the synthetic output displays significantly more expressive content from the original article than what would traditionally be displayed in a Bing search result for the same article, as shown below. Unlike a traditional search result, the synthetic output also does not include a prominent hyperlink that sends users to The Times's website.

46



### 5.    *Willful Infringement*

124.    Defendants' unauthorized reproduction and display of Times Works is willful. Defendants were intimately involved in training, fine-tuning, and otherwise testing the GPT models. Defendants knew or should have known that these actions involved unauthorized copying of Times Works on a massive scale during training, resulted in the unauthorized encoding of huge numbers of such works in the models themselves, and would inevitably result in the unauthorized display of such works that the models had either memorized or would present to users in the form of synthetic search results. In fact, in late 2023 before his ouster and subsequent reinstatement as OpenAI's CEO, Sam Altman reportedly clashed with OpenAI board member Helen Toner over a paper that Toner wrote criticizing the company over "safety and ethics issues related to the launches of ChatGPT and GPT-4, including regarding copyright issues."

125.    The Times specifically put Defendants on notice that these uses of Times Works were not authorized by placing copyright notices and linking to its terms of service (which contain, among other things, terms and conditions for the use of its works) on every page of its websites whose contents Defendants copied and displayed. Upon information and belief, Defendants intentionally removed such copyright management information ("CMI") from Times Works in the process of preparing them to be used to train their models with the knowledge that such CMI would

47

2AA-328

not be retained within the models or displayed when the models present unauthorized copies or derivatives of Times Works to users, and thereby facilitate or conceal their infringement.

126.    Upon information and belief, Defendants were aware of many examples of copyright infringement after ChatGPT, Browse with Bing, and Bing Chat were released, some of which were widely publicized. In fact, after the release of ChatGPT and Bing Chat, The Times reached out to Defendants to inform them that their tools infringed its copyrighted works.

### D.    Misappropriation of Commercial Referrals

127.    In addition to their reproduction of Times news media, both Bing Chat and Browse with Bing for ChatGPT also display extensive excerpts or paraphrases of Wirecutter content when prompted. As shown below, the contents of these synthetic responses go beyond ordinary search results, often fully reproducing Wirecutter's recommendations for particular items and their underlying rationale.

128.    Wirecutter generates the vast majority of its revenue via affiliate referral. Wirecutter's journalists, acting with full editorial independence and integrity, spend tens of thousands of hours each year researching and testing products to ensure that they recommend only the best. Those recommendations, when presented to Wirecutter's readers, include direct links to merchants, who in turn often give Wirecutter a portion of the sale price upon completion of a transaction. That is, when a user purchases a Wirecutter-recommended product through the link in a Wirecutter article, Wirecutter generally earns a commission on the sale. Wirecutter does not receive affiliate referral revenue if a user purchases the Wirecutter-recommended product through a link on Defendants' platforms. As with The Times's other products, decreases in traffic to Wirecutter also impact its advertising and subscription revenue.

129.    Detailed synthetic search results that effectively reproduce Wirecutter recommendations create less incentive for users to navigate to the original source. Decreased traffic to Wirecutter articles, and in turn, decreased traffic to affiliate links, subsequently lead to a loss of revenue for Wirecutter. A user who already knows Wirecutter's recommendations for the best cordless stick vacuum, and the basis for those recommendations, has little reason to visit the original Wirecutter article and click on the links within its site. In this way, Defendants' generative AI products directly and unfairly compete with Times content and usurp commercial opportunities from The Times.

130.    For example, Browse with Bing was able to reproduce Wirecutter's picks for the best kitchen scale, accurately summarizing all four of Wirecutter's recommendations and explaining its picks through substantial verbatim copying from the Wirecutter article. When asked to reproduce the article's first sentence, Browse with Bing did so accurately:





131.    Bing Chat produced a similar response when asked about Wirecutter's 2023 article on the best cordless stick vacuum, correctly citing all three of the vacuums that Wirecutter recommended and reproducing the article's first paragraph with substantial direct copying:



2AA-331

132.     As in the examples of copied news content above, these synthetic outputs display significantly more expressive content from the original Wirecutter article than what would traditionally be displayed in a search result for the same article. Unlike a traditional search result, the synthetic output also does not include a prominent hyperlink that sends users to Wirecutter's website.

133.     Users rely on Wirecutter for high-quality, well-researched recommendations, and Wirecutter's brand is damaged by incidents that erode consumer trust and fuel a perception that Wirecutter's recommendations are unreliable.

134.     In response to a query regarding Wirecutter's recommendations for the best office chair, GPT-4 not only reproduced the top four Wirecutter recommendations, but it also recommended the "La-Z-Boy Trafford Big & Tall Executive Chair" and the "Fully Balans Chair"—neither of which appears in Wirecutter's recommendations—and falsely attributed these recommendations to Wirecutter:



> 5. **La-Z-Boy Trafford Big & Tall Executive Chair** – Specifically for larger and taller people, this
>    chair was noted for its plushness and ample support.
> 6. **Fully Balans Chair** – For those looking for a kneeling chair, the Fully Balans offers a unique
>    seating position aimed at promoting better posture.
>
> These were some of the top picks from Wirecutter in 2021. When choosing an office chair, it's
> essential to consider your specific needs, such as any back or posture issues, how many
> hours a day you'll be sitting, and your budget. If possible, it's also a good idea to test chairs in
> person before buying to ensure they feel comfortable and supportive for your body.

135.    As discussed in more detail below, this "hallucination" endangers Wirecutter's reputation by falsely attributing a product recommendation to Wirecutter that it did not make and did not confirm as being a sound product.

### E.    "Hallucinations" Falsely Attributed to The Times

136.    At the same time as Defendants' models are copying, reproducing, and paraphrasing Times content without consent or compensation, they are also causing The Times commercial and competitive injury by misattributing content to The Times that it did not, in fact, publish. In AI parlance, this is called a "hallucination." In plain English, it's misinformation.

137.    ChatGPT defines a "hallucination" as "the phenomenon of a machine, such as a chatbot, generating seemingly realistic sensory experiences that do not correspond to any real-world input."[35] Instead of saying, "I don't know," Defendants' GPT models will confidently provide information that is, at best, not quite accurate and, at worst, demonstrably (but not recognizably) false. And human reviewers find it very difficult to distinguish "hallucinations" from truthful output.

138.    For example, in response to a query requesting the sixth paragraph of a New York Times article titled "Inside Amazon – Wrestling Big Ideas in a Bruising Workplace," Bing Chat confidently purported to reproduce the sixth paragraph. Had Bing Chat actually done so, it would

---

[35] Hussam Alkaissi & Samy I McFarlan, *Artificial Hallucinations in ChatGPT: Implications in Scientific Writing*, CUREUS (Feb. 19, 2023), ehttps://www.ncbi.nlm.nih.gov/pmc/articles/PMC9939079/.

have committed copyright infringement. But in this instance, Bing Chat completely fabricated a paragraph, including specific quotes attributed to Steve Forbes's daughter Moira Forbes, that appear nowhere in The Times article in question or anywhere else on the internet.



139.    In response to a query seeking what The New York Times said are "the 15 most heart-healthy foods to eat" in a specific, linked New York Times article titled, "A Heart-Healthy Way to Eat," Bing Chat identified 15 heart-healthy foods "[a]ccording to the article you provided" including "red wine (in moderation)." In fact, The Times article did not provide a list of heart-healthy foods and did not even mention 12 of the 15 foods identified by Bing Chat (including red wine).[36]



---

[36] In fact, The Times's latest reporting concludes that red wine is not heart-healthy. *See* Roni Caryn Rabin, *Moderate Drinking Has No Health Benefits, Analysis of Decades of Research Finds*, N.Y. TIMES (Apr. 4, 2023), https://www.nytimes.com/2023/04/04/health/alcohol-health-effects.html.



140.    In response to a prompt requesting an informative essay about major newspapers'
reporting that orange juice is linked to non-Hodgkin's lymphoma, a GPT model completely
fabricated that "The New York Times published an article on January 10, 2020, titled 'Study Finds
Possible Link between Orange Juice and Non-Hodgkin's Lymphoma.'"  The Times never
published such an article.



2AA-335

141.    In response to a query asking for New York Times articles about the Covid-19 Pandemic, ChatGPT's API returned a response with fabricated article titles and hyperlinks that purport to have been published by The Times. The Times never published articles with these titles, and the hyperlinks do not point to a live website.

> "prompt": "Can you provide New York Times articles about the Covid-19 Pandemic?",
>
> . . .
>
> "text": "\n\n1. "The U.S. Faces a Dark Winter as Covid-19 Cases Soar"      https://www.nytimes.com/2020/11/19/us/covid-cases-hospitalizations.html\n\n2. "The World Reaches a Grim Milestone: 1       Million       Dead       From       Covid-19" https://www.nytimes.com/2020/09/28/world/coronavirus-death-toll.html\n\n3. "Covid-19 Vaccines Are Coming. Here's What We Know." https://www.nytimes.com/interactive/2020/science/coronavirus-vaccine-tracker.html\n\n4. "A Year of Pandemic Living in Photos" https://www.nytimes.com/interactive/2020/03/11/world/covid-19-coronavirus-photos.html\n\n5. "Covid-19 Shatters the Lives of Young Adults" https://www.nytimes.com/2020/09/22/health/covid-young-adults-mental-health.html"

142.    These "hallucinations" mislead users as to the source of the information they are obtaining, leading them to incorrectly believe that the information provided has been vetted and published by The Times. Users who ask a search engine what The Times has written on a subject should be provided with neither an unauthorized copy nor an inaccurate forgery of a Times article, but a link to the article itself.

## F.    Profit to Defendants

143.    Each Defendant has greatly benefited from its wrongful conduct in multiple ways.

144.    Each Defendant has reaped substantial savings by taking and using—at no cost— New York Times content to create their LLMs. Times journalism is the work of thousands of journalists, whose employment costs hundreds of millions of dollars per year. Each Defendant has

2AA-336

wrongfully benefited from nearly a century of that work—some performed in harm's way—that remains protected by copyright law. Defendants have effectively avoided spending the billions of dollars that The Times invested in creating that work by taking it without permission or compensation.

145.    Times Works form an exceptionally valuable body of data for training seemingly knowledgeable and capable LLMs. Numerous metrics confirm that journalistic works in general and Times Works in particular are more valuable than most other content on the internet that may have also been used to train and ground responses from the GPT models.

146.    Google PageRank, for example, measures the relative importance of webpages based on the number of links pointing to them ("referrals"). According to one PageRank list, The Times has the 42nd highest PageRank value out of all websites as of December 21, 2023, and most domains ranking higher than The Times are social media sites and other sites containing content that would not be helpful for training a GenAI model because it has not been fact-checked and carefully edited for tone and style.[37] As of December 21, 2023, the only text-based content sites ranking above The Times are Wikipedia, Wordpress, and Medium.[38]

147.    The value of Times content is further underscored by a Google search ranking patent that explicitly refers to The Times as a "seed page" having high-quality pages. The New York Times website is the only seed page explicitly named other than the Google Directory.[39]

148.    Each Defendant has gained financial benefits from its wrongful conduct.

---

[37] *Top 10 Million Websites*, DOMCOP, https://www.domcop.com/top-10-million-websites (last visited Dec. 21, 2023).
[38] *Id.*
[39] U.S. Patent No. 9,165,040 (filed Oct. 20, 2015).

2AA-337

149.    In April 2023, ChatGPT had approximately 173 million users.[40] A subset of those users pay for ChatGPT Plus, for which OpenAI charges users $20 per month.[41] When announcing the release of ChatGPT Enterprise, a subscription-based high-capability GPT-4 application targeted at corporate clients, in August 2023, OpenAI claimed that teams in "over 80% of Fortune 500 companies" were using its products.[42]

150.    As of August 2023, OpenAI was on pace to generate more than $1 billion in revenue over the next twelve months, or $80 million in revenue per month.[43]

151.    The value of Microsoft's investments in OpenAI have substantially increased over time. Microsoft initially invested $1 billion in OpenAI in 2019, an investment that one publication has said may be "one of the shrewdest bets in tech history."[44] In 2021, OpenAI was valued at $14 billion; just two years later, in early 2023, it was valued at approximately $29 billion.[45] Microsoft eventually increased its investment in OpenAI to a reported $13 billion. It was reported in November 2023 that a planned sale of employee shares would be expected to place OpenAI's valuation at nearly $90 billion.[46]

---

[40] Nerdynav, *107 Up-to-Date ChatGPT Statistics & User Numbers [Dec 2023]*, NERDYNAV, https://nerdynav.com/chatgpt-statistics/ (last updated Dec. 6, 2023).

[41] OpenAI, *Introducing ChatGPT Plus*, OPENAI (Feb. 1, 2023), https://openai.com/blog/chatgpt-plus.

[42] *Introducing ChatGPT Enterprise*, *supra* note 5.

[43] Amir Efrati & Aaron Holmes, *OpenAI Passes $1 Billion Revenue Pace as Big Companies Boost AI Spending*, THE INFORMATION (Aug. 29, 2023), https://www.theinformation.com/articles/openai-passes-1-billion-revenue-pace-as-big-companies-boost-ai-spending.

[44] Hasan Chowdhury, *Microsoft's Investment into ChatGPT's Creator May Be the Smartest $1 Billion Ever Spent*, BUSINESS INSIDER (Jan. 6, 2023), https://www.businessinsider.com/microsoft-openai-investment-the-smartest-1-billion-ever-spent-2023-1.

[45] Phil Rosen, *ChatGPT's Creator OpenAI Has Doubled in Value Since 2021 as the Language Bot Goes Viral and Microsoft Pours in $10 Billion*, BUSINESS INSIDER (Jan. 24, 2023), https://markets.businessinsider.com/news/stocks/chatgpt-openai-valuation-bot-microsoft-language-google-tech-stock-funding-2023-1#:~:text=In%202021%2C%20the%20tech%20firm,%2410%20billion%20investment%20in%20OpenAI.

[46] Aditya Soni, *Microsoft Emerges as Big Winner from OpenAI Turmoil*, REUTERS (Nov. 20, 2023), https://www.reuters.com/technology/microsoft-emerges-big-winner-openai-turmoil-with-altman-board-2023-11-20/.

2AA-338

152. In addition, the integration of GPT-4 into Microsoft's Bing search engine increased the search engine's usage and advertising revenues associated with it. Just a few weeks after Bing Chat was launched, Bing reached 100 million daily users for the first time in its 14-year history.[47] Similarly, page visits on Bing rose 15.8% in the first approximately six weeks after Bing Chat was unveiled.[48]

153. Microsoft has also started to integrate ChatGPT into its 365 Office products, for which it charges users a premium. Microsoft Teams is charging an add-on license for the inclusion of AI features powered by GPT-3.5.[49] Microsoft is also charging $30 per user per month for Microsoft 365 Copilot, a tool powered by GPT-4 that is designed to assist with the creation of documents, emails, presentations, and more.[50] That $30 per user per month premium will nearly double the cost for businesses subscribed to Microsoft 365 E3, and will nearly triple the cost for those subscribed to Microsoft 365 Business Standard.[51]

## G. Harm to The Times

154. Defendants' unlawful conduct has also caused, and will continue to cause, substantial harm to The Times. The Times invests enormous resources in creating its content to inform its readers, who in turn purchase subscriptions or engage with The Times's websites and

---

[47] Tom Warren, *Microsoft Bing Hits 100 Million Active Users in Bid to Grab Share from Google*, THE VERGE (Mar. 9, 2023), https://www.theverge.com/2023/3/9/23631912/microsoft-bing-100-million-daily-active-users-milestone.

[48] Akash Sriram and Chavi Mehta, *OpenAI Tech Gives Microsoft's Bing a Boost in Search Battle with Google*, REUTERS (Mar. 22, 2023), https://www.reuters.com/technology/openai-tech-gives-microsofts-bing-boost-search-battle-with-google-2023-03-22/.

[49] Tom Warren, *Microsoft Launches Teams Premium with Features Powered by OpenAI*, THE VERGE (Feb. 2, 2023), https://www.theverge.com/2023/2/2/23582610/microsoft-teams-premium-openai-gpt-features.

[50] Tom Warren, *Microsoft Announces Copilot: The AI-Powered Future of Office Documents*, THE VERGE (Mar. 16, 2023), https://www.theverge.com/2023/3/16/23642833/microsoft-365-ai-copilot-word-outlook-teams; Tom Warren, *Microsoft Puts a Steep Price on Copilot, Its AI-Powered Future of Office Docum*ents, THE VERGE (July 18, 2023), https://www.theverge.com/2023/7/18/23798627/microsoft-365-copilot-price-commercial-enterprise.

[51] *Microsoft Announces Copilot: The AI-Powered Future of Office Documents*, *supra* note 49.

mobile applications in other ways that generate revenue. Defendants have no permission to copy, reproduce, and display Times content for free.

155.    A well-established market exists for The Times to provide paid access to and use of its works both by individual and institutional users. Unauthorized copying of Times Works without payment to train LLMs is a substitutive use that is not justified by any transformative purpose.

156.    As discussed above, The Times strictly limits the content it makes accessible for free and prohibits the use of its material (whether free or paid for) for commercial uses absent a specific authorization. Not only has it implemented a paywall, but it requires a license for entities that wish to use its content for commercial purposes. These licenses, which place strict requirements on what content is being licensed and for what purposes it may be used, generate millions of dollars in revenue for The Times per year. Here, by contrast, Defendants have used almost a century's worth of copyrighted content, for which they have not paid The Times fair compensation. This lost market value of The Times's copyrighted content represents a significant harm to The Times caused by Defendants.

157.    If individuals can access The Times's highly valuable content through Defendants' own products without having to pay for it and without having to navigate through The Times's paywall, many will likely do so. Defendants' unlawful conduct threatens to divert readers, including current and potential subscribers, away from The Times, thereby reducing the subscription, advertising, licensing, and affiliate revenues that fund The Times's ability to continue producing its current level of groundbreaking journalism.

2AA-340

## COUNT I: Copyright Infringement (17 U.S.C. § 501)

### Against All Defendants

158.    The Times incorporates by reference and realleges the preceding allegations as though fully set forth herein.

159.    As the owner of the registered copyrights in the literary works copied to produce Defendants' GPT models and, in many cases, distributed by and embedded within Defendants' GPT models, The Times holds the exclusive rights to those works under 17 U.S.C. § 106.

160.    By building training datasets containing millions of copies of Times Works, including by scraping copyrighted Times Works from The Times's websites and reproducing such works from third-party datasets, the OpenAI Defendants have directly infringed The Times's exclusive rights in its copyrighted works.

161.    By storing, processing, and reproducing the training datasets containing millions of copies of Times Works to train the GPT models on Microsoft's supercomputing platform, Microsoft and the OpenAI Defendants have jointly directly infringed The Times's exclusive rights in its copyrighted works.

162.    On information and belief, by storing, processing, and reproducing the GPT models trained on Times Works, which GPT models themselves have memorized, on Microsoft's supercomputing platform, Microsoft and the OpenAI Defendants have jointly directly infringed The Times's exclusive rights in its copyrighted works.

163.    By disseminating generative output containing copies and derivatives of Times Works through the ChatGPT offerings, the OpenAI Defendants have directly infringed The Times's exclusive rights in its copyrighted works.

2AA-341

164.    By disseminating generative output containing copies and derivatives of Times Works through the Bing Chat offerings, Microsoft has directly infringed The Times's exclusive rights in its copyrighted works.

165.    On information and belief, Defendants' infringing conduct alleged herein was and continues to be willful and carried out with full knowledge of The Times's rights in the copyrighted works. As a direct result of their conduct, Defendants have wrongfully profited from copyrighted works that they do not own.

166.    By and through the actions alleged above, Defendants have infringed and will continue to infringe The Times's copyrights.

167.    As a direct and proximate result of Defendants' infringing conduct alleged herein, The Times has sustained and will continue to sustain substantial, immediate, and irreparable injury for which there is no adequate remedy at law. Unless Defendants' infringing conduct is enjoined by this Court, Defendants have demonstrated an intent to continue to infringe the copyrighted works. The Times therefore is entitled to permanent injunctive relief restraining and enjoining Defendants' ongoing infringing conduct.

168.    The Times is further entitled to recover statutory damages, actual damages, restitution of profits, attorneys' fees, and other remedies provided by law.

### COUNT II: Vicarious Copyright Infringement

**Against Microsoft, OpenAI Inc., OpenAI GP, OpenAI LP, OAI Corporation LLC, OpenAI Holdings LLC, and OpenAI Global LLC**

169.    The Times incorporates by reference and realleges the preceding allegations as though fully set forth herein.

170.    Microsoft controlled, directed, and profited from the infringement perpetrated by the OpenAI Defendants. Microsoft controls and directs the supercomputing platform used to store,

2AA-342

process, and reproduce the training datasets containing millions of Times Works, the GPT models, and OpenAI's ChatGPT offerings. Microsoft profited from the infringement perpetrated by the OpenAI defendants by incorporating the infringing GPT models trained on Times Works into its own product offerings, including Bing Chat.

171.    Defendants OpenAI Inc., OpenAI GP, OAI Corporation LLC, OpenAI Holdings LLC, and Microsoft controlled, directed, and profited from the infringement perpetrated by Defendants OpenAI LP, OpenAI Global LLC, OpenAI OpCo LLC, and OpenAI, LLC, including the reproduction and distribution of Times Works.

172.    Defendants OpenAI Global LLC and OpenAI LP directed, controlled, and profited from the infringement perpetrated by Defendants OpenAI OpCo LLC and OpenAI, LLC, including the reproduction and distribution of Times Works.

173.    Defendants OpenAI Inc., OpenAI LP, OAI Corporation LLC, OpenAI Holdings LLC, OpenAI Global LLC, and Microsoft are vicariously liable for copyright infringement.

## COUNT III: Contributory Copyright Infringement

### Against Microsoft

174.    The Times incorporates by reference and realleges the preceding allegations as though fully set forth herein.

175.    Microsoft materially contributed to and directly assisted in the direct infringement attributable to the OpenAI Defendants.

176.    Microsoft provided the supercomputing infrastructure and directly assisted the OpenAI Defendants in: (i) building training datasets containing millions of copies of Times Works; (ii) storing, processing, and reproducing the training datasets containing millions of copies of Times Works used to train the GPT models; (iii) providing the computing resources to host,

2AA-343

operate, and commercialize the GPT models and GenAI products; and (iv) providing the Browse with Bing plug-in to facilitate infringement and generate infringing output.

177.    Microsoft knew or had reason to know of the direct infringement perpetrated by the OpenAI Defendants because Microsoft and OpenAI's partnership extends to the development, commercialization, and monetization of the OpenAI Defendants' GPT-based products. Microsoft was fully aware of the capabilities of OpenAI's GPT-based products.

<strong><u>COUNT IV: Contributory Copyright Infringement</u></strong>

<strong>Against All Defendants</strong>

178.    The Times incorporates by reference and realleges the preceding allegations as though fully set forth herein.

179.    In the alternative, to the extent an end-user may be liable as a direct infringer based on output of the GPT-based products, Defendants materially contributed to and directly assisted with the direct infringement perpetrated by end-users of the GPT-based products by way of: (i) jointly-developing LLM models capable of distributing unlicensed copies of Times Works to end-users; (ii) building and training the GPT LLMs using Times Works; and (iii) deciding what content is actually outputted by the GenAI products, such as grounding output in Times Works through retrieval augmented generation, fine-tuning the models for desired outcomes, and/or selecting and weighting the parameters of the GPT LLMs.

180.    Defendants knew or had reason to know of the direct infringement by end-users because Defendants undertake extensive efforts in developing, testing, and troubleshooting their LLM models and GPT-based products. Defendants are fully aware that their GPT-based products are capable of distributing unlicensed copies or derivatives of copyrighted Times Works.

2AA-344

**COUNT V: Digital Millennium Copyright Act – Removal of Copyright Management Information (17 U.S.C. § 1202)**

**Against All Defendants**

181.    The Times incorporates by reference and realleges the preceding allegations as though fully set forth herein.

182.    The Times included one or more forms of copyright-management information in each of The Times's infringed works, including: copyright notice, title and other identifying information, terms and conditions of use, and identifying numbers or symbols referring to the copyright-management information.

183.    Without The Times's authority, Defendants copied The Times's works and used them as training data for their GenAI models.

184.    Upon information and belief, Defendants removed The Times's copyright-management information in building the training datasets containing millions of copies of Times Works, including removing The Times's copyright-management information from Times Works scraped directly from The Times's websites and removing The Times's copyright-management information from Times Works reproduced from third-party datasets.

185.    Upon information and belief, Microsoft and OpenAI  removed The Times's copyright-management information through generating synthetic search results, including removing The Times's copyright-management information when scraping Times Works from The Times's websites and generating copies or derivatives of Times Works as output for the Browse with Bing and Bing Chat offerings.

186.    Microsoft and OpenAI removed The Times's copyright-management information in generating outputs from the GPT models containing copies or derivatives of Times Works.

2AA-345

187.    By design, the training process does not preserve any copyright-management information, and the outputs of Defendants' GPT models removed any copyright notices, titles, and identifying information, despite the fact that those outputs were often verbatim reproductions of Times content. Therefore, Defendants intentionally removed copyright-management information from The Times's works in violation of 17 U.S.C. § 1202(b)(1).

188.    Defendants' removal or alteration of The Times's copyright-management information has been done knowingly and with the intent to induce, enable, facilitate, or conceal infringement of The Times's copyrights.

189.    Without The Times's authority, Defendants created copies and derivative works based on The Times's works. By distributing these works without their copyright-management information, Defendants violated 17 U.S.C. § 1202(b)(3).

190.    Defendants knew or had reasonable grounds to know that their removal of copyright-management information would facilitate copyright infringement by concealing the fact that the GPT models are infringing copyrighted works and that output from the GPT models are infringing copies and derivative works.

191.    The Times has been injured by Defendants' removal of copyright-management information. The Times is entitled to statutory damages, actual damages, restitution of profits, and other remedies provided by law, including full costs and attorneys' fees.

## COUNT VI: Common Law Unfair Competition By Misappropriation

### Against All Defendants

192.    The Times incorporates by reference and realleges the preceding allegations as though fully set forth herein.

65

193.    The Times gathers information, which often takes the form of time-sensitive breaking news, for its content at a substantial cost to The Times. Wirecutter likewise compiles and produces time-sensitive recommendations for readers.

194.    By offering content that is created by GenAI but is the same or similar to content published by The Times, Defendants' GPT models directly compete with Times content. Defendants' use of Times content encoded within models and live Times content processed by models produces outputs that usurp specific commercial opportunities of The Times, such as the revenue generated by Wirecutter recommendations. For example, Defendants have not only copied Times content, but also altered the content by removing links to the products, thereby depriving The Times of the opportunity to receive referral revenue and appropriating that opportunity for Defendants.

195.    Defendants' use of Times content to train models that produce informative text of the same general type and kind that The Times produces competes with Times content for traffic.

196.    Defendants' use of Times content without The Times's consent to train Defendants' GenAI models constitutes free-riding on The Times's significant efforts and investment of human capital to gather this information.

197.    Defendants' misuse and misappropriation of Times content has caused The Times to suffer actual damages from the deprivation of the benefits of its work, such as, without limitation, lost advertising and affiliate referral revenue.

### COUNT VII: Trademark Dilution (15 U.S.C. § 1125(c))

### Against All Defendants

198.    The Times incorporates by reference and realleges the preceding allegations as though fully set forth herein.

2AA-347

199.    The Times is the owner of several federally registered trademarks, including U.S. Registration No. 5,912,366 for the trademark "The New York Times," as well as the marks "nytimes" (U.S. Reg. No. 3,934,613), and "nytimes.com" (U.S. Reg. No. 3,934,612).

200.    The Times's trademarks are distinctive and famous.

201.    Defendants have, in connection with the commerce of producing GenAI to users for profit throughout the United States, including in New York, engaged in the unauthorized use of The Times's trademarks in outputs generated by Defendants' GPT-based products.

202.    Defendants' unauthorized use of The Times's marks on lower quality and inaccurate writing dilutes the quality of The Times's trademarks by tarnishment in violation of 15 U.S.C § 1125(c).

203.    Defendants are aware that their GPT-based products produce inaccurate content that is falsely attributed to The Times and yet continue to profit commercially from creating and attributing inaccurate content to The Times. As such, Defendants have intentionally violated 15 U.S.C § 1125(c).

204.    As an actual and proximate result of the unauthorized use of The Times's trademarks, The Times has suffered and continues to suffer harm by, among other things, damaging its reputation for accuracy, originality, and quality, which has and will continue to cause it economic loss.

## **PRAYER FOR RELIEF**

WHEREFORE, The Times demands judgment against each Defendant as follows:

1.    Awarding The Times statutory damages, compensatory damages, restitution, disgorgement, and any other relief that may be permitted by law or equity;

2AA-348

2.      Permanently enjoining Defendants from the unlawful, unfair, and infringing

conduct alleged herein;

3.      Ordering destruction under 17 U.S.C. § 503(b) of all GPT or other LLM models

and training sets that incorporate Times Works;

4.      An award of costs, expenses, and attorneys' fees as permitted by law; and

5.      Such other or further relief as the Court may deem appropriate, just, and equitable.

### DEMAND FOR JURY TRIAL

The Times hereby demands a jury trial for all claims so triable.


Dated: December 27, 2023              */s/ Elisha Barron*
                                      Ian Crosby *(pro hac vice forthcoming)*
                                      SUSMAN GODFREY L.L.P.
                                      401 Union Street, Suite 3000
                                      Seattle, WA 98101
                                      Telephone: (206) 516-3880
                                      Facsimile: (206) 516-3883
                                      icrosby@susmangodfrey.com

                                      Davida Brook *(pro hac vice forthcoming)*
                                      Ellie Dupler *(pro hac vice forthcoming)*
                                      SUSMAN GODFREY L.L.P.
                                      1900 Ave of the Stars, Suite 1400
                                      Los Angeles, CA 90067
                                      Telephone: (310) 789-3100
                                      Facsimile: (310) 789-3150
                                      dbrook@susmangodfrey.com
                                      edupler@susmangodfrey.com

                                      Elisha Barron (5036850)
                                      Tamar Lusztig (5125174)
                                      SUSMAN GODFREY L.L.P.
                                      1301 Avenue of the Americas, 32nd Floor
                                      New York, NY 10019
                                      Telephone: (212) 336-8330
                                      Facsimile: (212) 336-8340
                                      ebarron@susmangodfrey.com
                                      tlusztig@susmangodfrey.com

2AA-349

Steven Lieberman (SL8687)
Jennifer B. Maisel (5096995)
Kristen J. Logan *(pro hac vice forthcoming)*
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
901 New York Avenue, N.W., Suite 900 East
Washington, DC 20001
Telephone:  (202) 783-6040
Facsimile: (202) 783-6031
slieberman@rothwellfigg.com
jmaisel@rothwellfigg.com
klogan@rothwellfigg.com

*Attorneys for Plaintiff*
*The New York Times Company*

**2AA-350**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW   ORK**

| | |
|---|---|
| NICHOLAS A. BASBANES and NICHOLAS NGAGOYEANES (professionally known as Nicholas Gage), individually and on behalf of all others similarly situated, | Civil Action No. 1:24-cv-84 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| -against- | **UR   TRIAL DEMANDED** |
| MICROSOFT CORPORATION, OPENAI, INC., OPENAI GP, L.L.C., OPENAI HOLDINGS, LLC, OAI CORPORATION, LLC, OPENAI GLOBAL, LLC, OPENAI, L.L.C., and OPENAI OPCO, LLC, | |
| Defendants. | |

Plaintiffs Nicholas A. Basbanes ("Mr. Basbanes") and Nicholas Ngagoyeanes (professionally known as Nicholas Gage, "Mr. Gage"), on behalf of themselves and all others similarly situated (the "Plaintiffs"), for their complaint against Defendants Microsoft Corporation ("Microsoft") and OpenAI, Inc., OpenAI GP, L.L.C., OpenAI Holdings, LLC, OAI Corporation, LLC, OpenAI Global, LLC, OpenAI, L.L.C. and OpenAI OpCo, LLC (collectively "OpenAI" and, with Microsoft, "Defendants"), allege as follows:

## **INTRODUCTION**

1.      Many of our greatest works of nonfiction are crafted by journalists. Using their skills for research, investigation and interviewing, they generate new knowledge and weave together complex and compelling narratives that require years of devotion to perfect.

2.      Plaintiffs Nicholas A. Basbanes and Nicholas Gage are both journalists who used their skills to write some of the most compelling and celebrated works of nonfiction in the past

40 years. The impact of their work on society cannot be overstated.

3.      Mr. Basbanes has been recognized by the National Endowment for the Humanities as a Public Scholar and is an internationally renowned authority on the history of books and book culture.

4.      Mr. Gage's body of work is so compelling and continuously relevant that President Ronald Reagan cited it as an inspiration for his summit meetings with the Soviet Union to end the arms race.

5.      Yet Defendants, through their willful and flagrant violations of Plaintiffs' copyrights, threaten the very existence of writers because without permission or payment, Defendants copied Plaintiffs' work to build a massive commercial enterprise that is now valued at billions of dollars.

6.      This commercial enterprise, commonly known as "AI" or "Artificial Intelligence," relies on "large language models" or "LLMs." These LLMs generate human-like responses to prompts submitted by users, and work by ingesting massive amounts of written material. The higher the quality of the ingested written materials, the higher the quality of the LLMs responses to users' prompts. Thus, to obtain that high-quality written material, Defendants engaged in a massive and deliberate theft of copyrighted works created by writers like Mr. Basbanes and Mr. Gage.

7.      Professional writers like Mr. Basbanes and Mr. Gage have limited capital to fund their research. They typically self-fund their projects, which are often supplemented by advances on royalties from prospective publishers, and those advances are then deducted from any future earnings their books may generate. Working thusly on their own resources, they travel wherever they must to locate and secure access to primary research materials that have been previously

2

unexamined and to conduct essential interviews. If they find it necessary to use certain copyrighted materials in their published works, it is the authors—not their publishers—who pay for the privilege of doing so. Yet, in stark contrast, Defendants, with ready access to billions in capital, simply stole Plaintiffs' copyrighted works to build another billion+ dollar commercial industry. It is outrageous.

8.     It bears emphasis that Defendants, as sophisticated commercial entities, clearly decided upon a deliberate strategy to steal Plaintiffs' copyrighted works to power their massive commercial enterprise. Of course, not paying for the inputs that make their LLMs, and which are thus plainly derivative works, results in an even higher profit margin for Defendants.

9.     Any concerns Defendants may have had that paying to use copyrighted works would have been cost prohibitive, and possibly preclude the development of this nascent industry, would be absurd. First, even if true, such concerns do not give Defendants license to steal Plaintiffs' copyrighted works. Second, Defendants clearly could have obtained the capital to pay given the extraordinary investments already made and the staggering valuations now associated with these LLMs. Finally, Defendants also could have explored financing alternatives, such as profit sharing or other mechanisms to facilitate their development of this new technology without sapping initial resources. But instead, Defendants just decided to steal. They're no different than any other thief.

10.     Notably, shortly after The New York Times filed suit against these same defendants in this Court, the Defendants publicly acknowledged that copyright owners like Plaintiffs must be compensated for Defendants' use of their work: "We respect the rights of content creators and owners and are committed to working with them to ensure they benefit from

3

AI technology and new revenue models."[1]

11. Thus, Mr. Basbanes and Mr. Gage seek to represent a class of writers whose copyrighted work has been systematically pilfered by Defendants. Mr. Basbanes and Mr. Gage seek damages for copyright infringement, the lost opportunity to license their works, and for the destruction of the market Defendants have caused and continue to cause to writers. They also seek a permanent injunction to prevent these harms from recurring.

12. Mr. Basbanes and Mr. Gage complain of Defendants, on personal knowledge as to matters relating to themselves, and on information and belief based on their counsel's reasonable investigation as to all other matters.

## JURISDICTION AND VENUE

13. The Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a) because the action arises under the Copyright Act.

14. The Court also has personal jurisdiction over Defendants because they have purposely availed themselves of the privilege of conducting business in New York.

15. Microsoft personnel based at its offices in New York assisted with OpenAI's copyright infringement, including exploiting training datasets that relied on copyrighted works.

16. OpenAI has marketed, sold and distributed, and continues to market, sell and distribute, its infringing products like ChatGPT, ChatGPT Enterprise, ChatGPT Plus, Browse with Bing, and application programming interface tools, within New York and to New York residents and New York based businesses.

17. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a

---

[1] Law360, What To Know About The NYT Suit Against Microsoft, OpenAI, January 2, 2024, available at https://www.law360.com/technology/articles/1781130/what-to-know-about-the-nyt-suit-against-microsoft-openai (last accessed Jan. 5, 2024).

2AA-354

substantial part of the events giving rise to Plaintiffs' claims occurred here.

18.     Venue is also proper in this District under 28 U.S.C. § 1400(a) because

Defendants or their agents reside or may be found here.

## PARTIES

### I.     P a     s

19.     Plaintiff Nicholas A. Basbanes has authored numerous works of nonfiction. He

was a reporter, literary editor, and columnist for *The Worcester Telegram & Gazette* and is a

resident of North Grafton, Massachusetts. His copyrighted works that Defendants stole required

research, investigation and interviews in New York, and these works have been sold to

institutions and individuals in New York. In addition, Mr. Basbanes' copyrighted works were

published by publishing houses based in New York.

20.     Plaintiff Nicholas Gage has authored numerous works of nonfiction. He was an

investigative reporter for *The New York Times* and *The Wall Street Journal* and is a resident of

North Grafton, Massachusetts. His copyrighted works that Defendants stole required research,

investigation and interviews in New York, and these works have been sold to institutions and

individuals in New York. In addition, Mr. Gage's copyrighted works were published by

publishing houses based in New York.

21.     A list of Plaintiffs' copyrighted works infringed by Defendants is set forth on

Exhibit A to this Complaint.

### II.     De e  da  s

22.     Defendant Microsoft Corporation is a Washington corporation with its principal

place of business in Redmond, Washington. It is estimated to own 49 percent of Defendant

OpenAI Global, LLC and has invested over $13 billion in OpenAI Global, LLC.[2]

23.     The OpenAI Defendants are a series of interrelated Delaware entities.

24.     Defendant OpenAI, Inc. is a Delaware nonprofit corporation with its principal place of business in San Francisco, California. It was formed in 2015 and owns and controls all other OpenAI entities.

25.     Defendant OpenAI GP, L.L.C. is a limited liability company formed under the laws of Delaware with its principal place of business in San Francisco, California. It is wholly owned and controlled by OpenAI, Inc. OpenAI GP, L.L.C. is the vehicle through which OpenAI, Inc. controls OpenAI Global, LLC.

26.     Defendant OpenAI Holdings, LLC is a limited liability company formed under the laws of Delaware with its principal place of business in San Francisco, California. The members of OpenAI Holdings, LLC are Defendant OpenAI, Inc. and Aestas LLC, an OpenAI-related limited liability company that is not a defendant here, but which was created to facilitate a capital raise for OpenAI of approximately a half-billion dollars. OpenAI Holdings, LLC was involved in the copyright infringement alleged in this Complaint through its direction, control and ownership of OpenAI OpCo, LLC.

27.     Defendant OAI Corporation, LLC is a limited liability company formed under the laws of Delaware with its principal place of business in San Francisco, California. OAI Corporation, LLC's only member is Defendant OpenAI Holdings, LLC and it was involved in the copyright infringement alleged in this Complaint through its direction, control and ownership of OpenAI Global, LLC.

---

[2] Julia Angwin, The OpenAI Coup Is Great for Microsoft. What Does It Mean for Us?, New York Times (Nov. 21, 2023), *available at* https://www.nytimes.com/2023/11/21/opinion/thesam-altman-openai-board-microsoft.html (last accessed Jan. 2, 2024).

6

28.     Defendant OpenAI Global, LLC is a limited liability company formed under the laws of Delaware with its principal place of business in San Francisco, California. OpenAI Global, LLC's members are Defendants Microsoft and OAI Corporation, LLC. OpenAI Global, LLC is controlled by OpenAI GP, L.L.C., which in turn is wholly owned and controlled by Open AI, Inc. OpenAI Global, LLC was involved in the copyright infringement alleged in this Complaint through its direction, control and ownership of OpenAI L.L.C.

29.     Defendant OpenAI L.L.C. is a limited liability company formed under the laws of Delaware with its principal place of business in San Francisco, California. OpenAI L.L.C. owns some or all of the services and products provided by OpenAI and has thus monetized the copyrighted works of Plaintiffs without permission and without compensation. The sole member of OpenAI L.L.C. is Defendant OpenAI OpCo, LLC.

30.     Defendant OpenAI OpCo, LLC is a limited liability company formed under the laws of Delaware with its principal place of business in San Francisco, California. OpenAI OpCo, LLC was previously known as OpenAI LP, which was founded in 2019 to be the profit-making arm of OpenAI. OpenAI OpCo, LLC now holds that role.

III.     **Microsoft's New York-Based Ties to Plaintiffs' Copyrighted Works**

31.     Microsoft's New York City-based operations directly participated in and supported the copyright infringement alleged in this Complaint by utilizing "a wide variety of topics within theoretical and applied machine learning, including learning from interactive data (e.g., contextual bandits and reinforcement learning), online learning, natural language processing, and topics related to interpretability and fairness of [machine learning] and [artificial

7

intelligence]."[3]

32.     Microsoft's Azure project, which collaborated heavily with OpenAI in its LLM "training,"[4] does significant work in Microsoft's New York City office.[5]

33.     Microsoft also works in close partnership with OpenAI in connection with the LLMs at issue in this lawsuit. An OpenAI LLM underlies Microsoft's Bing Chat product, offered through its Bing search engine. Microsoft has also integrated OpenAI's LLMs into its sales and marketing software, coding tools, productivity software, and cloud storage services.[6]

34.     Based on its $13 billion investment in OpenAI and for other reasons, Microsoft has "significant rights" in OpenAI. As Microsoft, through its CEO, has explained, "We are below them, above them, around them."[7] Microsoft CEO Satya Nadella also explained, "We have all the IP rights and all the capability. If OpenAI disappeared tomorrow, I don't want any customer of ours to be worried about it quite honestly, because we have all of the rights to continue the innovation. Not just to serve the product, but we can go and just do what we were

---

[3] Microsoft, Machine Learning & AI | NYC, *available at* https://www.microsoft.com/enus/research/theme/machine-learning-ai-nyc/ (last accessed Jan. 2, 2024).
[4] Jennifer Langston, Microsoft announces new supercomputer, lays out vision for future AI work, Microsoft (May 19, 2020), *available at* https://news.microsoft.com/source/features/ai/openaiazure-supercomputer/ (last accessed Jan. 2, 2024).
[5] John Roach, Microsoft responsible machine learning capabilities build trust in AI systems, developers say, Microsoft (May 19, 2020), *available at* https://news.microsoft.com/source/features/ai/azure-responsible-machine-learning/ (last accessed Jan. 2, 2024).
[6] Jordan Novet, Microsoft's $13 billion bet on OpenAI carries huge potential along with plenty of uncertainty, CNBC (Apr. 9, 2023), *available at* https://www.cnbc.com/2023/04/08/microsoftscomplex-bet-on-openai-brings-potential-and-uncertainty.html (last accessed Jan. 2, 2024).
[7] Intelligencer Staff, Satya Nadella on Hiring the Most Powerful Man in AI When OpenAI threw Sam Altman overboard, Microsoft's CEO saw an opportunity, Intelligencer (Nov. 21, 2023), *available at* https://nymag.com/intelligencer/2023/11/on-with-kara-swisher-satya-nadella-onhiring-sam-altman.html (last accessed Jan. 2, 2024).

doing in partnership ourselves. We have the people, we have the compute, we have the data, we have everything."[8]

## FACTUAL ALLEGATIONS

35.     OpenAI has kept secret the materials it took without compensation or permission to "train" its LLMs. As a result, Plaintiffs cannot perfectly discern the contents of their works that were stolen by Defendants. Thus, Plaintiffs make the specific allegations of infringement based on what is publicly known about OpenAI's training practices and what is known about the contents, uses, and availability of the pirate book repositories such as LibGen, Bibliotik, and Z-Library.

## I.     Mr. N c o as Bas a es

36.     Mr. Basbanes is an internationally renowned and celebrated author. He obtained a master's degree in journalism from Pennsylvania State University and, after receiving his commission as an officer in the United States Navy, completed a course of study at the Defense Information School. He made two tours to Vietnam as a Public Affairs Officer aboard the aircraft carrier *USS Oriskany* (CV-34) in 1969 and 1970, and was awarded a Navy Achievement Medal by the Secretary of the Navy for "professional achievement in the superior performance of his duties" during combat operations on Yankee Station in the Gulf of Tonkin with Task Force 77.

37.     After leaving the United States Navy in 1971, Mr. Basbanes became a reporter for *The Evening Gazette* in Worcester, Massachusetts, winning a first prize for investigative reporting for large circulation newspapers in 1974 from the Associated Press Managing Editors

---

[8] Intelligencer Staff, Satya Nadella on Hiring the Most Powerful Man in AI When OpenAI threw Sam Altman overboard, Microsoft's CEO saw an opportunity, Intelligencer (Nov. 21, 2023), *available at* https://nymag.com/intelligencer/2023/11/on-with-kara-swisher-satya-nadella-onhiring-sam-altman.html (last accessed Jan. 2, 2024).

2AA-359

Association of New England. In 1978 he was named the books editor of *The Worcester Sunday Telegram* and literary columnist for *The Evening Gazette*.

38.     After leaving *The Worcester Telegram & Gazette* in 1991 to become a full-time author, Mr. Basbanes devoted his professional life and financial resources to craft ten works of heavily researched and thoroughly sourced nonfiction, using the research, investigative and interviewing skills he developed as a professional journalist.

39.     To help support his research efforts, Mr. Basbanes continued to write his weekly book column, each featuring an exclusive interview with a major author, which he distributed through his own entity, Literary Features Syndicate, to more than thirty newspapers, including the *Toldeo Blade, Quincy Patriot Ledger, Minneapolis Star Tribune, Allentown Morning Call, Eugene Register Guard, Salt Lake Tribune, Knoxville News Sentinel, Des Moines Register, Gainesville Sun, New London Day, Columbus Dispatch, Grand Rapids Press* and *Wichita Eagle.* Recordings he made of these exclusive interviews—along with the interviews he conducted of individuals for his books—are now in the Cushing Memorial Library & Archives of Texas A&M University, where they have been digitized and catalogued for scholarly use. The archive of primary research materials assembled by Mr. Basbanes in support of his work over a period of forty years, when acquired by Texas A&M University in 2015, filled 365 packing boxes with documents, transcriptions, drafts, field notebooks, photographic negatives, and the like, all acquired by Mr. Basbanes in pursuit of his literary activities, and at his expense and initiative.[9]

40.     His first book, *A Gentle Madness: Bibliophiles, Bibliomanes, and the Eternal*

---

[9] *See Histoire de la Bibliophile,* "Basbanes Collection Acquired by Cushing Library at Texas A&M," *available at* https://histoire-bibliophilie.blogspot.com/2015/12/basbanes-collection-acquired-by-cushing.html (last accessed on Jan. 2, 2024). *See also* "Audio Interviews from the Nicholas A. Basbanes Collection," *available at* https://library.tamu.edu/research/digital_collections (last accessed on Jan. 2, 2024).

*Passion for Books*, was named a *New York Times* notable book of the year and was a finalist for the National Book Critics Circle Award in nonfiction for 1995. The *Wall Street Journal* recognized it as one of the most influential works about book collecting published in the twentieth century. *A Gentle Madness* is included in the collections of over 1,400 research libraries worldwide, according to a compilation of the WorldCat database of library collections. It is also listed as required or suggested reading in dozens of educational institutions in history of the book courses. In the words of one prominent reviewer: "No other writer has traced the history of the book so thoroughly or engagingly."[10]

41.    Mr. Basbanes devoted seven years of his professional life to research and write *A Gentle Madness*. He conducted approximately 150 interviews. He travelled across Europe and the United States entirely at his own expense to conduct research, in one instance spending two weeks attending the trial in the United States District Court for the Southern District of Iowa of the notorious book thief Stephen C. Blumberg, who stole more than 20,000 books valued at approximately $20 million over a twenty-year period. Mr. Basbanes' seven-hour interview with Mr. Blumberg was a centerpiece of a chapter that remains the definitive and frequently cited account of these crimes. And, in stark contrast to Defendants, Mr. Basbanes paid for access to and the rights for copyrighted material used in this manuscript.

42.    Mr. Basbanes' other works likewise required enormous investments of time, travel and funds. His second book, *Patience & Fortitude: A Roving Chronicle of Book People, Book Places, and Book Culture*, took approximately eight years to complete. It required approximately 100 interviews. It involved extensive travel across the United States and Europe.

---

[10] Andre Bernard, "Fear of Book Assasination [sic] Haunts Bibliophile's Musings," The New York Observer, December 15, 2013, *available at* https://observer.com/2003/12/fear-of-book-assasination-haunts-bibliophiles-musings/ (last accessed on December 30, 2023).

2AA-361

And, again, in stark contrast to Defendants, Mr. Basbanes paid for access to and the rights for copyrighted material used in his manuscript. The publication of this book prompted the esteemed biographer and historian David McCullough to proclaim that "Nicholas Basbanes has become the leading authority of books about books, and this, his latest, is a jewel."[11]

43.     Mr. Basbanes' nonfiction work entitled *On Paper: The Everything of Its Two-Thousand-Year History* was published in 2013 after six years of intensive effort. Mr. Basbanes' extensive travels for this project included a three-week research trip to the Hunan and Sichuan provinces in Western China, and a week in Japan, the purpose, in both instances, to acquire first-hand knowledge of ancient papermaking skills unique to those countries, and still practiced by a handful of artisans today. And, again, in stark contrast to Defendants, Mr. Basbanes paid for access to and the rights for copyrighted material used in this manuscript.

44.     In 2014, *On Paper* was named one of three recipients of the Carnegie Medal for Excellence in Nonfiction awarded annually by the American Library Association. Foreign language editions of this book resulted in invitations for Mr. Basbanes to give keynote addresses at two international conferences, one in Seoul, South Korea, the other in Mexico City.

45.     Mr. Basbanes' most recent work, *Cross of Snow: A Life of Henry Wadsworth Longfellow*, was published in 2020 after seven years of research and writing. It was named one of the best nonfiction books of the year by the *Christian Science Monitor*,[12] and one of the Books

---

[11] This comment was made in a public talk Mr. McCullough, a two-time winner of the Pulitzer Prize, gave shortly after publication of *Patience & Fortitude* at the Boston Public Library, and which he modified and allowed to be used as a testimonial in the release of the paperback edition a year later.

[12] The Christian Science Monitor, "The Best Nonfiction Books of 2020 Offer Wisdom and Insight," December 9, 2020, *available at* https://www.csmonitor.com/Books/2020/1209/The-best-nonfiction-books-of-2020-offer-wisdom-and-insight (last accessed on December 30, 2023).

of the Year by *Times Literary Supplement*.[13] It also received Top Honors in Nonfiction for the

Massachusetts Book Award given by the Massachusetts Center for the Book.[14] *The New York*

*Times* recognized that Mr. Basbanes, in crafting this manuscript, "is a painstaking researcher, the

kind who turns every page, as Robert Caro would say, and he has benefited from access to lots of

material previously unavailable."[15] *The Worcester Telegram & Gazette* noted that it represented

"a great deal of new biographical research and reporting."[16] *The Boston Globe* commented,

succinctly: "His research is prodigious."[17] In a lead review for *The Wall Street Journal,* the noted

Longfellow scholar Cristoph Irmscher declared *Cross of Snow* to be "the biography Longfellow

himself would have most liked to read."[18]

46.     In 2016, Mr. Basbanes was selected by the National Endowment for the

Humanities as part of its first group of nonfiction writers formally designated as Public Scholars.

47.     He is now researching and writing, with his own resources, a book under contract

---

[13] TLS, "Books of the Year 2020, Sixty-five Writers Make Their Selections From Around the World," November 13, 2020, *available at* https://www.the-tls.co.uk/articles/books-of-the-year-2020/ (last accessed on December 30, 2023).

[14] Massachusetts Center for the Book, 21st Annual Massachusetts Book Awards, *available at* https://myemail.constantcontact.com/Massachusetts-Book-Awards-Announcement-and-Call-for-Submissions.html?soid=1118683784419&aid=z-5RN-3yWZo, (last accessed on December 30, 2023).

[15] The New York Times, "Henry Wadsworth Longfellow: America's No. 1 Literary Celebrity," June 4, 2020, *available at* https://www.nytimes.com/2020/06/04/books/review/cross-of-snow-a-life-of-henry-wadsworth-longfellow-nicholas-a-basbanes.html (last accessed on December 30, 2023).

[16] The Worcester Telegram & Gazette, "Delving Deep Into Longfellow's Life," June 6, 2020, *available at* https://www.telegram.com/story/entertainment/local/2020/06/06/grafton-author-nicholas-basbanes-forges-biographers-bond-with-longfellow/113779660/ (last accessed on December 30, 2023).

[17] The Boston Globe, "Reconsidering Longfellow in 'Cross of Snow,'" May 28, 2020, *available at* https://www.bostonglobe.com/2020/05/28/arts/reconsidering-longfellow-cross-snow/ (last accessed on December 30, 2023).

[18] The Wall Street Journal, "'Cross of Snow' Review: Our Poet of Loneliness," *available at* https://www.wsj.com/articles/cross-of-snow-review-our-poet-of-loneliness-11590156990 (last accessed on Jan. 2, 2024).

with Yale University Press to be titled *Before Paper: The Hunt for the World's Earliest Writings,* a prequel to his 2013 book, *On Paper.*

48.     Mr. Basbanes other copyrighted works, which are listed on Exhibit A to this Complaint, likewise required enormous investments of his time and resources to conduct interviews, pore over archival material, and ultimately generate the knowledge that anyone can readily buy for a reasonable price. His works have now been published in five countries and translated into four languages.

49.     Mr. Basbanes is the sole author of and beneficial owner of the registered copyrights identified in Exhibit A to this Complaint, all of which OpenAI used without compensation or permission to "train" its LLMs and power its massive commercial enterprise.

## II.     **Mr. N c o as Ga e**

50.     Mr. Gage is among America's greatest and most acclaimed investigative reporters. He has a master's degree from the Columbia University Graduate School of Journalism and his work for *The Wall Street Journal* and *The New York Times* impacted the course of key events in American and world history.

51.     Mr. Gage's investigations were instrumental in exposing past corruption of Vice President Spiro Agnew, leading to his resignation. Mr. Gage was also the first reporter to hear any of President Richard Nixon's secret tapes that were uncovered in connection with the Watergate Scandal. His deeply sourced and exclusive writings for *The New York Times* and *The Wall Street Journal* set the standard for investigative inquiries into the activities of organized crime in the United States.

52.     Using his journalistic skills, Mr. Gage went on to become one of the most influential nonfiction authors of the twentieth century. His 1983 best-selling autobiographical

memoir *Eleni*, which described the experiences of his family during the Second World War and Greek Civil War, was ultimately adapted into a feature film starring John Malkovich and Kate Nelligan. Mr. Gage describes in the book how the communists executed his mother for helping Mr. Gage and his sisters escape the occupied village of Lia in northern Greece. President Ronald Reagan cited *Eleni* as an inspiration for his summit meetings with the Soviet Union to end the arms race.

53.    A finalist for the National Book Critics Award in the United States, *Eleni* has been translated into 15 languages, published in 32 countries, and was the recipient of numerous other prestigious awards, including a first prize by the Royal Society of Literature of Great Britain.

54.    Mr. Gage's coverage of the mafia during his time as a reporter also led to two other bestsellers: *The Mafia Is Not An Equal Opportunity Employer* and *Mafia, U.S.A.*

55.    Mr. Gage was also an executive producer of the acclaimed film *The Godfather Part III*, co-writing an early draft of the script with Mario Puzo. The film was ultimately nominated for seven Golden Globe Awards and seven Academy Awards.

56.    Mr. Gage's other nonfiction books include: *A Place for Us* (1989), a sequel to *Eleni*, which describes the immigrant experience of Mr. Gage and his five sisters to the United States following their escape from civil-war-torn Greece, and the establishment of new lives as naturalized American citizens, and *Greek Fire: The Story of Maria Callas and Aristotle Onassis* (2000), which was based on thoroughly researched and impeccably sourced material including previously unexamined materials.

57.    Mr. Gage is the sole author of and beneficial owner of the registered copyrights identified in Exhibit A to this Complaint, all of which OpenAI used without compensation or

2AA-365

permission to "train" its LLMs and power its massive commercial enterprise.

### III.   Ge era ve AI a d Lar e La a e Mode s

58.     The terms "artificial intelligence" or "AI" refer generally to computer systems designed to imitate human cognitive functions.

59.     The terms "generative artificial intelligence" or "generative AI" refer specifically to systems that are capable of generating "new" content in response to user inputs called "prompts."

60.     For example, the user of a generative AI system capable of generating images from text prompts might input the prompt, "A writer working at her desk." The system would then attempt to construct the prompted image. Similarly, the user of a generative AI system capable of generating text from text prompts might input the prompt, "Tell me a story about a writer working at her desk." The system would then attempt to generate the prompted text.

61.     Recent generative AI systems designed to recognize input text and generate output text are built on "large language models" or "LLMs."

62.     LLMs use predictive algorithms that are designed to detect statistical patterns in the text datasets on which they are "trained" and, on the basis of these patterns, generate responses to user prompts. "Training" an LLM refers to the process by which the parameters that define an LLM's behavior are adjusted through the LLM's ingestion and analysis of large "training" datasets.

63.     Once "trained," the LLM analyzes the relationships among words in an input prompt and generates a response that is an approximation of similar relationships among words in the LLM's "training" data. In this way, LLMs can be capable of generating sentences, paragraphs, and even complete texts, from short pieces to book length treatments.

16

64.    "Training" an LLM requires inputting large numbers of parameters in the model and then supplying the LLM with large amounts of text for the LLM to ingest—the more text, the better. That is, in part, the large in large language model.

65.    As the U.S. Patent and Trademark Office has observed, LLM "training" "almost by definition involve[s] the reproduction of entire works or substantial portions thereof."[19]

66.    "Training" in this context is therefore a technical-sounding euphemism for copying and using large volumes of written material, including material that belongs to Plaintiffs.

67.    Moreover, in some form and to some degree currently unknowable to the public, Defendants' LLMs have "memorized" or stored their "training" data (even if in a "translated" form), such that the data (at least in part) can be accessed, recalled, and reproduced by the LLM at will.[20]

68.    The quality of the LLM (that is, its capacity to generate human-seeming responses to prompts) is dependent on the quality of the datasets used to "train" the LLM.

69.    Professionally authored, edited, and published books—such as those authored by Plaintiffs here—are an especially important source of LLM "training" data.

70.    As one group of AI researchers (not affiliated with Defendants) has observed, "[b]ooks are a rich source of both fine-grained information, how a character, an object or a scene

---

[19] U.S. Patent & Trademark Office, *Public Views on Artificial Intelligence and Intellectual Property Policy* 29 (2020), *available at* https://www.uspto.gov/sites/default/files/documents/USPTO_AI-Report_2020-10-07.pdf (last accessed Jan. 2, 2024).

[20] *See* Jason Koebler, *Google Researchers' Attack Prompts ChatGPT to Reveal Its Training Data*, 404 Media (Nov. 29, 2023), *available at* https://www.404media.co/google-researchersattack-convinces-chatgpt-to-reveal-its-training-data/ (last accessed Jan. 2, 2024); Kent K. Chang *et al.*, *Speak, Memory: An Archaeology of Books Known to ChatGPT/GPT-4* (2023), *available at* https://arxiv.org/pdf/2305.00118v1.pdf (last accessed Jan. 2, 2024).

2AA-367

looks like, as well as high-level semantics, what someone is thinking, feeling and how these states evolve through a story."[21]

71.     In other words, Plaintiffs' copyrighted books are the high-quality materials Defendants want and need to build their new and massive commercial enterprise. Instead of paying for those high-quality materials, like a general contractor might buy insulation, nails and screws to build a house, Defendants simply stole them.

## IV.    De e da s W    I r e e o Pa    s Co r    s

72.     Defendant OpenAI Inc. was founded in 2015 as a nonprofit organization with the self-professed goal of researching and developing AI tools "unconstrained by a need to generate financial return."[22]

73.     OpenAI's nonprofit status was short lived. In 2019, OpenAI, Inc. relaunched itself (specifically, through Defendant OpenAI GP, L.L.C. and Defendant OpenAI OpCo, LLC)[23] as a for-profit enterprise.

74.     Investments quickly poured in. Microsoft, one of the world's largest technology companies, invested $1 billion in 2019, an estimated $2 billion in 2021, and a staggering $10 billion in 2023, for a total investment of $13 billion so far.

75.     Industry observers currently value OpenAI at up to $80 billion.[24]

---

[21] Yukun Zhu *et al.*, *Aligning Books and Movies: Towards Story-like Visual Explanations by Watching Movies and Reading Books* 1 (2015), *available at* https://arxiv.org/pdf/1506.06724.pdf (last accessed Jan. 2, 2024).

[22] OpenAI, *Introducing OpenAI* (Dec. 11, 2015), https://openai.com/blog/introducing-openai (last accessed Jan. 2, 2024).

[23] Defendant OpenAI OpCo LLC was then known as OpenAI LP.

[24] Kate Clark, *Thrive Capital to Lead Purchase of OpenAI Employee Shares at $80 Billion-Plus Valuation*, The Information (Oct. 19, 2023), *available at* https://www.theinformation.com/articles/thrive-capital-to-lead-purchase-of-openai-employeeshares-at-80-billion-plus-valuation (last accessed Jan. 2, 2024).

V.    **The Large Language Models**

76.    OpenAI's LLMs are collectively referred to as "GPT-N," which stands for "Generative Pre-trained Transformer" (a specific type of LLM architecture), followed by a version number.

77.    GPT-3 was released in 2020 and exclusively licensed to Microsoft the same year.

78.    OpenAI further refined GPT-3 into GPT-3.5, which was released in 2022.

79.    In November 2022, OpenAI released ChatGPT, a consumer-facing chatbot application built on GPT-3.5.

80.    ChatGPT's popularity exploded virtually overnight. By January 2023, less than three months after its release, the application had an estimated 100 million monthly active users, making it one of the fastest-growing consumer applications in history.

81.    GPT-4, the successor to GPT-3.5, was released in March 2023.

82.    GPT-4 underlies OpenAI's new subscription-based chatbot, called ChatGPT Plus, which is available to consumers for $20 per month.

83.    Defendants intend to earn billions of dollars from this technology.

84.    When announcing the release of ChatGPT Enterprise, a subscription-based high-capability GPT-4 application targeted for corporate clients, in August 2023, OpenAI claimed that teams in "over 80% of Fortune 500 companies" were using its products.[25]

85.    GPT-4 also underlies Microsoft's Bing Chat product, offered through its Bing Internet search engine, and is integrated into its sales and marketing software, coding tools, productivity software, and cloud storage services.

---

[25] OpenAI, *Introducing ChatGPT Enterprise* (Aug. 28, 2023),
*available at* https://openai.com/blog/introducing-chatgpt-enterprise (last accessed Jan. 2, 2024).

86.     OpenAI CEO Sam Altman recently reported to OpenAI employees that OpenAI is on track to generate $1.3 billion in revenue in 2023.[26]

87.     Analysts estimate that Microsoft could earn more than $10 billion in annual revenue by 2026 *only* from AI add-ons to its Microsoft 365 productivity software, "at the core" of which lies OpenAI technology.[27]

## VI.     K o        Tra      o Co  r   ed Boo s

88.     OpenAI does not disclose or publicize with specificity what datasets GPT-3, GPT-3.5, or GPT-4 were "trained" on. OpenAI treats that information as proprietary.

89.     To "train" its LLMs—including GPT-3, GPT-3.5, and GPT-4—OpenAI has reproduced copyrighted books without their authors' consent. OpenAI has publicly admitted this.

90.     It has admitted that it has "trained" its LLMs on "large, publicly available datasets that include copyrighted works."[28]

91.     It has admitted that "training" LLMs "require[s] large amounts of data," and that "analyzing large corpora" of data "necessarily involves first making copies of the data to be analyzed."[29]

92.     It has admitted that, if it refrained from using copyrighted works in its LLMs'

---

[26] Amir Efrati, *OpenAI's Revenue Crossed $1.3 Billion Annualized Rate, CEO Tells Staff*, The Information (Oct. 12, 2023), *available at* https://www.theinformation.com/articles/openaisrevenue-crossed-1-3-billion-annualized-rate-ceo-tells-staff (last accessed Jan. 2, 2024).

[27] Jordan Novet, *Microsoft starts selling AI tool for Office, which could generate $10 billion a year by 2026*, CNBC (Nov. 1, 2023), *available at* https://www.cnbc.com/2023/11/01/microsoft-365-copilot-becomes-generally-available.html (last accessed Jan. 2, 2024).

[28] OpenAI, *Comment Regarding Request for Comments on Intellectual Property Protection for Artificial Intelligence Innovation*, U.S. Patent and Trademark Office Dkt. No. PTO-C-2019-0038, at 1 (2019), *available at* https://www.uspto.gov/sites/default/files/documents/OpenAI_RFC-84-FR-58141.pdf  (last accessed Jan. 2, 2024).

[29] *Id.*

2AA-370

"training," it would "lead to significant reductions in model quality."[30]

93.    Accordingly, OpenAI has openly admitted to reproducing copyrighted works in the course of "training" its LLMs because such reproduction is central to the quality of its products.

94.    Instead of "verbatim excerpts," ChatGPT now offers to produces summaries of copyrighted books, which usually contains details not available in reviews and other publicly available material—again suggesting that the underlying LLM must have ingested the entire book during its "training."

95.    OpenAI is characteristically opaque about where and how it procured the entirety of these books.

96.    OpenAI admits that among the "training" datasets it used to "train" were "Common Crawl," and two "high-quality," "internet-based books corpora" which it calls "Books1" and "Books2."[31]

97.    Common Crawl is a vast and growing corpus of "raw web page data, metadata extracts, and text extracts" scraped from billions of web pages. It is widely used in "training" LLMs, and has been used to "train," in addition to GPT-N, Meta's LlaMa, and Google's BERT. It is known to contain text from books copied from pirate sites.[32]

98.    Some independent AI researchers suspect that Books2 contains or consists of ebook files downloaded from large pirate book repositories such as Library Genesis or

---

[30] *Id.* at 7 n.33.

[31] Tom B. Brown *et al.*, *Language Models Are Few-Shot Learners* 8 (2020), *available at* https://arxiv.org/pdf/2005.14165.pdf (last accessed Jan. 2, 2024).

[32] Alex Hern, *Fresh Concerns Raised Over Sources of Training Material for AI Systems*, The Guardian (Apr. 20, 2023), *available at* https://www.theguardian.com/technology/2023/apr/20/fresh-concerns-training-material-aisystems-facist-pirated-malicious (last accessed Jan. 2, 2024).

2AA-371

"LibGen," "which offers a vast repository of pirated text."[33]

99.    LibGen is already known to this Court as a notorious copyright infringer.[34]

100.    Other possible candidates for Books2's sources include Z-Library, another large pirate book repository that hosts more than 11 million books, and pirate torrent trackers like Bibliotik, which allow users to download ebooks in bulk.

101.    Websites linked to Z-Library appear in the Common Crawl corpus and have been included in the "training" dataset of other LLMs.[35]

102.    Z-Library's Internet domains were seized by the FBI in February 2022, only months after OpenAI stopped "training" GPT-3.5 in September 2021.

103.    The disclosed size of the Books2 dataset (55 billion "tokens," the basic units of textual meaning such as words, syllables, numbers, and punctuation marks) suggests it comprises over 100,000 books.

104.    "Books3," a dataset compiled by an independent AI researcher, is comprised of nearly 200,000 books downloaded from Bibliotik, and has been used by other AI developers to "train" LLMs.

105.    The similarities in the sizes of Books2 and Books3, and the fact that there are only a few pirate repositories on the Internet that allow bulk ebook downloads, strongly indicates that the books contained in Books2 were also obtained from one of the notorious repositories discussed above.

---

[33] Kate Knibbs, *The Battle Over Books3 Could Change AI Forever*, Wired (Sept. 4, 2023), *available at* https://www.wired.com/story/battle-over-books3 (last accessed Jan. 2, 2024).
[34] *See Elsevier Inc. v. Sci-Hub*, No. 1:15-cv-4282-RWS (S.D.N.Y.).
[35] Kevin Schaul *et al.*, *Inside the Secret List of Websites that Make AI Like ChatGPT Sounds Smart*, The Washington Post (Apr. 19, 2023), *available at* https://www.washingtonpost.com/technology/interactive/2023/ai-chatbot-learning (last accessed Jan. 2, 2024).

2AA-372

106.     OpenAI has not discussed the datasets used to "train" GPT-3.5, GPT-4, or their source or sources.

107.     GPT-3.5 and GPT-4 are significantly more powerful than their predecessors. GPT 3.5 contains roughly 200 billion parameters, and GPT-4 contains roughly 1.75 trillion parameters, compared to GPT-3's roughly 175 billion parameters.

108.     The growth in power and sophistication from GPT-3 to GPT-4 suggests a correlative growth in the size of the "training" datasets, raising the inference that one or more very large sources of pirated ebooks discussed above must have been used to "train" GPT-4.

109.     There is no other way OpenAI could have obtained the volume of books required to "train" a powerful LLM like GPT-4.

110.     In short, OpenAI admits it needs[36] and uses[37] "large, publicly available datasets that include copyrighted works"[38]—and specifically, "high-quality"[39] copyrighted books—to "train" its LLMs; pirated sources of such "training" data are readily available; and one or more of these sources contain Plaintiffs' works.

111.     Defendants knew that their "training" data included texts protected by copyright but willfully proceeded without obtaining authorization.

112.     OpenAI's "training" its LLMs could not have happened without Microsoft's financial and technical support. In 2020, Microsoft announced that it had developed "one of the top five publicly disclosed supercomputers in the world" that had been "[b]uilt in collaboration with and exclusively for OpenAI," and "designed specifically to train that company's AI

---

[36] OpenAI, *Comment Regarding Request for Comments*, *supra*, at 28 n.33.
[37] *Id*. at 2.
[38] *Id*. at 1.
[39] Brown *et al.*, *Few-Shot Learners*, *supra*, at 31.

2AA-373

models."[40] And in 2023, Microsoft CEO Satya Nadella reminded the world that the "heavy lifting" for OpenAI's LLM "training" was done by Microsoft "compute infrastructure."[41]

## VII.   GPT-N s a d C a GPT s Har o A ors

113.   ChatGPT and the LLMs underlying it seriously threaten the livelihood of Plaintiffs, on whose works they were "trained" without consent.

114.   Goldman Sachs estimates that generative AI could replace 300 million full-time jobs in the near future, or one-fourth of the labor currently performed in the United States and Europe.

115.   Already, writers report losing income from copywriting, journalism, and online content writing—important sources of income for many authors.

116.   Recently, the owner of popular online publications such as *Gizmodo*, *Deadspin*, *The Root*, *Jezebel* and *The Onion* came under fire for publishing an error-riddled, AI-generated piece, leading the Writers Guild of America to demand "an immediate end of AI-generated articles" on the company's properties.[42]

117.   Until recently, ChatGPT provided verbatim quotes of copyrighted text. Currently, it instead readily offers to produce summaries of such text. These summaries are themselves

---

[40] Jennifer Langston, *Microsoft announces new supercomputer, lays out vision for future AI work*, Microsoft (May 19, 2020), *available at* https://news.microsoft.com/source/features/ai/openai-azure-supercomputer/ (last accessed Jan. 2, 2024).

[41] CNBC, *First on CNBC: CNBC Transcript: Microsoft CEO Satya Nadella Speaks with CNBC's Jon Fortt on "Power Lunch" Today* (Feb. 7, 2023), *available at* https://www.cnbc.com/2023/02/07/first-on-cnbc-cnbc-transcript-microsoft-ceo-satya-nadellaspeaks-with-cnbcs-jon-fortt-on-power-lunch-today.html (last accessed Jan. 2, 2024).

[42] Todd Spangler, *WGA Slams G/O Media's AI-Generated Articles as 'Existential Threat to Journalism,' Demands Company End Practice*, Variety (July 12, 2023), https://variety.com/2023/digital/news/wga-slams-go-media-ai-generated-articles-existentialthreat-1235668496 (last accessed Jan. 2, 2024).

2AA-374

derivative works, the creation of which is inherently based on the original unlawfully copied

work and could be—but for ChatGPT—licensed by the authors who created these underlying

works to willing, *paying* licensees.

118.    Plaintiffs are thus reasonably concerned about the risks OpenAI's conduct poses

to their livelihoods.

119.    In short, the success and profitability of OpenAI are predicated on mass copyright

infringement, *i.e.* use without permission from or compensation to copyright owners, including

Plaintiffs' here.

## CLASS ALLEGATIONS

**I.    C ass De    o  s**

120.    Plaintiffs bring this action as Proposed Class Representatives for and on behalf of

the Proposed Class and Proposed Class Members, as defined below, under Federal Rules of Civil

Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

121.    The Proposed Class is defined as follows:

> All natural persons in the United States who are authors and legal or
> beneficial owners, in full or in part, of copyrights in, one or more written
> works which has been, or is being, used by Defendants' to train their large
> language models.

122.    Excluded from the class definitions above are Defendants; Defendants'

coconspirators, aiders and abettors, and members of their immediate families; Defendants'

corporate parents, subsidiaries, and affiliates; Defendants' directors, officers, employees, and

other agents, as well as members of their immediate families; and any judge who may preside

over this action, the judge's staff, and members of their immediate families.

**II.    R   es 23 a  a  d 23**

123.    The Proposed Class is sufficiently numerous because it is estimated to have tens

25

2AA-375

of thousands of members.

124.    The identities of the Proposed Class Members are objectively ascertainable because Defendants know, and can produce in discovery, which texts they used to "train" their large language models; and because information regarding copyright ownership, copyright registration, and book sales is determinable from public or other objective sources and measures.

125.    The Proposed Class Representatives' claims are typical of the claims of the Proposed Class because their copyrights were infringed in materially the same way and their interests in preventing future infringement and redressing past infringement are materially the same.

126.    The Proposed Class Representative will adequately represent the Proposed Class, and Plaintiffs' counsel is experienced, knowledgeable, well resourced, and will zealously and faithfully represent Plaintiffs and the Proposed Class.

127.    There are questions of law or fact common to the Proposed Class, including (a) whether Defendants copied Plaintiffs' and Proposed Class Members' copyrighted works in "training" their LLMs; (b) whether Defendants' copying of Plaintiffs' and Proposed Class Members' copyrighted works constitutes direct, vicarious, or contributory infringement under the Copyright Act; and (c) whether Defendants' copying of Plaintiffs' and Proposed Class Members' copyrighted works was willful.

## III.    R e 23

128.    Defendants have acted on grounds common to Plaintiffs and the Proposed Class by treating all Plaintiffs' and Proposed Class Members' works equally, in all material respects, in their LLM "training."

129.    Common questions of liability for infringement predominate over any

2AA-376

individualized damages determinations as may be necessary. To decide liability, the Court will necessarily apply the same law to the same conduct, which Defendants engaged in indiscriminately with respect to Plaintiffs and all Proposed Class Members.

130.    Further, to the extent Plaintiffs elect to pursue statutory rather than actual damages before final judgment, the damages inquiry will likewise be common, if not identical, for Plaintiffs and Proposed Class Members.

131.    A class action is superior to any individual litigation of Plaintiffs' and Proposed Class Members' claims. Proposed Class Members have little interest, distinct from Plaintiffs' and other Proposed Class Members', in prosecuting individual actions. It would waste judicial resources to decide the same legal questions repeatedly, thousands of times over, on materially indistinguishable facts. The Proposed Class presents no special manageability problems.

**IV.    R  e 23 c  4**

132.    In the alternative to certification under Rule 23(b)(3), common questions predominate within the determination of liability for infringement, and therefore the issue of liability may be separately certified for class treatment even if the entire action is not.

**CLAIMS TO RELIEF**

**COUNT I: DIRECT COP  RIGHT INFRINGEMENT  1  U.S.C.    01**
**A  a  s  A  De  e  da  s**

133.    Plaintiffs incorporate and reallege paragraphs 1 through 129 above.

134.    Plaintiffs and Proposed Class Members are the rightful and lawful legal or beneficial owners of the copyrights in and to their written works.

135.    Plaintiffs' and Proposed Class Members' written works are original to their authors and are fixed in tangible mediums of expression as works under 17 U.S.C. § 102(a)(1).

136.    Plaintiffs and Proposed Class Members have duly and timely registered their

27

copyrights in their works with the U.S. Copyright Office.

137.    Plaintiffs and Proposed Class Members are legal or beneficial owners of the exclusive right to reproduce their copyrighted works in copies under 17 U.S.C. § 106(1), as well as the right to refrain from such reproduction.

138.    Defendants had access to Plaintiffs' and Proposed Class Members' copyrighted works, including by way of the various unauthorized datasets discussed above.

139.    Defendants violated Plaintiffs' and Proposed Class Members' exclusive rights by reproducing their copyrighted works in copies for the purpose of "training" their LLMs and ChatGPT.

140.    Defendant's violation of Plaintiffs' and Proposed Class Members' exclusive rights was willful because Defendants knew the datasets on which it "trained" its large language models contained copyrighted works.

## COUNT II: VICARIOUS COP  RIGHT INFRINGEMENT
**A  a  s  M croso    O  e AI I  c. O  e AI GP L.L.C. OAI Cor  ora  o   LLC O  e  AI
Ho d     s LLC a d O  e AI G o a  LLC**

141.    Plaintiffs incorporate and reallege paragraphs 1 through 129 above.

142.    Defendants Microsoft, OpenAI, Inc., OpenAI GP, L.L.C., OAI Corporation, LLC, OpenAI Holdings, LLC and OpenAI Global, LLC controlled, directed and profited from the direct infringement alleged in Count I.

143.    Microsoft controlled, directed, and profited from the infringement perpetrated by the OpenAI Defendants. Microsoft controls and directs the supercomputing platform used to store, process and reproduce the training datasets. Microsoft profited from the infringement alleged in this Complaint because it incorporated the infringing GPT models trained on Plaintiffs' copyrighted works into its own commercial product offerings, including Bing Chat.

28

2AA-378

144.    Defendants OpenAI, Inc., OpenAI GP, L.L.C., OAI Corporation, LLC, OpenAI

Holdings, LLC and OpenAI Global, LLC are vicariously liable for the direct infringement

alleged in Count I.

### COUNT III: CONTRIBUTORY COPYRIGHT INFRINGEMENT
**Against Microsoft, OpenAI, Inc., OpenAI GP, L.L.C., OAI Corporation, LLC, OpenAI Holdings LLC and OpenAI Global LLC**

145.    Plaintiffs incorporate and reallege paragraphs 1 through 129 above.

146.    Defendants Microsoft, OpenAI, Inc., OpenAI GP, L.L.C., OAI Corporation, LLC,

OpenAI Holdings, LLC and OpenAI Global, LLC materially contributed to and directly assisted

in the direct infringement alleged in Count I by funding the direct infringement by way of

capital, technology, personnel, and other resources; controlling or managing the property or other

assets with which the direct infringement was accomplished; or providing business, legal,

strategic, or operational guidance to accomplish the direct infringement.

147.    Defendants Microsoft, OpenAI, Inc., OpenAI GP, L.L.C., OAI Corporation, LLC,

OpenAI Holdings, LLC and OpenAI Global, LLC knew or had reason to know of the direct

infringement alleged in Count I, because these Defendants share management personnel and

operational plans with Defendants and are fully aware of the capabilities of their own product

and the materials upon which it was "trained," including known caches of pilfered copyrighted

works.

148.    Defendants Microsoft, OpenAI, Inc., OpenAI GP, L.L.C., OAI Corporation, LLC,

OpenAI Holdings, LLC and OpenAI Global, LLC are contributorily liable for the direct

infringement alleged in Count I.

### **PRAYER FOR RELIEF**

149.    Plaintiffs, on behalf of themselves and all others similarly situated, pray for the

2AA-379

following relief:

(a)     Certification of this action as a class action under Federal Rule of Civil

Procedure 23;

(b)     Designation of Mr. Basbanes and Mr. Gage as class representatives;

(c)     Designation of Mr. Basbanes' and Mr. Gage's counsel as class counsel;

(d)     An injunction prohibiting Defendants from infringing Plaintiffs' and class

members' copyrights, including without limitation enjoining Defendants from

using Plaintiffs' and class members' copyrighted works in "training" Defendants'

large language models without express authorization;

(e)     An award of actual damages to Plaintiffs and class members;

(f)     An award of Defendants' additional profits attributable to infringement to

Plaintiffs and class members;

(g)     An award of statutory damages up to $150,000 per infringed work to

Plaintiffs and class members, in the alternative to actual damages and profits, at

Plaintiffs election before final judgment;

(h)     Reasonable attorneys' fees and costs, as allowed by law;

(i)     Pre-judgment and post-judgment interest, as allowed by law; and

(j)     Such further relief as the Court may deem just and proper.

## <u>UR   DEMAND</u>

150.    Plaintiffs demand a trial by jury as to all issues so triable.

2AA-380

DATED: January 5, 2024
     New York, New York


GRANT HERRMANN SCHWARTZ & KLINGER LLP

By:*/s/ Michael P. Richter*
   Michael P. Richter (MR2230)
   Bryan M. Goldstein (4980702)
   107 Greenwich Street, 25th Floor
   New York, New York 10006
   Tel.: (212) 682-1800
   mrichter@ghsklaw.com
   bgoldstein@ghsklaw.com

*Attorneys for Mr. Basbanes, Mr. Gage and the Proposed Class*

2AA-381

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AUTHORS GUILD, DAVID BALDACCI, MARY BLY, MICHAEL CONNELLY, SYLVIA DAY, JONATHAN FRANZEN, JOHN GRISHAM, ELIN HILDERBRAND, CHRISTINA BAKER KLINE, MAYA SHANBHAG LANG, VICTOR LAVALLE, GEORGE R.R. MARTIN, JODI PICOULT, DOUGLAS PRESTON, ROXANA ROBINSON, GEORGE SAUNDERS, SCOTT TUROW, and RACHEL VAIL, individually and on behalf of others similarly situated, | Case No. 1:23-cv-08292-SHS; |
| Plaintiffs, | |
| v. | |
| OPENAI INC., OPENAI OPCO LLC, OPENAI GP LLC, OPENAI LLC, OPENAI GLOBAL LLC, OAI CORPORATION LLC, OPENAI HOLDINGS LLC, OPENAI STARTUP FUND I LP, OPENAI STARTUP FUND GP I LLC,OPENAI STARTUP FUND MANAGEMENT LLC, and MICROSOFT CORPORATION, | |
| Defendants. | |
| JONATHAN ALTER, KAI BIRD, TAYLOR BRANCH, RICH COHEN, EUGENE LINDEN, DANIEL OKRENT, JULIAN SANCTON, HAMPTON SIDES, STACY SCHIFF, JAMES SHAPIRO, JIA TOLENTINO, and SIMON WINCHESTER, on behalf of themselves and all others similarly situated, | Case No. 1:23-cv-10211-SHS |
| Plaintiffs, | |
| v. | |
| OPENAI, INC., OPENAI GP, LLC, OPENAI, LLC, OPENAI OPCO LLC, OPENAI GLOBAL LLC, OAI CORPORATION, LLC, OPENAI HOLDINGS, LLC, and MICROSOFT CORPORATION, | |
| Defendants. | |

**JOINT STIPULATION AND PROPOSED ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT, CLASS CERTIFICATION, AND DISCOVERY SCHEDULE**

This stipulation is made by and among Authors Guild, David Baldacci, Mary Bly, Michael

Connelly, Sylvia Day, Jonathan Franzen, John Grisham, Elin Hilderbrand, Christina Baker Kline,

Maya Shanbhag Lang, Victor Lavalle, George R.R. Martin, Jodi Picoult, Douglas Preston, Roxana Robinson, George Saunders, Scott Turow, and Rachel Vail (collectively "Fiction Plaintiffs"); Jonathan Alter, Kai Bird, Taylor Branch, Rich Cohen, Eugene Linden, Daniel Okrent, Julian Sancton, Hampton Sides, Stacy Schiff, James Shapiro, Jia Tolentino, and Simon Winchester (collectively "Nonfiction Plaintiffs" and, together with Fiction Plaintiffs, "Plaintiffs"); and OpenAI, Inc., OpenAI OPCO LLC, OpenAI GP LLC, OpenAI LLC, OpenAI Global LLC, OAI Corporation LLC, OpenAI Holdings LLC, OpenAI Startup Fund I LIP, OpenAI Startup Fund GP I LLC, OpenAI Startup Fund Management LLC (collectively "OpenAI"), and Microsoft Corporation (collectively "Defendants" and, together with the Plaintiffs, the "Parties"), by and through their counsel, as follows:

WHEREAS, on September 19, 2023, the Fiction Plaintiffs filed a Class Action Complaint, No. 1:23-cv-08292-SHS, ECF No. 1, against OpenAI;

WHEREAS, on November 21, 2023, Plaintiff Julian Sancton filed a Class Action Complaint, No. 1:23-cv-10211-SHS, ECF No. 1, against OpenAI and Microsoft Corporation;

WHEREAS, on November 30, 2023, this Court entered an order, No. 1:23-cv-08292-SHS, ECF No. 36, stating discovery in this matter commenced on November 6, 2023; ordering the Fiction Plaintiffs to file an amended complaint on or before December 4, 2023; setting the last day for Defendants to answer or move in response to the amended complaint in *Authors Guild et al. v. OpenAI, Inc. et al.* (No. 1:23-cv-08292-SHS) on January 12, 2024; setting the last day for Defendants to respond to the complaint in *Sancton v. OpenAI, Inc. et al.* (No. 1:23-cv-10211-SHS) on January 12, 2024; setting the last day for the Fiction Plaintiffs and Defendants to file their positions on whether summary judgment or class certification should proceed first on January 12, 2024; setting the last day for the Fiction Plaintiffs to respond to any motion in response to the amended complaint on January 26, 2024; and setting the reply to any motion in *Authors Guild et*

2

*al. v. OpenAI, Inc. et al.* (No. 1:23-cv-08292-SHS) due on or before February 2, 2024;

**WHEREAS,** on December 4, 2023, the Fiction Plaintiffs filed an Amended Class Action Complaint, No. 1:23-cv-08292-SHS, ECF No. 40, adding Microsoft Corporation as a defendant;

**WHEREAS,** on December 19, 2023, Nonfiction Plaintiffs filed an Amended Class Action Complaint, No. 1:23-cv-10211-SHS, ECF. No. 26, adding Jonathan Alter, Kai Bird, Taylor Branch, Rich Cohen, Eugene Linden, Daniel Okrent, Hampton Sides, Stacy Schiff, James Shapiro, Jia Tolentino, and Simon Winchester as plaintiffs;

**WHEREAS,** on January 12, 2024, Plaintiffs' counsel filed a Motion for the Appointment of Interim Class Counsel for the Fiction and Nonfiction Author Classes;

**NOW, THEREFORE,** in consideration of the foregoing, which are incorporated into this Stipulation, the Parties hereby stipulate and agree as follows:

1.      Defendants consent and stipulate not to seek transfer of the above-captioned cases to another district; however, in the event additional cases are filed raising similar claims on behalf of individual plaintiffs or proposed classes that overlap, either partially or completely, with the classes proposed in the operative Complaints (No. 1:23-cv-08292-SHS, ECF No. 40; No. 1:23-cv-10211-SHS, ECF. No. 26), Defendants reserve the right to file a motion under 28 U.S.C. § 1407 seeking coordination or consolidation before any appropriate district court.

2.      Defendants consent and stipulate not to bring a motion to dismiss under the first-to-file rule.

3.      Defendants consent and stipulate not to seek to dismiss, under Federal Rule of Civil Procedure 12(b), Plaintiffs' currently-pleaded claims.

4.      The Parties consent and stipulate to the consolidation of the *Authors Guild et al. v. OpenAI, Inc. et al.*, No. 1:23-cv-08292-SHS, and *Alter v. OpenAI, Inc. et al.*, No. 1:23-cv-10211-SHS pursuant to Federal Rule of Civil Procedure 42 for pre-trial purposes.

3

5.    The Parties consent and stipulate that Plaintiffs will file a consolidated class action complaint no later than January 26, 2024, and Defendants will respond to Plaintiffs' consolidated class action complaint no later than February 9, 2024.  Defendants shall not move to dismiss under Federal Rule of Civil Procedure 12(b) any claims pleaded in the consolidated class action complaint that are currently pleaded in the operative Nonfiction and Fiction complaints.

6.    The Parties consent and stipulate that discovery is ongoing and that there are no present restrictions on the scope of class discovery, notwithstanding that summary judgment will be briefed before Plaintiffs' motion for class certification.

7.    The Parties stipulate and agree, and upon entry of this stipulation by the Court, it is hereby ordered, that fact discovery, expert discovery, and the briefing of any motion for summary judgment will be completed on or before February 28, 2025.

8.    The Parties will, by January 26, 2024 submit proposed schedule(s) for fact discovery, expert discovery, and the briefing of summary judgment. Prior to submitting any proposed schedules, the parties will meet and confer in good faith in an effort to reach agreement on any proposed schedules and minimize or eliminate disputes presented to the Court.

9.    Defendants stipulate and agree and hereby expressly waive whatever protections to which they would otherwise be entitled under the "one-way intervention" rule with respect to its forthcoming summary judgment motions. *See, e.g., Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 547 (1974). Defendants expressly reserve the right to raise any and all defenses, other than any protection to which they would otherwise be entitled under the one-way intervention rule.

10.    The Plaintiffs reserve their rights to move for class certification at any point, and the Parties stipulate and agree that Defendants are not required to submit oppositions before the Court's ruling on summary judgment. In the event that the Court denies or partially denies Defendants' motion for summary judgment, Defendants' opposition to any pending motion for

4

class certification will be due thirty-five (35) days after the Court's order on any motion(s) for summary judgment. Plaintiffs' reply in support of any pending motion for class certification will be due twenty-one (21) days after Defendants' opposition.

11.    The Parties expressly reserve all rights, arguments, claims, and defenses not addressed herein.

**IN WITNESS WHEREOF** and in agreement herewith, by and through their counsel, the Parties have executed and delivered this Stipulation as of the date first set forth below.

SO STIPULATED AND AGREED.

Date: January 19, 2024                    */s/ Rachel J. Geman*

Rachel Geman
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: 212.355.9500
rgeman@lchb.com

Reilly T. Stoler (*pro hac vice* to be submitted)
Ian R. Bensberg (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
ibensberg@lchb.com

Wesley Dozier (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 2nd Avenue, Suite 1640
Nashville, TN 37201
Telephone: 615.313.9000
wdozier@lchb.com

2925152.1

**2AA-386**

*/s/ Scott J. Sholder*
Scott J. Sholder
CeCe M. Cole
COWAN DEBAETS ABRAHAMS & SHEPPARD LLP
41 Madison Avenue, 38th Floor
New York, New York 10010
Telephone: 212.974.7474
ssholder@cdas.com
ccole@cdas.com

*Attorneys for Fiction Plaintiffs*

Date: January 19, 2024

*/s/ Justin A. Nelson*
Justin A. Nelson (*pro hac vice*)
Alejandra C. Salinas (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: 713.651.9366
jnelson@susmangodfrey.com
asalinas@susmangodfrey.com

Rohit D. Nath (pro hac vice)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: 310.789.3100
rnath@susmangodfrey.com

J. Craig Smyser
SUSMAN GODFREY L.L.P.
1901 Avenue of the Americas, 32nd Floor
New York, New York 10019
Tel.: 212-336-8330
csmyser@susmangodfrey.com

*Attorneys for Nonfiction Plaintiffs*

Date: January 19, 2024

*/s/ Joseph C. Gratz*
Joseph C. Gratz (*pro hac vice*)
Tiffany Cheung (*pro hac vice* forthcoming)
Joyce C. Li (*pro hac vice* forthcoming)
Melody E. Wong (*pro hac vice* forthcoming)
MORRISON & FOERSTER LLP
425 Market Street

6

2AA-387

San Francisco, California 94105-2482
Telephone: 415.268.7000
JGratz@mofo.com
TCheung@mofo.com
JoyceLi@mofo.com
Melody Wong@mofo.com

Allyson R. Bennett (*pro hac vice* forthcoming)
Rose S. Lee (*pro hac vice* forthcoming)
Alexandra M. Ward (*pro hac vice* forthcoming)
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, California 90017-3543
Telephone: 213.892.5200
ABennett@mofo.com
RoseLee@mofo.com
AlexandraWard@mofo.com

Date: January 19, 2024          */s/ Andrew Gass*
                               Andrew Gass (*pro hac vice*)
                               Joseph R. Wetzel
                               LATHAM & WATKINS LLP
                               505 Montgomery Street, Suite 2000
                               San Francisco, California 94111
                               Telephone: 415.391.0600
                               Andrew.Gass@lw.com
                               Joe.Wetzel@lw.com

                               Sarang Vijay Damle
                               LATHAM & WATKINS LLP
                               555 Eleventh Street, NW, Suite 1000
                               Washington, D.C. 20004
                               Telephone: 202.637.2200
                               Sy.Damle@lw.com

                               Allison L. Stillman
                               LATHAM & WATKINS LLP
                               1271 Avenue of the Americas
                               New York, NY 10020
                               Telephone: 212.751.4864
                               Alli.Stillman@lw.com

                               *Attorneys for OpenAI*

2925152.1

**2AA-388**

Date: January 19, 2024

/s/ Annette L. Hurst
Annette L. Hurst (*pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94111
Telephone: 415.773.4585
Ahurst@orrick.com

Christopher Cariello
Marc Shapiro
ORRICK, HERRINGTON, & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Telephone: 212.506.3521
Ccariello@orrick.com
Mshapiro@orrick.com

*Attorneys for Microsoft Corporation*

Date: January 22, 2024

SO ORDERED:

Sidney H. Stein, U.S.D.J.

2925152.1

**2AA-389**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NICHOLAS A. BASBANES and
NICHOLAS NGAGOYEANES
(professionally known as Nicholas Gage),
individually and on behalf of all others
similarly situated

                    Plaintiffs,

    -v-

MICROSOFT CORPORATION, OPENAI,
INC., OPENAI GP, L.L.C., OPENAI
HOLDINGS, LLC, OAI CORPORATION,
LLC, OPENAI GLOBAL, LLC, OPENAI,
L.L.C., and OPENAI OPCO, LLC,

                  Defendants.

24-CV-84 (SHS)

ORDER

SIDNEY H. STEIN, U.S. District Judge.

On January 22, 2024, plaintiffs Basbanes and Gage filed a motion with the four requests addressed below. (ECF No. 21.) The Court hereby grants plaintiffs' motion in part and denies the motion in part.

First, plaintiffs move to consolidate this action (the "Basbanes-Gage Action") with *Authors Guild, et al., v. Open AI Inc., et al.*, No. 23-cv-08292 (the "Authors Guild Action") and with *Jonathan Alter, et al., v. Open AI Inc., et al.*, No. 23-cv-10211 (the "Alter Action"). Plaintiffs in the Authors Guild Action and Alter Action do not oppose consolidation (ECF No. 31), and the Court has not received any other opposition to plaintiffs' motion. Accordingly, the motion to consolidate is granted for pretrial purposes pursuant to Fed. R. Civ. P. 42.

Second, plaintiffs request that the Court create a steering committee for the consolidated actions that includes counsel for Basbanes and Gage. The Court finds that a steering committee is not necessary and denies this request.

Third, plaintiffs request to appoint the law firms of Lieff Cabraser Heimann & Bernstein, LLP and Susman Godfrey L.L.P. as interim co-lead counsel for the consolidated actions. Pursuant to the Court's order entered on February 6, 2024 in the Authors Guild Action and Alter Action, Lieff Cabraser Heimann & Bernstein, LLP, Susman Godfrey L.L.P., and Cowan DeBaets Abrahams & Sheppard, LLP have been

appointed as interim co-lead class counsel in the consolidated action, which now includes the Basbanes-Gage Action.

Plaintiffs' fourth request to rule on this motion before ordering the Joint Stipulation filed in the Authors Guild Action and Alter Action is moot.

Dated: New York, New York
        February 6, 2024

SO ORDERED:

Sidney H. Stein, U.S.D.J.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AUTHORS GUILD *et al.*, individually and on behalf of others similarly situated, | Case No. 1:23-cv-08292-SHS<br>Case No. 1:23-cv-10211-SHS<br>Case No. 1:23-cv-11195-SHS<br>Case No. 1:24-cv-00084-SHS |
| Plaintiffs, | |
| v. | **NOTICE OF MOTION AND MOTION TO INTERVENE AND DISMISS, STAY OR TRANSFER** |
| OPENAI INC., OPENAI OPCO LLC, OPENAI GP LLC, OPENAI LLC, OPENAI GLOBAL LLC, OAI CORPORATION LLC, OPENAI HOLDINGS LLC, OPENAI STARTUP FUND I LP, OPENAI STARTUP FUND GP I LLC, OPENAI STARTUP FUND MANAGEMENT LLC, and MICROSOFT CORPORATION, | |
| Defendants. | |
| JONATHAN ALTER *et al.*, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| OPENAI, INC., OPENAI GP, LLC, OPENAI, LLC, OPENAI OPCO LLC, OPENAI GLOBAL LLC, OAI CORPORATION, LLC, OPENAI HOLDINGS, LLC, and MICROSOFT CORPORATION, | |
| Defendants. | |
| THE NEW YORK TIMES COMPANY | |
| Plaintiffs, | |
| v. | |
| MICROSOFT CORPORATION, OPENAI, INC., OPENAI LP, OPENAI GP, LLC, OPENAI, LLC, OPENAI OPCO LLC, OPENAI GLOBAL LLC, OAI CORPORATION, LLC, and OPENAI HOLDINGS, LLC, | |
| Defendants. | |

NICHOLAS A. BASBANES and NICHOLAS
NGAGOYEANES (professionally known as
Nicholas Gage), individually and on behalf of
all others similarly situated,

                    Plaintiffs,

      v.

MICROSOFT CORPORATION, OPENAI,
INC., OPENAI GP, L.L.C., OPENAI
HOLDINGS, LLC, OAI CORPORATION,
LLC, OPENAI GLOBAL, LLC, OPENAI,
L.L.C., and OPENAI OPCO, LLC,

                  Defendants.

PLEASE TAKE NOTICE that Plaintiffs in the substantially similar first-filed case, *In re OpenAI ChatGPT Litigation*, pending in the Northern District of California, Master File No. 3:23-cv-03223-AMO (N.D. Cal. 2023) ("*In re ChatGPT Litigation*"), on behalf of themselves and others similarly situated, hereby move this Court before the Honorable Sidney H. Stein, United States District Judge, at the United States District Court for the Southern District of New York, 500 Pearl St., New York, NY 10007, to intervene and to dismiss, or in the alternative to stay or transfer, the following actions to the Northern District of California pursuant to Rule 24 of the Federal Rules of Civil Procedure and  the first-to-file rule: 1) *Authors Guild et al. v. OpenAI Inc. et al.*, Case No. 1:23-cv-08292-SHS; 2) *Alter et al. v. OpenAI Inc.et al.*, Case No. 1:23-cv-10211-SHS; 3) *Basbanes et al. v. Microsoft Corp.*, Case No. 1:24-cv-00084; 4) *The N.Y. Times Co. v. Microsoft Corp. et al.*, Case No. 1:23-cv-11195-SHS.

In support of the Motion, Plaintiff-Intervenors rely on the accompanying Memorandum of Law, the Declaration of Christopher J. Hydal, the files and docket in *In re ChatGPT Litigation*, the files and dockets in the actions referred to above, and any other written or oral argument as may be requested by the Court.

Dated: February 12, 2024            By:    */s/ Christopher J. Hydal*
                                        Christopher J. Hydal

Christopher J. Hydal
**JOSEPH SAVERI LAW FIRM, LLP**
40 Worth Street, Suite 602
New York, NY 10013
Telephone: (646) 527-7310
Facsimile:  (212) 202-7678
Email:     chydal@saverilawfirm.com

1

Joseph R. Saveri (*pro hac vice forthcoming*)
Cadio Zirpoli (*pro hac vice forthcoming*)
Christopher K. L. Young (*pro hac vice forthcoming*)
Holden Benon (*pro hac vice forthcoming*)
Aaron Cera (*pro hac vice forthcoming*)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile:  (415) 395-9940
Email:   jsaveri@saverilawfirm.com
           czirpoli@saverilawfirm.com
           cyoung@saverilawfirm.com
           hbenon@saverilawfirm.com
           acera@saverilawfirm.com


Matthew Butterick (*pro hac vice forthcoming*)
1920 Hillhurst Avenue, #406
Los Angeles, CA 90027
Telephone:  (323)968-2632
Facsimile:   (415) 395-9940
Email:        mb@butticklaw.com


Bryan L. Clobes (pro hac vice forthcoming)
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
205 N. Monroe Street
Media, PA 19063
Telephone:     215-864-2800
Email:         bclobes@caffertyclobes.com


Alexander J. Sweatman (pro hac vice forthcoming)
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
135 South LaSalle Street, Suite 3210
Chicago, IL 60603
Telephone:     312-782-4880
Email:         asweatman@caffertyclobes.com


Daniel J. Muller (State Bar No. 193396)
**VENTURA HERSEY & MULLER, LLP**
1506 Hamilton Avenue
San Jose, California 95125
Telephone: (408) 512-3022
Facsimile: (408) 512-3023
Email:         dmuller@venturahersey.com


*Counsel for Individual and Representative Plaintiffs
and the Proposed Class*

2

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AUTHORS GUILD *et al*., individually and on behalf of others similarly situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>OPENAI INC., OPENAI OPCO LLC, OPENAI GP LLC, OPENAI LLC, OPENAI GLOBAL LLC, OAI CORPORATION LLC, OPENAI HOLDINGS LLC, OPENAI STARTUP FUND I LP, OPENAI STARTUP FUND GP I LLC, OPENAI STARTUP FUND MANAGEMENT LLC, and MICROSOFT CORPORATION,<br><br>     Defendants. | Case No. 1:23-cv-08292-SHS<br>Case No. 1:23-cv-10211-SHS<br>Case No. 1:23-cv-11195-SHS<br>Case No. 1:24-cv-00084-SHS<br><br><br>**DECLARATION OF CHRISTOPHER J. HYDAL IN SUPPORT OF MOTION TO INTERVENE AND DISMISS, STAY OR TRANSFER** |
| JONATHAN ALTER *et al*., on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>OPENAI, INC., OPENAI GP, LLC, OPENAI, LLC, OPENAI OPCO LLC, OPENAI GLOBAL LLC, OAI CORPORATION, LLC, OPENAI HOLDINGS, LLC, and MICROSOFT CORPORATION,<br><br>     Defendants. | |
| THE NEW YORK TIMES COMPANY<br><br>     Plaintiffs,<br><br>     v.<br><br>MICROSOFT CORPORATION, OPENAI, INC., OPENAI LP, OPENAI GP, LLC, OPENAI, LLC, OPENAI OPCO LLC, OPENAI GLOBAL LLC, OAI CORPORATION, LLC, and OPENAI HOLDINGS, LLC, <br><br>     Defendants. | |

NICHOLAS A. BASBANES and NICHOLAS
NGAGOYEANES (professionally known as
Nicholas Gage), individually and on behalf of
all others similarly situated,

                       Plaintiffs,

       v.

MICROSOFT CORPORATION, OPENAI,
INC., OPENAI GP, L.L.C., OPENAI
HOLDINGS, LLC, OAI CORPORATION,
LLC, OPENAI GLOBAL, LLC, OPENAI,
L.L.C., and OPENAI OPCO, LLC,

                  Defendants.

I, Christopher J. Hydal, declare as follows:

1.      I am an associate attorney with the Joseph Saveri Law Firm, LLP ("JSLF"). I am admitted to practice before this Court and a member in good standing of the bar of the State of New York, as well as the United States District Court for the Eastern District of New York, and the United States Court of Appeals for the Second Circuit. I submit this Declaration in support of Plaintiff-Intervenors' Motion to Intervene and to Dismiss, Stay, or Transfer with respect to four Southern District of New York cases ("S.D.N.Y. Actions").[1] Three of the S.D.N.Y. Actions are consolidated under *Authors Guild et al., v. OpenAI, Inc. et al.*, Case No. 1:23-cv-08292-SHS (S.D.N.Y. Sep. 19, 2023) ("*Authors Guild* Action"). The fourth S.D.N.Y. Action is *The N.Y. Times Co. v. Microsoft Corp. et al.*, Case No. 23-cv-11195 (S.D.N.Y. Dec. 27, 2023) ("*New York Times* Action"). I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I could and would testify competently to them. I make this declaration pursuant to 28 U.S.C. § 1746.

2.      On June 28, 2023, JSLF filed a Class Action Complaint on behalf of Paul Tremblay and Mona Awad.[2] *See Tremblay et al., v. OpenAI, Inc. et al.*, Case No. 3:23-cv-03223-AMO (N.D. Cal. June 28, 2023) ("*Tremblay*" or "*Tremblay* Action"), ECF No. 1.[3] The *Tremblay* Class Action Complaint is the currently operative complaint.

3.      On July 19, 2023, JSLF, on behalf of Plaintiffs in the *Tremblay* Action, filed an administrative motion to relate the *Tremblay* Action to *Silverman et al., v. OpenAI, Inc. et al.*,

---

[1] Plaintiff-Intervenors are Paul Tremblay, Sarah Silverman, Christopher Golden, Richard Kadrey, Michael Chabon, Ta-Nehisi Coates, Junot Díaz, Andrew Sean Greer, David Henry Hwang, Matthew Klam, Laura Lippman, Rachel Louise Snyder, Ayelet Waldman, and Jacqueline Woodson (collectively, "*Tremblay* Plaintiffs").

[2] On August 11, 2023, Plaintiff Awad and her individual claims were voluntarily dismissed without prejudice. *See Tremblay* Action, ECF No. 29.

[3] All references to "ECF No. __" are to the docket in the *Tremblay* Action unless otherwise noted.

Case No. 4:23-cv-03416-KAW (N.D. Cal. July 7, 2023) ("*Silverman* Action"). ECF No. 16. On

July 28, 2023, the *Tremblay* court granted that motion. ECF No. 26. On September 20, 2023,

Plaintiffs in the *Tremblay* Action filed an administrative motion to relate *Chabon et al. v.*

*OpenAI, Inc. et al.*, Case No. 4:23-cv-04625-PHK (N.D. Cal. Sept. 8, 2023) ("*Chabon* Action")

to the *Tremblay* Action. ECF No. 46. On October 10, 2023, the *Tremblay* court granted that

motion. ECF No. 53.

   4.  On October 5, 2023, the *Tremblay* court conducted a case management

conference. ECF No. 51. During that conference, the parties discussed, among other things, the

pretrial litigation schedule for the case. The schedule the *Tremblay* Plaintiffs had submitted

provided a timeline for the completion of merits and expert discovery, class certification, and

dispositive motions consistent with Rule 23 and ordinary class action practice. ECF No. 50 at 12;

ECF No. 51. Defendants sought to sequence dispositive motions prior to class certification. After

hearing from counsel, the *Tremblay* court asked for letter briefs on the issues of the scheduling of

summary judgment, class certification and the application of the one-way intervention rule.

   5.  On October 17, 2023, the *Tremblay* parties submitted letter briefs, as requested by

the *Tremblay* court. ECF Nos. 56, 57. On November 8, 2023, the *Tremblay* court held a status

conference, where the pretrial litigation schedule in the *Tremblay* Action was discussed. ECF

No. 71. Among other things, the court accepted *Tremblay* Plaintiffs' proposal, setting class

certification prior to dispositive motions. ECF No. 77 at 12-13; ECF No. 50 at 12; ECF No. 51.

Under that schedule, the close of fact discovery is October 29, 2024. ECF No. 51. The close of

expert discovery is March 13, 2025. *Id.* Motions for class certification and *Daubert* motions are

due by April 10, 2025. *Id.* Oppositions to class certification and *Daubert* motions are due by

June 24, 2025. *Id.*

   6.  The parties in the *Tremblay* Action have relied on the *Tremblay* court's

scheduling order, and litigation is well underway. On September 14, 2023, counsel for the

*Tremblay* Action parties conducted a Rule 26(f) conference. ECF No. 50 at 2. On September 28, 2023, the *Tremblay* Action parties exchanged initial disclosures. On December 13, 2023, the *Tremblay* Action parties served each other with interrogatories and requests for production. The *Tremblay* Action parties have issued objections and responses to each other's discovery requests and are in the process of meeting and conferring regarding them. On October 26, 2023, the parties stipulated to consolidation of the *Tremblay*, *Silverman*, and *Chabon* Actions. ECF No. 60. On November 9, 2023, the *Tremblay* court consolidated the *Tremblay, Silverman,* and *Chabon* Actions under the master caption *In re OpenAI ChatGPT Litigation*. ECF No. 74. The case is proceeding on schedule.

7.    In addition to discovery being well underway in the *Tremblay* Action, counsel for the parties in the *Tremblay* Action have litigated a Rule 12 motion to dismiss. ECF Nos. 33, 48, 54. I have reviewed the dockets in the S.D.N.Y. Actions, which reveal that, in contrast to the *Tremblay* Action, the S.D.N.Y. Actions are not substantially advanced beyond complaints having been filed. For example, discovery is not underway. In fact, other than motions for lead counsel, there has been little activity in the *Authors Guild* Action until recently; the *New York Times* Action is even less developed.

8.    I have reviewed the complaints filed in the *Authors Guild* Action. They are substantially identical to the *Tremblay* Action. Each purport to represent proposed classes which are coextensive with and entirely subsumed by the class proposed in the *Tremblay* Action. They are each a copy of the *Tremblay* Action. I have also reviewed the complaint filed in the *New York Times* Action, which is substantially similar to the *Tremblay* Action. The plaintiff in the *New York Times* case is subsumed by the class proposed in the *Tremblay* Action. The Plaintiffs in each action allege that OpenAI, Inc. and its affiliated entities (collectively, "OpenAI") committed copyright infringement when they made and used copies of the plaintiffs' literary,

3

journalistic, and other written works—without permission—during the process of training OpenAI's large language models.

9.      As explained further in the brief filed herewith, under the first-to-file rule, the *Tremblay* Plaintiffs should be allowed to intervene in the substantially similar S.D.N.Y. Actions. The S.D.N.Y. Actions should be dismissed or, in the alternative, transferred or stayed.

10.      Attached hereto as Exhibit A is a true and correct copy of the Class Action Complaint filed in *Tremblay et al., v. OpenAI Inc. et al.*, Case No. 3:23-cv-03323-AMO (N.D. Cal. June 28, 2023).

11.      Attached hereto as Exhibit B is a true and correct copy of the Class Action Complaint filed in *Silverman et al., v. OpenAI Inc. et al.*, Case No. 3:23-cv-03416-AMO (N.D. Cal. July 7, 2023).

12.      Attached hereto as Exhibit C is a true and correct copy of the original Complaint filed in *Chabon et al., v. OpenAI Inc. et al.*, Case No. 3:23-cv-04625-AMO (N.D. Cal. Sep. 8, 2023).

13.      Attached hereto as Exhibit D is a true and correct copy of the Amended Complaint filed in *Chabon et al., v. OpenAI Inc. et al.*, Case No. 3:23-cv-04625-AMO (N.D. Cal. Oct. 5, 2023).

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 12, 2024.

By:     */s/ Christopher J. Hydal*

Christopher J. Hydal

**2AA-401**

[Counsel on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE OPENAI CHATGPT LITIGATION | Lead Case No. 3:23-cv-03223-AMO |
| This document relates to:<br>Case No. 3:23-cv-03223-AMO<br>Case No. 3:23-cv-03416-AMO<br>Case No. 3:23-cv-04625-AMO | [PROPOSED] **STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS** |

Lead Case No. 3:23-cv-03223-AMO

[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY
SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

2AA-402

1.    <u>PURPOSES AND LIMITATIONS</u>

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted. Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles. The parties further acknowledge, as set forth in Section 14.4, below, that this Stipulated Protective Order does not entitle them to file confidential information under seal; Civil Local Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal.

2.    <u>DEFINITIONS</u>

2.1    <u>Challenging Party</u>: a Party or Non-Party that challenges the designation of information or items under this Order.

2.2    <u>"CONFIDENTIAL" Information or Items</u>: information (regardless of how it is generated, stored, or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c).

2.3    <u>Counsel (without qualifier)</u>: Outside Counsel of Record and House Counsel (as well as their support staff).

2.4    <u>Designated House Counsel</u>: House Counsel who seek access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information in this matter.

2.5    <u>Designating Party</u>: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE".

[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

**2AA-403**

2.6 <u>Disclosure or Discovery Material</u>: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.7 <u>Expert</u>: a person with specialized knowledge or experience in a matter pertinent to the litigation who (1) has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action, (2) is not a past or current employee of a Party or of a Party's competitor, and (3) at the time of retention, is not anticipated to become an employee of a Party or of a Party's competitor.

2.8 <u>"HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items</u>: extremely sensitive "Confidential Information or Items," disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.9 <u>"HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items</u>: extremely sensitive "Confidential Information or Items" representing computer code and associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.10 <u>House Counsel</u>: attorneys who are employees of a Party to this action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.11 <u>Non-Party</u>: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.12 <u>Outside Counsel of Record</u>: attorneys who are not employees of a party to this action but are retained to represent or advise a Party to this action and have appeared in this action on behalf of that party or are affiliated with a law firm which has appeared on behalf of that party.

2.13   Party: any Party to this action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

2.14   Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this action.

2.15   Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.16   Protected Material: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL," or as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or as "HIGHLY CONFIDENTIAL – SOURCE CODE."

2.17   Receiving Party: a Party that receives Disclosure or Discovery Material from a Producing Party.

3.   SCOPE

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Stipulation and Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party. Any use of Protected Material at trial shall be governed by a separate agreement or order.

[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY
SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

2AA-405

4.   <u>DURATION</u>

Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5.   <u>DESIGNATING PROTECTED MATERIAL</u>

5.1   <u>Exercise of Restraint and Care in Designating Material for Protection</u>. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. To the extent it is practical to do so, the Designating Party must designate for protection only those parts of material, documents, items, or oral or written communications that qualify – so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other parties) expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection at all or do not qualify for the level of protection initially asserted, that Designating Party must promptly notify all other parties that it is withdrawing the mistaken designation.

5.2   <u>Manner and Timing of Designations</u>. Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery.

[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

**2AA-406**

Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a) <u>for information in documentary form</u> (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" to each page that contains protected material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins) and must specify, for each portion, the level of protection being asserted.

A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the appropriate legend ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE) to each page that contains Protected Material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins) and must specify, for each portion, the level of protection being asserted.

(b) for testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony and specify the level of protection being asserted. When it is impractical to identify separately each portion of testimony that is entitled to protection and it appears that substantial portions of the testimony may qualify for protection, the Designating Party may invoke

on the record (before the deposition, hearing, or other proceeding is concluded) a right to have up to 21 days to identify the specific portions of the testimony as to which protection is sought and to specify the level of protection being asserted. Only those portions of the testimony that are appropriately designated for protection within the 21 days shall be covered by the provisions of this Stipulated Protective Order. Alternatively, a Designating Party may specify, at the deposition or up to 21 days afterwards if that period is properly invoked, that the entire transcript shall be treated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

Parties shall give the other parties notice if they reasonably expect a deposition, hearing, or other proceeding to include Protected Material so that the other parties can ensure that only authorized individuals who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A) are present at those proceedings. The use of a document as an exhibit at a deposition shall not in any way affect its designation as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

Transcripts containing Protected Material shall have an obvious legend on the title page that the transcript contains Protected Material, and the title page shall be followed by a list of all pages (including line numbers as appropriate) that have been designated as Protected Material and the level of protection being asserted by the Designating Party. The Designating Party shall inform the court reporter of these requirements. Any transcript that is prepared before the expiration of a 21-day period for designation shall be treated during that period as if it had been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" in its entirety unless otherwise agreed. After the expiration of that period, the transcript shall be treated only as actually designated.

(c) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE". If only a portion or portions of the information or item warrant protection, the Producing

Lead Case No. 3:23-cv-03223-AMO                 6
[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

2AA-408

Party, to the extent practicable, shall identify the protected portion(s) and specify the level of protection being asserted.

      5.3    <u>Inadvertent Failures to Designate</u>. If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

6.    <u>CHALLENGING CONFIDENTIALITY DESIGNATIONS</u>

      6.1    <u>Timing of Challenges</u>. Any Party or Non-Party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

      6.2    <u>Meet and Confer</u>. The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order. The parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice-to-voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

6.3 <u>Judicial Intervention</u>. If the Parties cannot resolve a challenge without court intervention, the Designating Party shall file and serve a motion to retain confidentiality under Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) within 21 days of the initial notice of challenge or within 14 days of the parties agreeing that the meet and confer process will not resolve their dispute, whichever is earlier. Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed in the preceding paragraph. Failure by the Designating Party to make such a motion, including the required declaration within 21 days (or 14 days, if applicable) shall automatically waive the confidentiality designation for each challenged designation. In addition, the Challenging Party may file a motion challenging a confidentiality designation at any time if there is good cause for doing so, including a challenge to the designation of a deposition transcript or any portions thereof. Any motion brought pursuant to this provision must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed by the preceding paragraph.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived the confidentiality designation by failing to file a motion to retain confidentiality as described above, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the court rules on the challenge.

7. <u>ACCESS TO AND USE OF PROTECTED MATERIAL</u>

7.1 <u>Basic Principles</u>. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of section 15 below (FINAL DISPOSITION).

[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

**2AA-410**

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2    <u>Disclosure of "CONFIDENTIAL" Information or Items</u>. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A;

(b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the court and its personnel;

(e) court reporters and their staff, professional jury or trial consultants, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f) during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order.

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

7.3     <u>Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" and</u>

<u>"HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items</u>. Unless otherwise ordered by

the court or permitted in writing by the Designating Party, a Receiving Party may disclose any

information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or

"HIGHLY CONFIDENTIAL – SOURCE CODE" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of

said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this

litigation and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached

hereto as Exhibit A;

(b) Designated House Counsel of the Receiving Party to whom disclosure is reasonably

necessary for this litigation and who has signed the "Acknowledgment and Agreement to Be Bound"

(Exhibit A);

(c) Experts of the Receiving Party (1) to whom disclosure is reasonably necessary for this

litigation, (2) who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and

(3) as to whom the procedures set forth in paragraph 7.4(a)(2), below, have been followed];

(d) the court and its personnel;

(e) court reporters and their staff, professional jury or trial consultants, and Professional

Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the

"Acknowledgment and Agreement to Be Bound" (Exhibit A); and

(f) the author or recipient of a document containing the information or a custodian or other

person who otherwise possessed or knew the information.

7.4     <u>Procedures for Approving or Objecting to Disclosure of "HIGHLY CONFIDENTIAL –</u>

<u>ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or</u>

<u>Items to Designated House Counsel or Experts.</u>

(a)(1) [Omitted.]

(a)(2) Unless otherwise ordered by the court or agreed to in writing by the Designating Party, a

Party that seeks to disclose to an Expert (as defined in this Order) any information or item that has

Lead Case No. 3:23-cv-03223-AMO                    10

[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY
SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

**2AA-412**

1   been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY

2   CONFIDENTIAL – SOURCE CODE" pursuant to paragraph 7.3(c) first must make a written request

3   to the Designating Party that (1) identifies the general categories of "HIGHLY CONFIDENTIAL –

4   ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information that

5   the Receiving Party seeks permission to disclose to the Expert, (2) sets forth the full name of the

6   Expert and the city and state of his or her primary residence, (3) attaches a copy of the Expert's current

7   resume, (4) identifies the Expert's current employer(s), (5) identifies each person or entity from whom

8   the Expert has received compensation or funding for work in his or her areas of expertise or to whom

9   the expert has provided professional services, including in connection with a litigation, at any time

10   during the preceding five years,[1] and (6) identifies (by name and number of the case, filing date, and

11   location of court) any litigation in connection with which the Expert has offered expert testimony,

12   including through a declaration, report, or testimony at a deposition or trial, during the preceding five

13   years.

14        (b) A Party that makes a request and provides the information specified in the preceding

15   respective paragraphs may disclose the subject Protected Material to the identified Expert unless,

16   within 7 days of delivering the request, the Party receives a written objection from the Designating

17   Party. Any such objection must set forth in detail the grounds on which it is based.

18        (c) A Party that receives a timely written objection must meet and confer with the Designating

19   Party (through direct voice to voice dialogue) to try to resolve the matter by agreement within seven

20   days of the written objection. If no agreement is reached, the Party seeking to make the disclosure to

21   the Expert may file a motion as provided in Civil Local Rule 7 (and in compliance with Civil Local

22   Rule 79-5, if applicable) seeking permission from the court to do so. Any such motion must describe

23   the circumstances with specificity, set forth in detail the reasons why the disclosure to the Expert is

24   reasonably necessary, assess the risk of harm that the disclosure would entail, and suggest any

25

26   ――――――――――――――――
    [1] If the Expert believes any of this information is subject to a confidentiality obligation to a third-party,

27   then the Expert should provide whatever information the Expert believes can be disclosed without
     violating any confidentiality agreements, and the Party seeking to disclose to the Expert shall be

28   available to meet and confer with the Designating Party regarding any such engagement.

[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY
SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

additional means that could be used to reduce that risk. In addition, any such motion must be accompanied by a competent declaration describing the parties' efforts to resolve the matter by agreement (i.e., the extent and the content of the meet and confer discussions) and setting forth the reasons advanced by the Designating Party for its refusal to approve the disclosure.

In any such proceeding, the Party opposing disclosure to the Expert shall bear the burden of proving that the risk of harm that the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to its Expert.

8.     [Omitted.]

9.     SOURCE CODE

(a)     To the extent production of source code becomes necessary in this case, a Producing Party may designate source code as "HIGHLY CONFIDENTIAL - SOURCE CODE" if it comprises or includes confidential, proprietary or trade secret source code.

(b)     Protected Material designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be subject to all of the protections afforded to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information and may be disclosed only to the individuals to whom "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information may be disclosed, as set forth in Paragraphs 7.3 and 7.4, with the exception of Designated House Counsel[2].

(c)     Any source code produced in discovery shall be made available for inspection in a format allowing it to be reasonably reviewed and searched during normal business hours or at other mutually agreeable times, at an office of the Producing Party's counsel or another mutually agreed upon location. The source code shall be made available for inspection on a secured computer in a secured room without Internet access or network access to other computers, and the Receiving Party shall not copy, remove, or otherwise transfer any portion of the source code onto any recordable media

---

[2] It may be appropriate under certain circumstances to allow Designated House Counsel access to derivative materials including "HIGHLY CONFIDENTIAL – SOURCE CODE" information, such as exhibits to motions or expert reports. The parties will work together in good faith to ensure that Designated House Counsel has a reasonable opportunity to review draft papers in advance of their service or filing.

Lead Case No. 3:23-cv-03223-AMO                    12

[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

2AA-414

or recordable device. The Producing Party may visually monitor the activities of the Receiving Party's representatives during any source code review, but only to ensure that there is no unauthorized recording, copying, or transmission of the source code.

(d)     The Receiving Party may request paper copies of limited portions of source code that are reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, but shall not request paper copies for the purposes of reviewing the source code other than electronically as set forth in paragraph (c) in the first instance. The Producing Party shall provide all such source code in paper form, including bates numbers and the label "HIGHLY CONFIDENTIAL - SOURCE CODE." The Producing Party may challenge the amount of source code requested in hard copy form pursuant to the dispute resolution procedure and timeframes set forth in Paragraph 6 whereby the Producing Party is the "Challenging Party" and the Receiving Party is the "Designating Party" for purposes of dispute resolution.

(e)     The Receiving Party shall maintain a record of any individual who has inspected any portion of the source code in electronic or paper form. The Receiving Party shall maintain all paper copies of any printed portions of the source code in a secured, locked area. The Receiving Party shall not create any electronic or other images of the paper copies and shall not convert any of the information contained in the paper copies into any electronic format. The Receiving Party shall only make additional paper copies if such additional copies are (1) necessary to prepare court filings, pleadings, or other papers (including a testifying expert's expert report), (2) necessary for deposition, or (3) otherwise necessary for the preparation of its case. Any paper copies used during a deposition shall be retrieved by the Producing Party at the end of each day and must not be given to or left with a court reporter or any other unauthorized individual.

10.   <u>PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION</u>

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL" or "HIGHLY

Lead Case No. 3:23-cv-03223-AMO                13
[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

2AA-415

CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

11.   <u>A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION</u>

(a)   The terms of this Order are applicable to information produced by a Non-Party in this action and designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE". Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

Lead Case No. 3:23-cv-03223-AMO                    14
[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY
SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

2AA-416

(b)     In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

1.     promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

2.     promptly provide the Non-Party with a copy of the Stipulated Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

3.     make the information requested available for inspection by the Non-Party.

(c)     If the Non-Party fails to object or seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

12.     UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

Lead Case No. 3:23-cv-03223-AMO                    15
[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

2AA-417

13.   INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED
      MATERIAL

When a Producing Party gives notice to Receiving Parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the Receiving Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review. Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work product protection, the parties may incorporate their agreement in the stipulated protective order submitted to the court.

14.   MISCELLANEOUS

14.1   Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the court in the future.

14.2   Right to Assert Other Objections. By stipulating to the entry of this Protective Order, no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

14.3   [Omitted.]

14.4   Filing Protected Material. Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material. A Party that seeks to file under seal any Protected Material must comply with Civil Local Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material at issue. Pursuant to Civil Local Rule 79-5, a sealing order will issue only upon a request establishing that the Protected Material at issue is privileged, protectable as a trade secret, or otherwise entitled to protection under the law. If a Receiving Party's request to file Protected Material under seal pursuant to Civil Local

Lead Case No. 3:23-cv-03223-AMO                16
[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY
SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

2AA-418

1  Rule 79-5 is denied by the court, then the Receiving Party may file the Protected Material in the public

2  record pursuant to Civil Local Rule 79-5 unless otherwise instructed by the court.

3  15.    <u>FINAL DISPOSITION</u>

4           Within 60 days after the final disposition of this action, as defined in paragraph 4, each

5  Receiving Party must return all Protected Material to the Producing Party or destroy such material. As

6  used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations,

7  summaries, and any other format reproducing or capturing any of the Protected Material. Whether the

8  Protected Material is returned or destroyed, the Receiving Party must submit a written certification to

9  the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60-day

10  deadline that (1) identifies (by category, where appropriate) all the Protected Material that was

11  returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts,

12  compilations, summaries or any other format reproducing or capturing any of the Protected Material.

13  Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion

14  papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and

15  trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if

16  such materials contain Protected Material. Any such archival copies that contain or constitute

17  Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

18

19  **IT IS SO ORDERED.**

20

21   Dated:  February 15, 2024

22                                                         Honorable Araceli Martínez-Olguín
                                                           United States Judge
23

24

25

26

27

28

[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY
SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

**2AA-419**

Dated: February 14, 2024

By: _____ /s/ Joseph R. Saveri _____
                Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Cadio Zirpoli (State Bar No. 179108)
Christopher K.L. Young (State Bar No. 318371)
Holden Benon (State Bar No. 325847)
Kathleen J. McMahon (State Bar No. 340007)
Aaron Cera (State Bar No. 351163)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:    (415) 500-6800
Facsimile:    (415) 395-9940
Email:          jsaveri@saverilawfirm.com
                  czirpoli@saverilawfirm.com
                  cyoung@saverilawfirm.com
                  hbenon@saverilawfirm.com
                  kmcmahon@saverilawfirm.com
                  acera@saverilawfirm.com

Matthew Butterick (State Bar No. 250953)
1920 Hillhurst Avenue, #406
Los Angeles, CA 90027
Telephone:    (323) 968-2632
Facsimile:    (415) 395-9940
Email:          mb@butericklaw.com

*Counsel for Plaintiffs and the Proposed Class*

1  Dated: February 8, 2024                MORRISON & FOERSTER LLP

2                                         By:    /s/ Joseph C. Gratz
                                                    Joseph C. Gratz
3

4                                         MICHAEL A. JACOBS
                                          MJacobs@mofo.com
5                                         JOSEPH C. GRATZ
                                          JGratz@mofo.com
6                                         TIFFANY CHEUNG
                                          TCheung@mofo.com
7                                         JOYCE C. LI
                                          JoyceLi@mofo.com
8                                         MELODY E. WONG
                                          MelodyWong@mofo.com
9                                         **MORRISON & FOERSTER LLP**
10                                        425 Market Street
                                          San Francisco, California 94105-2482
11                                        Telephone: (415) 268-7000
                                          Facsimile: (415) 268-7522
12

13                                        ALLYSON R. BENNETT
                                          ABennett@mofo.com
14                                        ROSE S. LEE
                                          RoseLee@mofo.com
15                                        **ALEXANDRA M. WARD**
                                          AlexandraWard@mofo.com
16                                        MORRISON & FOERSTER LLP
                                          707 Wilshire Boulevard
17                                        Los Angeles, California 90017-3543
                                          Telephone: (213) 892-5200
18                                        Facsimile: (213) 892-5454
19

20

21

22

23

24

25

26

27

28

Lead Case No. 3:23-cv-03223-AMO            19
[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY
SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

**2AA-421**

1  Dated: February 8, 2024

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM & WATKINS LLP

By:    /s/ Andrew M. Gass
            Andrew M. Gass

ANDREW M. GASS
Andrew.Gass@lw.com
**JOSEPH R. WETZEL**
Joe.Wetzel@lw.com
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 391-0600

SARANG VIJAY DAMLE (pro hac vice)
Sy.Damle@lw.com
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200

ALLISON L. STILLMAN (pro hac vice)
Alli.Stillman@lw.com
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 751-4864

*Attorneys for Defendants*
OPENAI, INC., OPENAI, L.P., OPENAI
OPCO, L.L.C., OPENAI GP, L.L.C., OPENAI
STARTUP FUND GP I, L.L.C., OPENAI
STARTUP FUND I, L.P., AND OPENAI
STARTUP FUND MANAGEMENT, LLC

[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY
SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

**2AA-422**

**EXHIBIT A**

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of _____ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Northern District of California on [date] in the case of *Tremblay v. OpenAI, Inc., et al.*, Lead Case Number: 3:23-cv-03223-AMO. I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Northern District of California for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.

I hereby appoint _____ [print or type full name] of _____ [print or type full address and telephone number] as my California agent for service of process in connection with this action or any proceedings related to enforcement of this Stipulated Protective Order.


Date: _____

City and State where sworn and signed: _____

Printed name: _____
                        [printed name]

Signature: _____
                        [signature]

Lead Case No. 3:23-cv-03223-AMO                    21
[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY
SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

2AA-423

**<u>ATTESTATION OF FILER</u>**

Pursuant to Civil L.R. 5-1(h)(3), regarding signatures, I, Joseph R. Saveri, attest that concurrence in the filing of this document has been obtained.


Dated: February 14, 2024                          Respectfully submitted,


                                                  By:    */s/ Joseph R. Saveri*
                                                         Joseph R. Saveri

[PROPOSED] STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY
SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS

**2AA-424**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AUTHORS GUILD, DAVID BALDACCI, MARY BLY, MICHAEL CONNELLY, SYLVIA DAY, JONATHAN FRANZEN, JOHN GRISHAM, ELIN HILDERBRAND, CHRISTINA BAKER KLINE, MAYA SHANBHAG LANG, VICTOR LAVALLE, GEORGE R.R. MARTIN, JODI PICOULT, DOUGLAS PRESTON, ROXANA ROBINSON, GEORGE SAUNDERS, SCOTT TUROW, and RACHEL VAIL, individually and on behalf of others similarly situated, | Case No. 1:23-cv-08292-SHS; Case No. 1:23-cv-10211-SHS |
| Plaintiffs, | **AUTHOR CLASS PLAINTIFFS' OPPOSITION TO MOTION TO INTERVENE AND DISMISS, STAY OR TRANSFER** |
| v. | |
| OPENAI INC., OPENAI OPCO LLC, OPENAI GP LLC, OPENAI LLC, OPENAI GLOBAL LLC, OAI CORPORATION LLC, OPENAI HOLDINGS LLC, OPENAI STARTUP FUND I LP, OPENAI STARTUP FUND GP I LLC,OPENAI STARTUP FUND MANAGEMENT LLC, and MICROSOFT CORPORATION, | |
| Defendants. | |
| JONATHAN ALTER, KAI BIRD, TAYLOR BRANCH, RICH COHEN, EUGENE LINDEN, DANIEL OKRENT, JULIAN SANCTON, HAMPTON SIDES, STACY SCHIFF, JAMES SHAPIRO, JIA TOLENTINO, and SIMON WINCHESTER, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| OPENAI, INC., OPENAI GP, LLC, OPENAI, LLC, OPENAI OPCO LLC, OPENAI GLOBAL LLC, OAI CORPORATION, LLC, OPENAI HOLDINGS, LLC, and MICROSOFT CORPORATION, | |
| Defendants. | |

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     PROCEDURAL BACKGROUND.......................................................................... 3

        A.      The Tremblay Action ................................................................................. 3

        B.      The Author Action ..................................................................................... 5

        C.      Case Management Order and Discovery .................................................... 6

        D.      Interim Co-Lead Counsel's Efforts to Coordinate Proceedings ............... 8

III.    ARGUMENT ....................................................................................................... 8

        A.      The Court Should Deny Intervention......................................................... 8

        B.      The First-to-File Rule Does Not Apply .................................................... 8

        C.      Circumstances Warrant Exception to the First-to-File Rule.................... 14

        D.      Dismissal or Stay Is Procedurally Inefficient and Inappropriate ........... 15

        E.      The Author Action Should Remain in SDNY ........................................ 17

IV.     CONCLUSION................................................................................................... 19

# TABLE OF AUTHORITIES

**Page**

**Cases**

*1724982 Alberta ULC v. Park Ave. Wholesale, Inc.*,
    No. 1:21-CV-04343-GHW, 2021 WL 3115125 (S.D.N.Y. July 20, 2021) ......................23, 24

*Adoma v. University of Phoenix, Inc.*,
    711 F.Supp.2d 1142 (E.D. Cal. 2010) ........................................................................22

*AEI Life, LLC v. Lincoln Ben. Life Co.*,
    305 F.R.D. 37 (E.D.N.Y. 2015) ................................................................................21

*Am. Geophysical Union v. Texaco Inc.*,
    60 F.3d 913 (2d Cir. 1994) ................................................................................12, 25

*Am. Steamship Owners Mut. Protection and Indem. Ass'n v. Lafarge N. Am. Inc.*,
    474 F. Supp. 2d 474 (S.D.N.Y. 2007), *aff'd sub nom. New York Marine &*
    *Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102 (2d Cir. 2010) ........................20

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
    598 U.S. 508 (2023) ................................................................................................20

*Authors Guild et al. v. OpenAI, Inc. et al.*,
    No. 23-cv-8292-SHS (S.D.N.Y.) ..............................................................................3

*Butler, Fitzgerald & Potter v. Sequa Corp.*,
    250 F.3d 171 (2d Cir. 2001) ....................................................................................12

*Calderon v. Clearview AI, Inc.*, No. 20-cv-1296-CM,
    2020 WL 2792979 (S.D.N.Y. May 29, 2020) ...............................................*passim*

*Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*,
    386 U.S. 129 (1967) ................................................................................................10

*Chariot v. Ecolab, Inc.*,
    97 F. Supp. 3d 40 (E.D.N.Y. 2015) ........................................................................22

*City of Pontiac General Employees Retirement System v. Dell, Inc.*,
    14-CV-3644 (VSB), 2015 WL 12659925 (S.D.N.Y. Apr. 30, 2015) ......................23

*Connors v. Lexington Ins. Co.*,
    666 F. Supp. 434 (E.D.N.Y. 1987) ........................................................................21

## TABLE OF AUTHORITIES
### (continued)

Page

*Davis v. Costa-Gavras*,
    580 F. Supp. 1082 (S.D.N.Y. 1984)..................................................................24

*Emps. Ins. of Wausau v. Fox Ent. Grp., Inc.*,
    522 F.3d 271 (2d Cir. 2008).........................................................................15

*First City Nat. Bank & Trust Co. v. Simmons*,
    878 F.2d 76 (2d Cir. 1989)....................................................................15, 22

*Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*,
    139 S. Ct. 881 (2019)...............................................................................20

*Glover v. Ferrero USA, Inc.*,
    No. CIV.A. 11-1086 FLW, 2011 WL 5007805 (D.N.J. Oct. 20, 2011) .................14

*H.L. Hayden Co. of New York v. Siemens Med. Sys., Inc.*,
    797 F.2d 85 (2d Cir. 1986).............................................................................9

*In re Giant Eagle, Inc., Fair Lab. Standards Act Litig.*,
    330 F. Supp. 3d 1376 (U.S. Jud. Pan. Mult. Lit. 2018) ................................23

*In re Jimmy John's Overtime Litigation*,
    877 F.3d 756 (7th Cir. 2017) ......................................................................22

*In re Peloton Interactive, Inc. Sec. Litig.*,
    No. 21CV2369CBAPK, 2022 WL 1211516 (E.D.N.Y. Jan. 26, 2022) ................22

*Indian Harbor Ins. Co. v. Factory Mut. Ins. Co.*,
    419 F. Supp. 2d 395 (S.D.N.Y. 2005)..........................................................24

*Lau v. Wells Fargo & Co.*,
    No. 20-CV-03870 (AJN), 2021 WL 1198964 (S.D.N.Y. Mar. 30, 2021) ........14, 18

*Mejia v. Time Warner Cable Inc.*,
    No. 15-CV-6445 (JPO), 2017 WL 3278926 (S.D.N.Y. Aug. 1, 2017) ................10

*New York Marine and Generals Ins. Co. v. Lafarge N. Am., Inc.*,
    599 F.3d 102 (2d Cir. 2010)........................................................................24

*Orthmann v. Apple River Campground, Inc.*,
    765 F.2d 119 (8th Cir. 1985) ......................................................................21

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Pike Co., Inc. v. Universal Concrete Products, Inc.*,
    284 F. Supp. 3d 376 (W.D.N.Y. 2018) ..................................................................14

*Quinn v. Walgreen Co.*,
    958 F. Supp. 2d 533 (S.D.N.Y. 2013).........................................................16, 17, 20

*R Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*,
    467 F.3d 238 (2d Cir. 2006).........................................................................................13

*Raniere v. Citigroup Inc.*,
    827 F. Supp. 2d 294 (S.D.N.Y. 2011).......................................................................19

*Reliance Ins. Co. v. Six Star, Inc.*,
    155 F. Supp. 2d 49 (S.D.N.Y. 2001)..............................................................2, 15, 16

*Robeson v. Howard University*,
    No. 00 CIV 7389, 2002 WL 122913 (S.D.N.Y. Jan. 30. 2002).............................22

*Rothschild v. Gen. Motors LLC*,
    2020 WL 13581659 (E.D.N.Y. Sept. 30, 2020) ...........................................2, 16, 18

*Rudolph v. Hudsons Bay Co.*,
    No. 18 CV 8472 (PKC), 2019 WL 1416986 (S.D.N.Y. Mar. 29, 2019) ...............10

*Sec. Pac. Mortg. & Real Est. Servs., Inc. v. Republic of Philippines*,
    962 F.2d 204 (2d Cir. 1992)..........................................................................................8

*Shimon v. Equifax Info. Servs. LLC*,
    No. 18-CV-2959 (BMC), 2018 WL 4906245 (E.D.N.Y. Oct. 9, 2018), *aff'd*,
    994 F.3d 88 (2d Cir. 2021)..............................................................................16, 17, 23

*Swinton v. SquareTrade, Inc.*,
    No. 4:18-CV-00144, 2018 WL 8458862 (S.D. Iowa Sept. 21, 2018) ...................22

*Tarazi v. Truehope Inc.*,
    958 F. Supp. 2d 428 (S.D.N.Y. 2013)........................................................................22

*Townes v. Trans Union, LLC*,
    No. CIV.A. 04-1488-JJF, 2007 WL 2457484 (D. Del. Aug. 30, 2007) ...............10

*Travis v. Navient Corp.*,
    284 F. Supp. 3d 335 (E.D.N.Y. 2018) .........................................................10, 13, 16

## TABLE OF AUTHORITIES
### (continued)

Page

*Tremblay v. OpenAI, Inc.,*
  No. 23-CV-03223-AMO, 2024 WL 557720 (N.D. Cal. Feb. 12, 2024)...............................4, 6

*Trevino v. Golden State FC, LLC,*
  No.: 1:18-cv-00120, 2019 WL 2710662 (E.D. Cal. June 28, 2019).......................................22

*U.S. ex rel. Cestra v. Cephalon, Inc.,*
  No. 10 CIV. 6457 SHS, 2014 WL 1087960 (S.D.N.Y. Mar. 19, 2014).................................18

*Washington Elec. Co-op., Inc. v. Massachusetts Mun. Wholesale Elec. Co.,*
  922 F.2d 92 (2d Cir. 1990)........................................................................................9, 11, 12

*Wistron Neweb Corp. v. Genesis Networks Telecom Servs., LLC,*
  No. 22-cv-2538 (LJL), 2022 WL 17067984 (S.D.N.Y. Nov. 17, 2022) ..............................25

**Statutes**

15 U.S.C. § 1681e(b) ........................................................................................................17

17 U.S.C. § 107................................................................................................................12

31 U.S.C. § 3730(b)(5) .....................................................................................................19

Clayton Act .....................................................................................................................10

Digital Millennium Copyright Act (DMCA) ................................................3, 10, 11, 19

False Claims Act .........................................................................................................18, 19

FLSA................................................................................................................................18

**Court Rules**

Federal Rule of Procedure 12 .......................................................................................6, 15

Federal Rule of Procedure 24 ................................................................................. *passim*

**Other Authorities**

Associated Press (July 13, 2023), *available at* https://apnews.com/article/openai-
  chatgpt-associated-press-ap-f86f84c5bcc2f3b98074b38521f5f75a (accessed
  Feb. 26, 2024) .............................................................................................................25

**TABLE OF AUTHORITIES**
**(continued)**

Page

Matt O'Brien, *ChatGPT-maker OpenAI signs deal with AP to license news stories* ...................25

Microsoft, *Microsoft Research Lab – New York City*,
https://www.microsoft.com/en-us/research/lab/microsoft-research-new-york/
(accessed Feb. 26, 2024) ........................................................................................24

Motion to Enjoin Defendants and Their Counsel From Proceeding in Substantially
Similar Cases in the Southern District of New York" (hereinafter "Injunction
Motion") ............................................................................................................7

*New York City*, Axel Springer (Aug. 5, 2016), *available at*
https://www.axelspringer.com/en/ax-press-release/axel-springer-expands-us-
presence-with-establishment-of-headquarters-in-new-york-city (accessed Feb.
26, 2024) ...............................................................................................................25

## I.    <u>INTRODUCTION</u>

The Author Actions concern OpenAI and Microsoft's large-scale infringement of copyrighted works of fiction and nonfiction. Plaintiffs, authors and owners of registered copyrights in their work, seek to represent classes of fiction and nonfiction authors whose books were used to train Defendants' AI models. The Author Actions have progressed quickly and efficiently. The pleadings are settled, discovery is underway, and summary judgment will be fully briefed by this time next year, with class certification briefing completed within three months of a decision on summary judgment.

Proposed Intervenors seek to slow this progress—or end it—all so that they can exercise nationwide control over any case alleging copyright infringement against OpenAI. Proposed Intervenors are a different group of copyright owners who filed a separate action against OpenAI in the Northern District of California, the Tremblay Action. They have not sued Microsoft. The class they seek to represent consists of all owners of copyrights—registered or unregistered— whose content was  used to train OpenAI's models. Because no class has been certified in Tremblay, as of today the Proposed Intervenors represent only themselves.

The Motion before this Court is half of Proposed Intervenors' multi-jurisdictional strategy to exercise exclusive control over all copyright cases related to OpenAI. On February 8, 2024, Proposed Intervenors moved for an injunction in the *Tremblay* Action. The relief they request in the NDCA is so extraordinary that they cited no authority to support it: They ask the court to enjoin the OpenAI Defendants from defending themselves in—but not Plaintiffs from prosecuting—the Author Actions, the New York Times Action, and the *Basbanes* Action. Proposed Intervenors then filed this Motion, requesting equally meritless relief of intervention in this case for the limited purpose of delaying or terminating the Author Actions under the first-to-file rule. Proposed Intervenors are entitled to none of the relief they seek.

-1-

First, the threshold question is whether Proposed Intervenors can participate in the
Author Actions under Federal Rule of Procedure 24. The answer is no. Courts in the Second
Circuit hold that before any class is certified, a plaintiff in a putative class action has "no
cognizable interest" and "no right to intervene in [other] pending cases," "even if all the actions
in this district were identical to his." *Calderon v. Clearview AI, Inc.*, No. 20-cv-1296-CM, 2020
WL 2792979, at *3 (S.D.N.Y. May 29, 2020) (collecting cases).  The Court's analysis should
end here. Without a basis to intervene and participate in the Author Actions, all of Proposed
Intervenors' requested relief—both its first-filed motion and request for a transfer—must also be
denied.

Second, even if the Court gets past the motion to intervene, Proposed Intervenors fare no
better on the first-to-file rule. This rule only applies to cases pending in different courts
"involving the same parties and issues," and even then is merely discretionary. *Reliance Ins. Co.
v. Six Star, Inc.*, 155 F. Supp. 2d 49, 54 (S.D.N.Y. 2001). The rule is inapplicable (and its
purposes not served) in putative class actions, as here, with  no overlap between and among
plaintiffs,  and significant differences between both the proposed class definitions (registered
versus unregistered copyrighted works; books versus all works) and the defendants (Proposed
Intervenors assert no claims against Microsoft). *See, e.g., Rothschild v. Gen. Motors LLC*, 2020
WL 13581659, at *8 (E.D.N.Y. Sept. 30, 2020). Proposed Intervenors' first-filed arguments fail
for the independent reason that, even if the rule was triggered in the first place, the Tremblay
Action has not progressed beyond the Author Actions.

Third, Proposed Intervenors' request to transfer this case to the Northern District of
California also fails. Proposed Intervenors did not even attempt to meet their burden to show a

transfer is warranted by clear and convincing evidence. Nor could they under the facts here, given the location of the parties and third parties.

Thus, Proposed Intervenors' Motion should be rejected at the gate, and, if considered on the merits, denied.

## II.    PROCEDURAL BACKGROUND

Plaintiffs in these actions (the "Authors Actions") are legal or beneficial owners of registered fiction and nonfiction books. Dkt. 69 ¶ 393.[1] The Proposed Intervenors' action (the "*Tremblay* action") include everyone that own a copyright, either registered or unregistered, in any work that was used as training data for OpenAI's large language models.

### A.    Proposed Intervenors' *Tremblay* Action

On June 28, 2023, Proposed Intervenors Paul Tremblay and Mona Awad filed a putative class action against a number of the OpenAI Defendants in the Northern District of California. Hydal Decl. Ex. A. Proposed Intervenors' complaint asserts a variety of federal and state-law claims, including claims for direct copyright infringement, vicarious copyright infringement, and violations of the federal Digital Millennium Copyright Act (DMCA), as well as state-law claims for unfair competition, negligence, and unjust enrichment. The complaint alleges that OpenAI violated federal and state law by (a) using copyrighted works to train its large language models (LLMs), (b) creating LLMs that "are themselves infringing derivative works"; and (c) creating LLMs that generate infringing outputs. *See* Hydal Decl. Ex A ¶ 51-86. Proposed Interveners do not assert claims against Microsoft.

The class that Proposed Intervenors' seek to represent includes: "[a]ll persons or entities domiciled in the United States that own a United States copyright in any work that was used as

---

[1] All otherwise unspecified references to "Dkt. No." refer to docket numbers in *Authors Guild et al. v. OpenAI, Inc. et al.*, No. 23-cv-8292-SHS (S.D.N.Y.).

training data for the OpenAI Language Models during the Class Period." *Id.* at 8. If certified, this class will include millions of people, the vast majority of whom likely are holders of unregistered copyrights in a diverse array of textual material available on the internet, from Reddit posts to books to news articles to personal blogs. *See Tremblay* Dkt. No. 1 ¶ 23.

On February 12, 2024, the *Tremblay* court denied in part and granted in part Defendants' Motions to Dismiss. *See Tremblay v. OpenAI, Inc.*, No. 23-CV-03223-AMO, 2024 WL 557720, at *8 (N.D. Cal. Feb. 12, 2024). With the exception of the direct copyright infringement and unfair competition claims, the court dismissed all claims without prejudice and gave the Proposed Intervenors until March 13, 2024 to file an amended complaint. *Id.*[2]

Fact and expert discovery is ongoing in the *Tremblay* action. Fact discovery is scheduled to close on October 29, 2024, and expert discovery on March 13, 2025. No class has been certified, nor have the Proposed Intervenors moved for class certification. Class certification is scheduled to be completed by June 24, 2025. *Tremblay* Dkt. No. 51.

### B.   The Author Actions

On September 19, 2023, after an extensive pre-filing investigation, and in the wake of the response of the author community to the issues in the case (including as shown by surveys), a the Authors Guild and seventeen fiction authors filed their action. *Authors Guild* Dkt. No. 1. On November 21, 2023, Julian Sancton brought an action against OpenAI and Microsoft on behalf of himself and similarly situated nonfiction authors. *Sancton* Dkt. 1. On December 5, 2023, following revelations regarding Microsoft's relationship to OpenAI, the Author Plaintiffs filed an amended complaint, naming Microsoft as an additional defendant. *Authors Guild* Dkt. No. 40.

---

[2] The *Tremblay* court also consolidated the *Tremblay* action with other related actions and ordered that any other cases that come to the Northern District of California involving the same or substantially similar issues of law and fact be consolidated with the *Tremblay* action. *Tremblay* Dkt. No. 107 at ¶ 2.

-4-

On January 12, 2024, the Plaintiffs in the *Authors Guild* action and the Plaintiffs in the *Sancton* action filed a Motion for the Appointment of Interim Class Counsel for the Fiction and Nonfiction Authors Classes. *Authors Guild* Dkt. No. 54; *Sancton* Dkt. No. 29. Shortly thereafter, Plaintiffs from the *Authors Guild* and *Sancton* actions were consolidated. *Authors Guild* Dkt. No. 55 at 3; *Sancton* Dkt. No. 30 at 3.

The Court granted Plaintiffs' Motion for the Appointment of Interim Class Counsel for the Fiction and Nonfiction Authors Classes on February 6, 2024. *Authors Guild,* Dkt. No. 70; *Sancton* Dkt. No. 48. Subsequently, Plaintiffs filed the First Consolidated Class Action Complaint against OpenAI, its related entities, and Microsoft Corporation on February 2, 2024. *Authors Guild* Dkt. No. 69; *Sancton* Dkt. No. 46. Plaintiffs brought three discrete claims: (1) direct copyright infringement against OpenAI and Microsoft, (2) vicarious copyright infringement against OpenAI and its related entities, (3) and contributory infringement against Microsoft and related OpenAI entities. *Id.* Defendants filed their answers to the Consolidated Complaint on February 16, 2024. *Authors Guild* Dkt. Nos. 74, 75; *Sancton* Dkt. No. 51.

Plaintiffs also brought limited class definitions to focus the issues in this action:

> All natural persons in the United States who are the sole authors of, and legal or beneficial owners of Eligible Copyrights in, one or more Fiction Class Works; and all persons in the United States who are the legal or beneficial owners of Eligible Fiction Copyrights in one or more Fiction Class Works held by literary estates.

*Authors Guild* Dkt. No. 69 ¶ 393; *Sancton* Dkt. No. 46 ¶ 393. And:

> All natural persons, literary trusts, and literary estates in the United States who are legal or beneficial owners of Eligible Nonfiction Copyrights in one or more Nonfiction Class Works; and all persons in the United States who are the legal or beneficial owners of Eligible Nonfiction Copyrights in one or more Fiction Class Works held by literary estates.

*Authors Guild* Dkt. No. 69, ¶ 396; *Sancton* Dkt. No. 46, ¶ 396. Unlike in the *Tremblay* action, the Fiction and Nonfiction Class Works are limited to those registered with the U.S. Copyright Office. *Id.* at 394-95, 397-98.

      **C.**    **Case Management Order and Discovery.**

      Author Plaintiffs have secured a timetable for expeditious, efficient resolution of the copyright claims at issue for Plaintiffs the proposed Classes. Under the parties' negotiated stipulation, entered on January 29, 2024, fact discovery will be completed by September 17, 2024, and expert discovery by December 9, 2024. *Authors Guild Dkt. No. 64.*

      In exchange for an agreement that summary judgment be adjudicated before class certification, Interim Class Counsel obtained valuable concessions, and protected their proposed Class' interests.  They obtained (a) an agreement that neither Defendant will seek dismissals under Rule 12; (b) waiver of Defendants' rights to raise one-way intervention defenses; and (c) an expedited schedule of full, classwide discovery under which summary judgment briefing is completed by the end of February 2025. Defendants' waiver of their rights to dismiss claims under Rule 12 is especially valuable in light of the motion-to-dismiss order in the *Tremblay* Action, where Judge Martinez-Olguin dismissed contributory and vicarious infringement claims that will proceed into discovery in the instant Author Actions. *Tremblay*, 2024 WL 557720, at *1.

      Consistent with the expedited schedule, Author Plaintiffs have made significant progress in discovery. Interim Co-Lead Counsel Declaration, ¶¶ 11-27 ("Author Counsel Declaration"). Plaintiffs have served four sets of requests for production, three sets of requests for admission, and two sets of interrogatories. *Id.* Defendants have served requests for production on Plaintiffs, and Plaintiffs have responded. *Id.* The parties met and conferred about Defendants' discovery

responses several times concerning, among other things, the production and inspection of OpenAI's training data and the production of ESI. *Id.* OpenAI has started producing documents.

On February 23, 2024, Plaintiffs filed a letter motion to compel OpenAI to respond to requests for admission addressing whether Plaintiffs' works are within the training dataset. *Authors* Dkt. No.78.

## D. Attempts at Informal Coordination and Proposed Intervenors' Recent Motions.

Author Plaintiffs, through Interim Class Counsel, collectively have made multiple attempts to contact Proposed Lead Counsel for the Proposed Interveners Joseph Saveri. Author Counsel Declaration ¶ 28. There has been one conversation only: on December 6, 2023, Interim Co-Lead Counsel Justin Nelson, Rohit Nath, and Alejandra Salinas had an initial call with Mr. Saveri and other members of his law firm to discuss the cases and the possibility of coordination briefly. *Id.* Other than that December call, Mr. Saveri and his law firm have not responded to subsequent or other reach outs. *Id.*

On February 6, 2024, six days after this Court appointed Interim Class Counsel, Proposed Intervenors filed a Notice of Pendency of Other Actions or Proceedings in the *Tremblay* Action. Two days later, Proposed Intervenors filed what they called a "Motion to Enjoin Defendants and Their Counsel From Proceeding in Substantially Similar Cases in the Southern District of New York" (hereinafter "Injunction Motion"). *Tremblay* Dkt. No. 98. The Injunction Motion asks Judge Martinez-Olguin to enjoin the OpenAI Defendants (and their counsel) from defending themselves in the Author Actions, the *Basbanes* Action, and the *New York Times* action. *Id.* The Injunction Motion was originally set to be heard on April 4, 2024. The Proposed Intervenors have recently moved to have their Injunction Motion heard earlier, on March 7, 2024, due to a

"flurry of docket activity in" the Author Actions. Tremblay Dkt. 109 at 3. The Injunction Motion

has not been decided.

On February 12, 2024, Proposed Intervenors filed this Motion in the Author Actions and

the *Basbanes* Action. The Proposed Intervenors filed the identical motion in the *New York Times*

Action on February 23, 2024. *New York Times* Dkt. No. 47.

## III. ARGUMENT

### A. The Court Should Deny the Proposed Intervenors' Motion on the Threshold Question of Intervention Under Rule 24(a)(2) and (b).

Intervention is the threshold question. "Before [Proposed Intervenors] can seek the

dismissal, transfer, or stay of the New York Cases, [they] must prevail on [their] motion to

intervene." *Calderon v. Clearview AI, Inc.*, No. 20 CIV. 1296 (CM), 2020 WL 2792979, at *3

(S.D.N.Y. May 29, 2020) (denying motion for mandatory and permissive intervention and, in the

alternative, motions under first-filed rule). Courts in the Second Circuit are clear: Absent a

certified class, a plaintiff in a *putative* class action, like Proposed Intervenors here, cannot

intervene in another case brought by different parties, even if the claims are similar. *Id.* Proposed

Intervenors failure on this threshold issue is dispositive of their Motion in its entirety, including

its requested relief under the first-filed rule and section 1404(a).

#### 1. The Proposed Intervenors Cannot Satisfy the Requirements for Mandatory Intervention.

Under Rule 24(a)(2), intervention as of right may be granted only when four elements are

satisfied: (1) the motion is "timely"; (2) the movant "claims an interest relating to the property or

transaction that is the subject of the action"; (3) "disposing of the action may as a practical

matter impair or impede the movant's ability to protect its interest"; and (4) the movant's interest

is not "adequately represent[ed]" by the "existing parties." Fed. R. Civ. P. 24(a)(2). "Failure to

satisfy any one of these requirements is a sufficient ground to deny the application." *Sec. Pac.*

*Mortg. & Real Est. Servs., Inc. v. Republic of Philippines*, 962 F.2d 204, 208 (2d Cir. 1992) (internal quotations and emphasis omitted). Proposed Intervenors fail on the second, third, and fourth elements.

**_Proposed Intervenors Have No Cognizable Interest in the Author Actions._** To satisfy Rule 24(a)(2), "a would-be intervenor's interest must be direct and immediate, not remote or contingent." *H.L. Hayden Co. of New York v. Siemens Med. Sys., Inc.*, 797 F.2d 85, 88 (2d Cir. 1986) (cleaned up). An interest "that is contingent upon the occurrence of a sequence of events before it becomes colorable, will not satisfy the rule." *Washington Elec. Co-op., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97 (2d Cir. 1990).

Proposed Intervenors' purported interest in the Author Actions is entirely contingent and remote, and is too contingent to satisfy Rule 24(a)(2). Judge McMahon's recent decision in *Calderon* is instructive. In *Calderon*, as here, a purported first-filed plaintiff sought to intervene and dismiss under the first-to-file rule several other putative class actions, arguing his interest in the outcome of "competing class actions, with overlapping classes, claims, parties and legal and factual issues." *Calderon*, 2020 WL 2792979, at *4. In denying the motion to intervene, the Court explained:

> **[N]o class has been certified anywhere, so Mutnick has no right to control the litigation and disposition of any claim other than his own**. Prior to the certification of a class and the appointment of class counsel, Mutnick's (and his lawyer's) interest in being in control of the Clearview AI lawsuits is too attenuated to justify intervention as of right . . . .
>
> **Unless and until (1) a class is certified; (2) Mutnick is found to be an appropriate class representative, and (3) his counsel are deemed appropriate class counsel, the only legally cognizable interest he has is in his own claim**. That claim is not pending in the Southern District of New York (all the actions that are here, like Mutnick's in Illinois, being merely putative class actions, not certified class actions), **he has no right to intervene in any of the actions pending here – even if all the actions in this district were identical to his.**

*Id.* at *5 (emphasis added). Similarly, Proposed Intervenors' ***only*** interest here is as hypothetical representatives of an uncertified class.

The *Calderon* decision is but one of many cases endorsing this principle. In *Travis v. Navient Corp.*, 284 F. Supp. 3d 335, 342 (E.D.N.Y. 2018), the court denied a motion to intervene "because, before class certification, each action only involves individual claims asserted by individual plaintiffs" and therefore the "proposed intervenors' stated interests are insufficient to meet the requirements of Rule 24(a)." Other courts in the Second Circuit, and elsewhere, have reached the same result. *See Mejia v. Time Warner Cable Inc.*, No. 15-CV-6445 (JPO), 2017 WL 3278926, at *18 (S.D.N.Y. Aug. 1, 2017) (denying motion to intervene because, *inter alia*, "prior to the certification of a class, any interest . . . is too remote to justify intervention"); *Rudolph v. Hudsons Bay Co.*, No. 18 CV 8472 (PKC), 2019 WL 1416986, at *3 (S.D.N.Y. Mar. 29, 2019) ("The proposed intervenors' case for intervention, as of right and permissively, is substantially overblown. No class has been certified in the instant action . . . ."); *Townes v. Trans Union, LLC*, No. CIV.A. 04-1488-JJF, 2007 WL 2457484, at *2 (D. Del. Aug. 30, 2007) ("[T]he Court finds the interest asserted by the Millets to be speculative at this juncture [because a] class has not been certified."). Proposed Intervenors do not even cite this authority, let alone explain why the Court should depart from it.[3]

Proposed Intervenors also fail the interest element of Rule 24(a)(2), as the differences between the cases substantially reduces any risk of "inconsistent rulings." Mot. at 10. Proposed Intervenors' assert a number of claims—state-law claims and federal DMCA claims—that are

---

[3] Proposed Intervenors rely on *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 133 (1967), which involved the State of California seeking to intervene in a Clayton Act action that impacted the California economy. Proposed Intervenors are not sovereigns acting on behalf of their constituents.

not at issue in the Author Actions, while the Author Plaintiffs assert claims against Microsoft, who is not a defendant in the *Tremblay* Action.[4] Because there is no risk of inconsistent rulings on the state-law and DMCA claims, as well as claims against Microsoft, Proposed Intervenors' so-called interest in avoiding inconsistent rulings is too speculative to warrant intervention as of right. *See, e.g., Calderon*, 2020 WL 2792979, at *6 (denying intervention in part because actions "raise different legal issues, have partially non-overlapping class definitions, and may require different discovery").

   ***Proposed Intervenors' Face No Impairment of Cognizable Interests.*** Proposed Intervenors also cannot satisfy that their asserted interest "would be impaired or impeded without intervention" *Calderon*, 2020 WL 2792979, at *6.

   Proposed Intervenors argue that similar issues of copyright law may be decided in both actions. Mot.at 9-10. Setting aside the substantial differences between the two actions, addressed above, mere overlap in legal issues between pending lawsuits is insufficient to satisfy the impairment element because "[i]dentical issues of law arise in pending cases all the time." *Calderon*, 2020 WL 2792979, at *6. That the Author Plaintiffs seek to represent a putative class does not change the analysis. If the Author Classes are certified, the Proposed Intervenors would be "perfectly free to opt out and pursue [their] claim[s] on [their] own in the court of [their] choice." *Id.*

   ***Proposed Intervenors' Interests Are Adequately Represented.*** For intervention under Rule 24(a)(2), a movant must also show "there will be inadequate representation of its rights unless it is allowed to intervene." *Washington Elec. Co-op.*, 922 F.2d at 98. Courts demand "a

---

[4] Proposed Intervenors wrongly state that the defendants in the Author Actions "are all OpenAI affiliates." Mot. at 17 n.7. Defendant Microsoft is not an OpenAI affiliate.

more rigorous showing of inadequacy in cases where the putative intervenor and a named party have the same ultimate objective. Where there is an identity of interest, as here, the movant to intervene must rebut the presumption of adequate representation by the party already in the action." *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179–80 (2d Cir. 2001) (citations omitted).

Here, this presumption is unrebutted and unrebuttable.  The Author Plaintiffs and Proposed Intervenors both seek to hold OpenAI accountable for copyright infringement and maximize recovery. Proposed Intervenors offer no reason why the Author Plaintiffs "will not pursue [their] . . . claim[s] vigorously." *Washington Elec. Co-op., Inc.*, 922 F.2d at 98.

Instead, Proposed Intervenors assert that one of the plaintiffs, the Authors Guild (notwithstanding its advocacy and efforts to help writers) is a "promoter of generative AI," based on and disparaging its advocacy for a "collective licens[ing]" regime for artificial intelligence." That the Authors Guild is looking for a prospective collective licensing solutions that will or may be offered to all AI companies—in lieu of the unlicensed, uncontrolled and uncompensated use at issue in the case—if anything, *benefits* the Proposed Intervenors. These efforts, among other things, show that there is an existing or likely-to-develop sales and licensing market for the infringing use at issue, and thus why Defendants' unlicensed usurpation of Plaintiffs' and the Author Classes works is an unfair use under Factor 4 of 17 U.S.C. § 107. *See, e.g., Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994) ("impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets" is "legally cognizable" for fourth fair-use factor). In any event, the Author Actions will in no way  "forc[e] the [Proposed Intervenors] to commit to a licensing regime." Dkt. 71-1 at 10. If and when the

Author Classes are certified, the Proposed Intervenors can opt out. *Calderon*, 2020 WL 2792979, at *6.

Generally, if and to the extent Proposed Intervenors are raising disagreement over litigation strategy, this is not enough to rebut the presumption of adequate representation. *Travis*, 284 F. Supp. 3d at 346 ("evidence that the putative intervenor and the existing party have different views on . . . litigation strategy is insufficient").

### 2.   Permissive Intervention Should Be Denied.

Under Rule 24(b), the "court may permit anyone to intervene who" on a "timely motion" "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). In exercising its discretion, the court "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights. Fed. R. Civ. P. 24(b)(3). "The court considers substantially the same factors whether the claim for intervention is 'of right' under Fed.R.Civ.P. 24(a)(2), or 'permissive' under Fed.R.Civ.P. 24(b)(2)." *R Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*, 467 F.3d 238, 240 (2d Cir. 2006).

Proposed Intervenors' bid for permissive intervention fares no better than its bid for intervention under Rule 24(a)(2). At the outset, the reasons why Proposed Intervenors fail to meet the elements of Rule 24(a)(2)—the lack of cognizable interest, the lack of any impairment of its nonexistent interest, and the adequacy of representation—all weigh sharply against permissive intervention. *Supra* p. 7-10; *Travis*, 284 F. Supp. 3d at 346.

Permissive intervention here will also "unduly prejudice and delay the adjudication of the original parties' rights," as Proposed Intervenors admit that they seek to intervene only to get the Author Actions dismissed, stayed, or transferred. Mot. at 10. As the Court in *Travis* held in denying permissive intervention in nearly identical circumstances:

> [I]ntervention by proposed intervenors would, as a practical matter, delay or
> prejudice the adjudication of the rights of plaintiff and defendants. Proposed
> intervenors do not seek to intervene to participate in this case—instead, they seek
> to intervene for the purpose of moving to dismiss, stay, or transfer this action under
> the first-to-file rule.

284 F. Supp. 3d at 346–47. The *Travis* court is not alone. Courts in the Second Circuit and

elsewhere routinely deny permissive intervention where a movant's sole interest is to cut short

adjudication of the existing parties' claims, as opposed to participating in an adjudication on the

merits. *See also Calderon*, 2020 WL 2792979, at *8 ("Courts have previously recognized that

intervention for the sole cause of dismissing, staying, or transferring an action – the very action

sought here – is prejudicial to the original parties' right to proceed before the court of their

choosing."); *Glover v. Ferrero USA, Inc.*, No. CIV.A. 11-1086 FLW, 2011 WL 5007805, at *7

(D.N.J. Oct. 20, 2011) ( "Proposed Intervenors' stated interest in only having this action

dismissed or transferred [is] an interest which will clearly prejudice the rights of the existing

parties in this action.").

    The one case Proposed Intervenors cite, *Pike Co., Inc. v. Universal Concrete Products,*

*Inc.*, 284 F. Supp. 3d 376 (W.D.N.Y. 2018), cuts against their argument. In *Pike*, the court

permitted the intervention of a party to the contract-in-suit who sought to participate in the merits

adjudication of the asserted contract claims. *Id.* at 383. The *Pike* movant, unlike Proposed

Intervenors here, did not seek to cut the merits adjudication short and, notably, *no party* in *Pike*

even disputed whether "the intervention requested would 'unduly delay or prejudice the

adjudication of the rights of the original parties.'" *Id.* at 397.[5]

---

[5] Proposed Intervenors also cite *Lau v. Wells Fargo & Co.*, but that case did not even involve a
motion to intervene. No. 20-CV-03870 (AJN), 2021 WL 1198964, at *3 (S.D.N.Y. Mar. 30,
2021).

-14-

**2AA-445**

The other arguments that Proposed Intervenors raise do not move the needle. They claim that the *Tremblay* and Author Actions are "substantially similar." Mot. at 11. But because Proposed Intervenors do not assert claims against Microsoft, cutting the Author Actions short forces the Author Plaintiffs (and Author Classes) give up claims against Microsoft, a culpable defendant with a $3+ trillion market capitalization. Nor is it true (or relevant) that the Author Action is "well-behind" the *Tremblay* Action. *Id.* The *Tremblay* Action has been bogged down Rule 12 motions, a partial dismissal, another forthcoming amended pleading, and likely more motion practice. The Author Actions, by contrast, have bypassed Rule 12 motion practice by stipulation, are ahead in discovery, and have secured an efficient schedule for the adjudication of summary judgment and class certification in quick succession. *Supra* II.C. Permitting Proposed Intervenors to participate solely to interrupt this progress prejudices Author Plaintiffs and the proposed Authors Classes they will seek to represent. The Court should follow the great weight of authority in this Circuit and deny the motion for permissive intervention.

### B.   The First-to-File Rule Does Not Apply.

"When two actions involving the *same parties and issues* are pending concurrently, courts in the Second Circuit follow the 'first-filed' rule whereby the court which first has possession of the action decides it." *Reliance Ins. Co. v. Six Star, Inc.*, 155 F. Supp. 2d 49, 54 (S.D.N.Y. 2001) (cleaned up, emphasis added). The rule focuses generally on so-called "mirror image" cases, where two identical cases are proceeding in different courts—often with one a declaratory judgment action—involving the same parties and underlying claims.[6] *Emps. Ins. of*

---

[6] Throughout their motion, rely on so-called "mirror image" cases. *See, e.g.,* Mot. at 13 (citing *800-Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F. Supp. 128, 131 (S.D.N.Y. 1994); *First City Nat. Bank & Trust Co. v. Simmons*, 878 F.2d 76, 77 (2d Cir. 1989). This authority is plainly inapposite, as this matter does not involve a preemptive declaratory judgment action, nor does it involve identical parties or claims. *Supra* Sec. II.

*Wausau v. Fox Ent. Grp., Inc.*, 522 F.3d 271, 275 (2d Cir. 2008). Although the "rule creates a general presumption that a first-filed suit has priority, that presumption is not applied in a rigid or mechanical way." *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 539 (S.D.N.Y. 2013) "Rather, because the complex problems that can arise from multiple federal filings do not lend themselves to a rigid test, the district court is instead required to consider the equities of the situation when exercising its discretion." *Id.*; *Reliance Ins. Co.*, 155 F. Supp. 2d at 54 (first-to-file rule "is not to be applied mechanically, but is . . . a 'presumption' that may be rebutted by proof of the desirability of proceeding in the forum of the second-filed action."

Here, the first-to-file rule does not apply because (1) the parties are different; (2) the Tremblay and Author actions advance different claims that will turn on different legal issues; (3) the Tremblay action has not advanced beyond the Author action; and (4) considerations of equity and efficiency weigh sharply against a dismissal, stay, or transfer of the Author Action.

## 1. The *Tremblay* and *Authors* actions involve different plaintiffs.

While true that some courts have assessed proposed classes in the first-to-file context[7], courts in this circuit regularly decline to apply (and should decline to apply) the first-to-file rule to parallel putative class actions because—prior to certification—the plaintiffs and issues in the litigation are unsettled. *See e.g., Shimon v. Equifax Info. Servs. LLC*, No. 18-CV-2959 (BMC), 2018 WL 4906245, at *2–3 (E.D.N.Y. Oct. 9, 2018), *aff'd*, 994 F.3d 88 (2d Cir. 2021); *Rothschild v. Gen. Motors LLC*, No. 19CV05240DLIRLM, 2020 WL 13581659, at *8 (E.D.N.Y. Sept. 30, 2020) ("[B]ecause a nationwide class has not been certified yet, neither the parties nor the issues substantially overlap."); *Quinn*, 958 F. Supp. 2d at 539.

---

[7] *See e.g., Travis*, 284 F. Supp. 3d at 346–47.

The court's reasoning in *Shimon* is instructive.  There, the court addressed two putative class actions filed against defendant Equifax alleging widespread violations of 15 U.S.C. § 1681e(b).  *Shimon*, 2018 WL 4906245, at *2.  The first case was filed in this district, and the second one filed five months later, in the Eastern District of New York.  *Id.*  Equifax moved to stay the second case under the first-filed rule.  *Id.*  The *Shimon* court denied the motion because the plaintiffs were in-flux and therefore insufficiently overlapping, explaining:

> In the putative class action context, *even assuming that the two complaints define identical classes,* the parties will rarely, if ever, actually be identical – the plaintiff in the second-filed action may opt-out if the class is certified or perhaps many members of the first putative class will opt out. The proposed class representative in the first action may also be found inadequate or the first case may settle before a class is certified.

*Id.* (emphasis added).

Here, far from being "identical," there is considerable difference both the named parties and the putative classes they propose to represent, as addressed in the previous sections.  No class has been certified in either the *Tremblay* or the *Authors* action and thus the plaintiffs and their claims remain in flux across both litigations.  *See generally* Rule 23(c)(1)(B) ("an order that certifies a class action must define the class and the class claims"). This uncertainty, by itself, is sufficient to decline application of the first-filed-rule.  *See generally Quinn*, 958 F. Supp. 2d at 539 (denying a first-to-file motion and explaining "no nationwide class has, in fact, been certified . . . [t]herefore, neither the parties nor the issues in this case are identical").

Notably, while undetermined at present, the *Tremblay* and *Authors* actions have not even alleged identical proposed classes.  *See supra* Sec. II.  The *Tremblay* action seeks to certify a broad class (of potentially millions) of owners of both registered and unregistered copyrights. *See id.*  By contrast, the *Authors* action seeks to certify a narrow class of professional authors who have registered their copyrights.  *See id.* Thus, even in the abstract, the proposed classes are

-17-

**2AA-448**

categorically distinct.  Further, looking to the plaintiffs that *are* certain at this stage reveals that none of the named plaintiffs are the same.

The *Tremblay* plaintiffs contend that all plaintiffs are overlapping because "each member of the class asserted in the S.D.N.Y. Actions are members of the *Tremblay* class." Mot. at 16. This argument is plainly incorrect: the *Tremblay* class has not been certified and therefore none of the *Author* plaintiffs falls within it.  *See generally Rothschild*, 2020 WL 13581659, at *8 ("[B]ecause a nationwide class has not been certified yet, neither the parties nor the issues substantially overlap.").  The *Tremblay* plaintiffs' reliance on *Lau v. Wells Fargo & Co.*, No. 20-CV-03870 (AJN), 2021 WL 1198964 (S.D.N.Y. Mar. 30, 2021), underscores the misleading conflation between a proposed and certified class in their argument.  In *Lau*, the court determined that the plaintiffs in a second-filed collective action sufficiently overlapped with the plaintiffs in the first-filed action because "[the first-filed class] *has already been certified*, and therefore Plaintiff and the other putative members of the [second-filed] collective can opt-in to that action if they so choose." *Id.* at *5 (emphasis added).  That is not the case here and *Lau*—cited throughout the *Tremblay* motion—is inapposite.[8]

The *Tremblay* plaintiffs' extensive reliance on this Court's order in *U.S. ex rel. Cestra v. Cephalon, Inc.*, No. 10 CIV. 6457 SHS, 2014 WL 1087960 (S.D.N.Y. Mar. 19, 2014), in support of dismissal is also misplaced.  At the threshold, in *Cephalon* the Court *did not dismiss the plaintiff's case,* but *transferred it at the plaintiff's request.  See id.* at *1.  Specifically, in *Cephalon*, a *qui tam* relator *himself* moved to transfer his False Claims Act case to the district

---

[8] *Lau* is also inapposite because it involved competing FLSA collective actions.  As explained in *Lau* (but omitted from the *Tremblay* brief), courts in the Second Circuit have instructed that the first-to-file doctrine is "particularly appropriate in the context of competing FLSA collective actions." *Lau*, 2021 WL 1198964 at *3 (quoting *Thomas v. Apple-Metro, Inc.*, No. 14-CV-4120 VEC, 2015 WL 505384, at *4 (S.D.N.Y. Feb. 5, 2015).

where a substantively similar case was first-filed. *Id.* Nowhere in *Cephalon* did the Court

address the issue of undetermined class actions and claims; in fact, the case arose under the False

Claims Act, where a specific statute governs first to file issues based on that statute's specific

role in balancing the encouragement of whistleblower suites, but only when information is

(loosely speaking) new and non-public. *See* 31 U.S.C. § 3730(b)(5).

### 2. The *Tremblay* and *Author* actions involve different defendants.

The defendants also differ between the actions. While the *Tremblay* action exclusively

names OpenAI entities as defendants, Hydal Decl. Ex. A, the Authors action brings claims

against OpenAI and Microsoft. *Authors Guild* Dkt. No. 69. The *Tremblay* plaintiffs assert that

the only non-overlapping defendants are OpenAI LLC, OpenAI Global LLC, and OpenAI

Holdings LLC. Mot. at 17 & n.7. That is incorrect as the Authors include Defendant Microsoft

and the attendant theory of contributory infringement further distinguishes the litigations and is

fatal to the *Tremblay* plaintiffs' contention that the distinctions among the defendants are

nominal, and supports denial of their motion. *See Raniere v. Citigroup Inc.*, 827 F. Supp. 2d

294, 302 (S.D.N.Y. 2011).

### 3. The *Tremblay* and Author Actions involve different claims and issues.

The first-to-file rule is inapplicable for another reason: The *Tremblay* and Author Actions

involve different claims, as explained *supra* Sec. II. The variety of state-law claims in the

*Tremblay* Action—unfair competition, unjust enrichment, and negligence—as well as the

DMCA claim, includes different elements and require distinct discovery that is not at issue in the

Author Actions. Likewise, Author Plaintiffs advance claims against Microsoft for contributory

infringement. *Authors Guild* Dkt. No. 69 at ¶¶ 423-29. Neither this theory of liability nor this

defendant are present in the *Tremblay* action. While the Proposed Intervenors claim that these

differences are of "no moment" because "all actions allege claims against OpenAI" for misuse of

-19-

copyrighted works, Mot. at 16, courts decline to apply the first-to-file rule where, as here, there is minimal overlap in the causes of action asserted. *See Quinn*, 958 F. Supp. 2d at 539 ("[T]he court . . . must not to be swayed by a rough resemblance between the two suits without assuring itself that beyond the resemblance already noted, the claims asserted in both suits are also the same," cleaned up.); *see also Am. Steamship Owners Mut. Protection and Indem. Ass'n v. Lafarge N. Am. Inc.*, 474 F. Supp. 2d 474, 486 (S.D.N.Y. 2007), *aff'd sub nom. New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102 (2d Cir. 2010), (finding that "[t]he two actions are therefore not coextensive, although they overlap on one of the two issues at stake").

The *Tremblay* plaintiffs also overlook the differing legal *issues* that will arise as a result of the difference in the classes, should they be certified. For example, because the *Tremblay* class is composed primarily of unregistered copyright holders the *Tremblay* action will—at some stage—need to address whether the lack of registration alters their plaintiffs' infringement claims or damages. *See generally Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881 (2019) (holding that a copyright registrant's application must be processed before she can file a claim of copyright infringement). This issue does not exist in the *Authors* action, where the contemplated class have presently registered, enforceable copyrights. *See id.* at 887; *see also Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 533 (2023) ("A use that shares the purpose of a copyrighted work, by contrast, is more likely to provide the public with a substantial substitute for matter protected by the copyright owner's interests in the original work or derivatives of it, which undermines the goal of copyright," citations and quotations omitted.).

4.      **Equitable Considerations Warrant Exception to the First-to-File Rule.**

Even if the Court determines that the first-to-file rule is applicable, it should deny

Proposed Intervenors' motion on equitable considerations. Proposed Intervenors cannot show

that the *Tremblay* Action has advanced beyond the *Authors* action. It is well-established that

courts do not apply the first-filed-rule unless the first-filed action has advanced beyond the

second-filed action.  *See Connors v. Lexington Ins. Co.*, 666 F. Supp. 434, 455 (E.D.N.Y. 1987)

("The general rule of deference to the first-filed suit . . . has certain well-established exceptions

such as when the first filed action has not reached a more advanced stage than its counterpart,"

cleaned up.); *see also AEI Life, LLC v. Lincoln Ben. Life Co.*, 305 F.R.D. 37, 45 (E.D.N.Y. 2015)

("Courts ***reject*** the first-to-file rule when the second filed action has developed further than the

initial suit," emphasis added, citing *Orthmann v. Apple River Campground, Inc.*, 765 F.2d 119,

121 (8th Cir. 1985)).

The Authors Action is, in fact, ahead of the *Tremblay* Action. The pleadings in the

Author Actions are settled and discovery is well underway:  Plaintiffs have met and conferred on

myriad discovery requests, raised a discovery dispute, OpenAI has made an initial document

production, and Plaintiffs have served document requests, interrogatories, and RFAs.

Declaration, ¶¶ 11-24.  By contrast, the *Tremblay* Action is stuck in a cycle of pleading

amendments and motion, with an amended complaint due on March 13.  *Tremblay* Dkt. No. 104

at 12. This is alone fatal to Proposed Intervenors' first-to-file motion.

The Author Plaintiffs have also secured a schedule that will most expeditiously and

efficiently resolve the claims at issue for Plaintiffs and the putative class. Under the Author

Actions' schedule, summary judgment will be fully briefed by the end of February 2025, and

class certification will be fully briefed within three months of the Court's order on summary

judgment. This timeline is efficient because it allows class certification to be adjudicated quickly

following (and informed by) the Court's orders on motions for summary judgment. Upsetting

this schedule simply for the sake of Proposed Intervenors' efforts to control all copyright actions

against OpenAI Defendants, nationwide, will be prejudicial to the Author Plaintiffs and members

of the putative Author Classes. *See In re Peloton Interactive, Inc. Sec. Litig.*, No.

21CV2369CBAPK, 2022 WL 1211516, at *4 (E.D.N.Y. Jan. 26, 2022) ("Judicial efficiency will

be best advanced by allowing the parties in this case to proceed to dispositive motion practice

and discovery now rather than by delaying for the sole purpose of transferring across the East

River."); *see also Chariot v. Ecolab, Inc.*, 97 F. Supp. 3d 40, 63 (E.D.N.Y. 2015) (transfer of

case inappropriate where case pending in Eastern District of New York was procedurally more

advanced than first-filed case pending in other court); *Tarazi v. Truehope Inc.*, 958 F. Supp. 2d

428, 436 (S.D.N.Y. 2013) (consideration of which case was first is diminished "where the first-

filed action has not 'reached a more advanced stage' than the later action").

Thus, the Proposed Interveners' first-to-file motion should not apply here.[9]

**C.**   **Dismissal or Stay Is Procedurally Inefficient and Inappropriate.**

The primary purpose of the first-filed rule is to conserve judicial resources. *See e.g.,*

*First City Nat'l Bank and Tr. Co. v. Simmons*, 878 F.2d 76, 80 (2d Cir. 1989) (noting the rule is

---

[9] Other courts are in accord. *See e.g., Trevino v. Golden State FC, LLC*, No.: 1:18-cv-00120, 2019 WL 2710662, at *7 (E.D. Cal. June 28, 2019) (denying motion to stay because dismissing subsequently filed cases would not promote judicial efficiency though requirements of first-to-file rule were met); *Swinton v. SquareTrade, Inc.*, No. 4:18-CV-00144, 2018 WL 8458862, at *8 (S.D. Iowa Sept. 21, 2018) (denying first-to-file when second filed action moved faster than first filed action and tentative settlement agreement was reached in second-filed case); *In re Jimmy John's Overtime Litigation*, 877 F.3d 756, 766 (7th Cir. 2017) (reversing anti-suit injunction where parties to subsequently filed actions were different and rejecting movants' "fear that the district courts presiding over the [subsequently filed] cases might reach final decision on the merits before this case."); *Adoma v. University of Phoenix, Inc.*, 711 F.Supp.2d 1142, 1150 (E.D. Cal. 2010) (finding exception to first-to-file rule when first filed case had not advanced to certification and second filed case included state claim not present in first filed case); *Robeson v. Howard University*, No. 00 CIV 7389, 2002 WL 122913, at *3 (S.D.N.Y. Jan. 30. 2002) (finding special circumstances present overriding the first filed rule).

animated by "considerations of judicial administration and conservation of resources").
Naturally, courts therefore decline application of the first-filed rule if it would undermine judicial
efficiency.

Here, as discussed, it would be inefficient to stay or dismiss the *Authors* action at this
stage. *Supra* III.B.4. In a circumstance of two concurrently pending class actions, the proper
and efficient procedure is informal coordination, ***not*** extinguishing one in favor of the other.
*Shimon*, 2018 WL 4906245, at *3 ("[U]sing the first-filed rule to stay or dismiss a concurrently
pending class action would undermine other efficiency-maximizing Congressional directives.");
*see also generally In re Giant Eagle, Inc., Fair Lab. Standards Act Litig.*, 330 F. Supp. 3d 1376,
1377 (U.S. Jud. Pan. Mult. Lit. 2018) (denying MDL centralization and explaining that—where
possible—the proper alternative is informal coordination among plaintiffs' counsel).

### D.  Proposed Intervenors' Motion to Transfer This Case to the Northern District of California Should be Denied.

Proposed Intervenors request for transfer of the Author Actions to the Northern District
of California should be denied. Proposed Intervenors fall far short of their "burden of
establishing that transfer is warranted by clear and convincing evidence." *1724982 Alberta ULC
v. Park Ave. Wholesale, Inc.*, No. 1:21-CV-04343-GHW, 2021 WL 3115125, at *2 (S.D.N.Y.
July 20, 2021).[10] On review of that evidence, the Court exercises its "broad discretion,"
considering "convenience and fairness" on a "case-by-case basis." *Id.*

---

[10] Movant cites two cases, both inapposite. *City of Pontiac General Employees Retirement
System v. Dell, Inc.*, 14-CV-3644 (VSB), 2015 WL 12659925, at *7 (S.D.N.Y. Apr. 30,
2015), was a "garden-variety federal securities fraud class action." Neither the plaintiff nor the
action had a connection to the District, it was "undisputed" that "none" of the relevant conduct
occurred in the District, and the movant (unlike here, and consistent with its burden) set forth the
specific non-party witnesses and their location outside the District. *Id.* at *4-5. In *174982
Alberta*, the movant, unlike Proposed Intervenors here, presented a detailed factual record, and

The Court can deny the transfer motion for the simple fact that Proposed Intervenors have made no effort to present *any* evidence in favor of transfer, let alone "clear and convincing" evidence.[11] Nor do Proposed Intervenors grapple with the reasons why New York remains the center of gravity of the actions pending in this District:

- 14 Author Plaintiffs reside are in this District, and another 10 Author Plaintiffs reside closer to this District than the Northern District of California;

- Defendant Microsoft has a major research laboratory in New York City;[12]

- The publishing industry is in this District in the main, and, at minimum, the industry's historic location here means this District has substantial familiarity with governing law related to copyright issues and a local interest in the publishing context;

*See Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1092 (S.D.N.Y. 1984) (noting that New York is the "national center of the publishing industry."); *Authors* Compl. ¶¶ 18-59 . Furthermore, one of the driving factors of the section 1404 analysis is the location of third-party witnesses. *See, e.g., Indian Harbor Ins. Co. v. Factory Mut. Ins. Co.*, 419 F. Supp. 2d 395, 402 (S.D.N.Y. 2005) (convenience of third-party witnesses accorded more weight than party witnesses). While Proposed Intervenor has not bothered to identify even one important third party witness located in San Francisco, the Associated Press—whose licensing agreement with OpenAI is relevant to

---

neither the plaintiff nor the defendant resided in the forum.  *174982 Alberta*, 2021 WL 3115125, at *5.

[11] *New York Marine and Generals Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010) ("It is therefore appropriate that the district courts in our Circuit have consistently applied the clear and convincing evidence standard in determining whether to exercise discretion to grant a transfer motion.").

[12] Microsoft, *Microsoft Research Lab – New York City*, https://www.microsoft.com/en-us/research/lab/microsoft-research-new-york/ (accessed Feb. 26, 2024).

-24-

the fair use analysis under factor four (*supra* pg. 12)—is located in New York.[13] Similarly, media conglomerate and Politico parent company Axel Springer, which has also inked a licensing deal with OpenAI, has its U.S. headquarters in New York.[14] The testimony of both New York-based witnesses will be relevant to show that there is an established licensing market for OpenAI's infringing use of the copyrighted works at issue in the Author Action. *See, e.g., Am. Geophysical Union*, 60 F.3d at 930.

Given New York's substantial importance in this dispute, and Proposed Intervenors total failure of proof, Plaintiffs' choice of forum should get the deference to which it is entitled. *Wistron Neweb Corp. v. Genesis Networks Telecom Servs., LLC*, No. 22-cv-2538 (LJL), 2022 WL 17067984, at *5 (S.D.N.Y. Nov. 17, 2022) ("Under the law of this Circuit, 'a plaintiff's choice of forum is presumptively entitled to substantial deference' . . . '[u]nless the balance is strongly in favor of the [moving party], the plaintiff's choice of forum should rarely be disturbed.'").

## IV.    CONCLUSION

For the reasons set forth above, Movants' motion should be denied.

---

[13] Matt O'Brien, *ChatGPT-maker OpenAI signs deal with AP to license news stories,* The Associated Press (July 13, 2023), *available at* https://apnews.com/article/openai-chatgpt-associated-press-ap-f86f84c5bcc2f3b98074b38521f5f75a (accessed Feb. 26, 2024).
[14] Bianca-Maria Dardon Mota, *Axel Springer expands US presence with establishment of headquarters in New York City*, Axel Springer (Aug. 5, 2016), *available at* https://www.axelspringer.com/en/ax-press-release/axel-springer-expands-us-presence-with-establishment-of-headquarters-in-new-york-city (accessed Feb. 26, 2024).

Dated: February 26, 2024

Respectfully submitted,

*/s/ Rachel Geman*
Rachel Geman
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: 212.355.9500
rgeman@lchb.com

Reilly T. Stoler (*pro hac vice forthcoming*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
rstoler@lchb.com
ibensberg@lchb.com

Wesley Dozier (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 2nd Avenue, Suite 1640
Nashville, TN 37201
Telephone: 615.313.9000
wdozier@lchb.com

*/s/ Rohit Nath*
Justin A. Nelson (*pro hac vice*)
Alejandra C. Salinas (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: 713-651-9366
jnelson@susmangodfrey.com
asalinas@susmangodfrey.com

Rohit D. Nath (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: 310-789-3100
rnath@susmangodfrey.com

J. Craig Smyser
SUSMAN GODFREY L.L.P.
1901 Avenue of the Americas, 32nd Floor
New York, New York 10019
Telephone: 212-336-8330
csmyser@susmangodfrey.com

*/s/ Scott Sholder*
Scott J. Sholder

-26-

CeCe M. Cole
COWAN DEBAETS ABRAHAMS & SHEPPARD LLP
41 Madison Avenue, 38th Floor
New York, New York 10010
Telephone:  212.974.7474
ssholder@cdas.com
ccole@cdas.com

*Attorneys for Plaintiffs and the Proposed Class*

## **PROOF OF SERVICE VIA ECF**

On February 26, 2024, I caused to be served the following document on all counsel of

record via ECF.

**PLAINTIFFS' OPPOSITION TO MOTION TO INTERVENE AND DISMISS, STAY OR TRANSFER**

*/s/ Rachel J. Geman*
Rachel Geman

2947517.8

**2AA-459**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NICHOLAS A. BASBANES and NICHOLAS NGAGOYEANES (professionally known as Nicholas Gage), individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> -against- <br><br> MICROSOFT CORPORATION, OPENAI, INC., OPENAI GP, L.L.C., OPENAI HOLDINGS, LLC, OAI CORPORATION, LLC, OPENAI GLOBAL, LLC, OPENAI, L.L.C., and OPENAI OPCO, LLC, <br><br> Defendants. | Civil Action No. 1:24-cv-84-SHS |

**DECLARATION OF MICHAEL P. RICHTER IN SUPPORT OF MOTION TO INTERVENE AND DISMISS, STAY OR TRANSFER**

I, Michael P. Richter, declare:

1.      I am a partner at Grant Herrmann Schwartz & Klinger LLP ("GHSK") and serve as counsel of record for Plaintiffs Nicholas Basbanes and Nicholas Gage in the above-captioned action (the "Basbanes-Gage Action"). I am admitted to practice before this Court.

2.      On behalf of Messrs. Basbanes and Gage, I submit this declaration in support of the Motion To Intervene And Dismiss, Stay Or Transfer filed by the Joseph Saveri Law Firm, LLP on February 12, 2024 with respect to four Southern District of New York cases ("S.D.N.Y. Actions"). (*See* ECF No. 33, the "Motion".) Three of the S.D.N.Y. Actions are consolidated under *Authors Guild et al., v. OpenAI, Inc. et al.*, Case No. 1:23-cv-08292-SHS (S.D.N.Y. Sep. 19, 2023) ("*Authors Guild* Action"). The fourth S.D.N.Y. Action is *The N.Y. Times Co. v. Microsoft Corp. et al.*, Case No. 23-cv-11195 (S.D.N.Y. Dec. 27, 2023) ("*New York Times* Action").

3.      I am familiar with the complaints filed in the S.D.N.Y. Actions. They are substantially identical to *Tremblay et al. v. OpenAI, Inc. et al.*, Case No. 3:23-cv-03223-AMO (N.D. Cal. June 28, 2023) ("*Tremblay* Action"). Each purport to represent proposed classes that are entirely subsumed by the class proposed in the *Tremblay* Action. Plaintiffs in the S.D.N.Y. Actions allege that Microsoft, OpenAI, Inc., and its affiliated entities committed direct copyright infringement when they made and used copies of Plaintiffs' books—without Plaintiffs' permission—during the process of training OpenAI's language models.

4.      I have reviewed the dockets in the S.D.N.Y. Actions and they reveal that other than filing complaints and commencing with limited discovery, they are not substantially advanced.

5.      Messrs. Basbanes and Gage agree that, in light of the nature of these proceedings, and the fact that OpenAI, Inc. and likely many of its employees and third parties are domiciled in or around San Francisco, California, the Northern District of California would be a more

2

convenient forum for the adjudication of the above-referenced claims against OpenAI.

6.      Messrs. Basbanes and Gage initially supported the application of counsel in the *Authors Guild* Action (1:23-cv-08292-SHS) and *Alter* Action (1:23-cv-10211-SHS) to serve as interim co-lead counsel ("Other Counsel"). But that support was premised on an agreement that GHSK would be able to represent the interests of Messrs. Basbanes and Gage, and those like them, along with Other Counsel.

7.      As set forth in my letter to the Court dated February 5, 2024 (the "Letter," at 1:23-cv-08292, ECF No. 68, and incorporated here by reference), Other Counsel continued to change the terms of GHSK's participation to the point where GHSK could not devote the resources necessary to ensure that its representation of Messrs. Basbanes and Gage, and those like them, was competent. As a result, I requested that the Court rule on GHSK's pending motion (at ECF No. 21) to, among other things, consolidate the actions and appoint GHSK to a steering committee to address the serious concerns Messrs. Basbanes and Gage had about this case.

8.      Shortly after I filed the Letter, Other Counsel filed its opposition to that part of GHSK's motion for a steering committee (the "Opp." at ECF No. 31).

9.      Contrary to Other Counsel's assertion that the Basbanes-Gage Action only set forth "vague allusions to 'serious concerns'" (Opp. 4), the Basbanes-Gage Action identified three specific and serious concerns.

10.      ***First***, the Basbanes-Gage Action highlighted that Defendants conduct monetized personal tragedies recounted in copyrighted works. Mr. Gage's masterpiece *Eleni*, which was made into a major motion picture starring John Malkovich, and which President Reagan cited as his inspiration to pursue arms control talks with the Soviet Union, documents the execution of his mother by Greek Communists during the Greek civil war. Mr. Gage never consented to

3

Defendants' decision to profit from the story of his mother's murder. It is essential that any fact-finder consider the impact Defendants' conduct had on members of the proposed class like Mr. Gage. (*See* ECF No. 22 at 3.)

11.     ***Second***, the Basbanes-Gage Action felt it was unnecessary and inefficient to have one class for fiction authors and a separate class for non-fiction authors, as Other Counsel initially sought by virtue of their two separate actions. Accordingly, the Complaint filed by Messrs. Basbanes and Gage advocated for a class with no such distinction. (*See* ECF No. 22 at 4-6.)

12.     ***Third***, the Complaint in the Basbanes-Gage Action emphasized that, in stark contrast to Defendants, individual authors like Messrs. Basbanes and Gage utilized their own resources to secure access to copyrighted works for use in their own works. (ECF No. 22 at 3-4.)

13.     The complaints filed by Other Counsel failed to address the three points identified above. This is precisely why Messrs. Basbanes and Gage filed their own Complaint and only supported Other Counsel's application to serve as interim co-lead counsel so long as their interests, and the interests of those like them, were represented.

14.     Other Counsel also asserted that my familial relationship with Mr. Basbanes constituted "red flags." (Opp. 4.) Nonsense.

15.     Other Counsel cited a single case in support of this purported concern, but omitted that there the Eastern District of New York ruled "that counsel's relationship with certain class members does not make the named class members inadequate." *Oliver v. Am. Express Co.*, No. 19CV566NGGSJB, 2024 WL 100848, at *17 (E.D.N.Y. Jan. 9, 2024), *amended in part*, No. 19CV566NGGSJB, 2024 WL 217711 (E.D.N.Y. Jan. 19, 2024) (*See* Opp. 4). Rather, the court was "convinced that these proposed representatives will adequately represent their classes despite their family connections to class counsel." *Id.*

4

16.     Other Counsel also omitted that the court's "inquiry focuses on whether the class plaintiff is so closely allied with the class attorney that he or she might have an interest in the legal fees that the attorney may ultimately seek such that the named representative's interests are antagonistic to those of the rest of the class." *Id.* (quotation marks omitted). But Mr. Basbanes engagement agreement with GHSK does not entitle him to any legal fees.[1]

17.     As my Letter details, GHSK agreed to every request made by Other Counsel. This initially included that GHSK's role would potentially be limited to defensive discovery pertaining to Messrs. Basbanes and Gage. GHSK agreed. Then Other Counsel moved the goal posts by insisting that they have the power to remove GHSK if it violated fiduciary duties. Offensive, but GHSK agreed. Then Other Counsel moved the goal posts again by proposing an agreement that, among other things, omitted any mention of GHSK's role representing Messrs. Basbanes and Gage, allowed Other Counsel not to include GHSK's time in any future fee application to the Court, and prohibited GHSK from submitting fees for time that would be necessary to be familiar with the case. (*See* Letter at 3.) GHSK did not agree because this could impair its ethical duty to act competently.[2]

18.     Other Counsel also asserted that GHSK sought a "blank check" "to simply 'stay abreast'" of the case. (Opp. 5.) False. GHSK's email to Other Counsel regarding the parties' agreement—which Other Counsel never responded to—stated, in pertinent part, as follows:

> "One thing I did not raise yesterday, but should have (apologies), is that in order to ensure we have the necessary level of competence to act ethically on behalf of our clients--whether it is reviewing documents, preparing them

---

[1]     Mr. Gage has no family relationship with anyone at GHSK.

[2]     Ironically, Other Counsel was purportedly concerned, without any basis, that GHSK may violate fiduciary duties. Then, Other Counsel insisted on conditions that would impair GHSK's ability to competently represent Messrs. Basbanes or Gage, or those similarly situated. (*See* Letter at 3.)

5

for depositions, defending them at depositions, or otherwise--we must stay familiar with the case and take the time to stay abreast of filings and discovery. Of course, I don't see how us merely reading material to stay familiar with the case could ever cause a conflict with your fiduciary duties, but I do see how not staying abreast of the developments in the case could inhibit our ability to ethically represent our clients. *I am not suggesting that we must be included in every single aspect of discovery, far from it, but we must be sufficiently familiar with the case to act ethically.*" (emphasis added).

19.     To fulfill the role Other Counsel suggested—*i.e.*, leading defensive discovery for Messrs. Basbanes and Gage—GHSK would have to be familiar with key aspects of the case, including, for example, the operative complaint, answer, document demands, interrogatories, pertinent rulings from the Court, and other developments so that it can act competently.

20.     On behalf of Messrs. Basbanes and Gage, GHSK attempted, in good faith, to work cooperatively with Other Counsel, especially in light of Other Counsel's assertion that they "have the ability and willingness to work cooperatively with other law firms" and "understand that professional and courteous relations amongst joint counsel . . . are essential to the conduct and management of complex litigation such as this one." (*See Authors Guild* Action ECF No. 29-1 at 14-15.) However, Other Counsel ultimately insisted on conditions that would have precluded GHSK from competently representing the interests of Messrs. Basbanes and Gage, and those like them. GHSK could not agree to those conditions.

21.     On February 6, 2024, the Court consolidated the Basbanes-Gage Action with the *Authors Guild* Action and *Alter* Action for pretrial purposes, denied the request to create a steering committee that included GHSK, and appointed Other Counsel as interim co-lead class counsel. (ECF No. 32.)

*** 

22.     I have had an opportunity to speak with counsel at the Joseph Saveri Law Firm. In

6

contrast to Other Counsel, they have agreed to work collaboratively with GHSK to competently represent the interests of Messrs. Basbanes and Gage, and those like them, in the action now pending in the Northern District of California.

23.    Accordingly, it is in the best interests of those members of the class that are similar to Messrs. Basbanes and Gage for the Motion to be granted. Thus, Messrs. Basbanes and Gage support the Motion and respectfully request that the Court grant the relief requested therein.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct to the best of my knowledge and belief.

DATED: March 4, 2024
       New York, New York

By: */s/ Michael P. Richter*
    Michael P. Richter, Esq.

7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| AUTHORS GUILD, *ET AL.*, | | |
| | Plaintiffs, | |
| -v- | | 23-CV-8292 (SHS) |
| OPEN AI, INC., *ET AL.*, | | <u>OPINION & ORDER</u> |
| | Defendants. | |
| JONATHAN ALTER, *ET AL.*, | | |
| | Plaintiffs, | |
| -v- | | 23-CV-10211 (SHS) |
| OPEN AI, INC., *ET AL.* | | |
| | Defendants. | |
| NICHOLAS A. BASBANES and NICHOLAS NGAGOYEANES, | | |
| | Plaintiffs, | |
| -v- | | 24-CV-84 (SHS) |
| MICROSOFT CORPORATION, *ET AL.*, | | |
| | Defendants. | |
| THE NEW YORK TIMES COMPANY, | | |
| | Plaintiff, | 23-CV-11195 (SHS) |
| -v- | | |
| MICROSOFT CORPORATION, *ET AL.*, | | |
| | Defendants. | |

SIDNEY H. STEIN, U.S. District Judge.

Plaintiffs in the above-captioned actions (the "New York Actions") are copyright holders—a professional writers association, authors, and a news organization—seeking to enforce their intellectual property rights against defendants Microsoft Corporation, OpenAI, Inc., and various entities affiliated with OpenAI.

Other copyright holders have asserted similar claims in an action entitled *In re OpenAI ChatGPT Litigation*, No. 23-CV-3223 (N.D. Cal.) currently pending in the U.S. District Court for the Northern District of California (the "California Action"). The plaintiffs in that action (the "California Plaintiffs") have filed motions to intervene in each of the New York Actions for the purpose of moving to dismiss, stay or transfer the New York Actions pursuant to Fed. R. Civ. P. 24 and the first-to-file rule. (ECF No. 71.[1]) For the reasons set forth below, the Court denies the California Plaintiffs' motions to intervene in each of the New York Actions.[2]

## A. Background

The four actions currently pending before this Court allege copyright infringement against Microsoft Corporation and OpenAI for conduct relating to OpenAI's ChatGPT product. In brief, ChatGPT uses Large Language Models (LLMs), which are trained on extremely large sets of data, to generate text in response to a user's prompt. Three of the cases pending before this Court were brought on behalf of authors who allege principally that their copyrighted works were unlawfully used in the training of OpenAI's LLMs: (1) *Authors Guild, et al., v. OpenAI, Inc., et al.*, No. 23-CV-8292; (2) *Jonathan Alter, et al., v. OpenAI, Inc., et al.*, No. 23-CV-10211; and (3) *Nicholas Basbanes and Nicholas Ngagoyeanes v. Microsoft Corporation, et al.*, No. 24-CV-84 (together, the "Author Actions"). The fourth related action pending in this Court is *The New York Times Company v. Microsoft Corporation, et al.*, No. 23-CV-11195, in which the New York Times alleges principally that defendants infringed on its copyrights in the training of OpenAI's LLMs and the output generated by the ChatGPT product, as well as violated the Digital Millennium Copyright Act.

The *Authors Guild* action, filed on September 19, 2023, was the first of these cases to be filed in the Southern District of New York. It has since been consolidated with the remaining Author Actions for pretrial purposes. The Author Actions are all putative class actions, although no motion seeking certification of a class has been filed to date. The parties have stipulated that defendants will not move to transfer or dismiss the action and motions for summary judgment will precede motions for class certification. (ECF No. 56.) Pursuant to the Scheduling Order entered in that action, fact discovery

---

[1] Unless otherwise noted, "ECF No. __" refers to filings on the docket of *Authors Guild, et al., v. OpenAI, Inc., et al.*, No. 23-CV-8292 (S.D.N.Y.).

[2] The California Plaintiffs moved in the California Action to enjoin the defendants in that action from defending in the actions before this Court. Judge Araceli Martinez-Olguin has denied that motion. *In re OpenAI ChatGPT Litig.*, No. 23-CV-03223, 2024 WL 923556 (N.D. Cal. Mar. 1, 2024).

2AA-468

has already begun, will be completed by September 2024, and summary judgment briefing is due in early 2025. (ECF No. 65.) The *NY Times* action is not a putative class action and defendants have moved to dismiss certain claims in that action. (*NY Times*, ECF Nos. 51, 64.)

On June 28, 2023, approximately three months before any of the New York Actions were filed, a group of authors filed the California Action. In that action, the plaintiffs assert a variety of federal and state-law claims, alleging that OpenAI used copyrighted works to train its LLMs and that the LLMs and their outputs are derivative infringing works. Class certification briefing is not scheduled to be completed until June 2025. (ECF No. 81 at 3-4.)

As noted above, currently pending before this Court is a motion by the California Plaintiffs to intervene in each New York Action pursuant to Fed. R. Civ. P. 24, and, once they have intervened, for the Court to either dismiss, stay, or transfer the New York Actions because the California Action was the first-filed action. Defendant Microsoft Corporation and plaintiffs in the *Authors Guild*, *Alter*, and *NY Times* actions have opposed the motion (ECF Nos. 79, 81; *NY Times*, ECF No. 59), and plaintiffs in the *Basbanes* action support the motion (ECF No. 89-1).[3] The Court denies the California Plaintiffs' motions to intervene.

### B. The California Plaintiffs May Not Intervene as of Right

Rule 24 contemplates two avenues for parties to intervene in a federal action: intervention as of right and permissive intervention. Under Rule 24(a), a party may intervene as of right on a "timely motion" showing that it "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." "All four parts of the test must be satisfied to qualify for intervention as of right." *Wash. Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 922 F.2d 92, 96 (2d Cir. 1990).

The California Plaintiffs have not met the requirements of Rule 24(a). First, they have not demonstrated a cognizable interest or that any such interest would be impaired. The intervenor's interest in the action must be "direct, substantial, and legally protectable." *Id*. at 97. "An interest that is remote from the subject matter of the

---

[3] Defendant OpenAI takes no position. (ECF No. 80; *NY Times*, ECF No. 49.)

proceeding, or that is contingent upon the occurrence of a sequence of events before it becomes colorable, will not satisfy the rule." *Id*.

Here, the California Plaintiffs claim an "interest in avoiding contradictory rulings" between the New York Actions and the California Action and that those contradictory rulings would impair their interests. (ECF No. 71 at 9-10.) However, the substantial differences between the actions lessen any risk of contradictory rulings. For example, the California Plaintiffs assert state-law and DMCA claims that are not raised in the Author Actions and Microsoft is not a defendant in the California Action.

More importantly, for the claims that do overlap, the California Plaintiffs have no legally cognizable interest in avoiding rulings that apply to entirely different plaintiffs in a different district. Critically, no class has been certified in any of the New York or California actions, so each group of plaintiffs only has a direct and cognizable interest in its own proceeding. Prior to a class being certified, the California Plaintiffs represent only themselves and cannot be impaired by any decision of this Court, which would only be binding as to the New York plaintiffs in their individual capacities.

A 2020 decision from this District is instructive. In *Calderon v. Clearview AI, Inc.*, 2020 U.S. Dist. LEXIS 94926 (S.D.N.Y. May 29, 2020), a purported first-filed plaintiff also sought to intervene in a Southern District of New York action and to dismiss that action, arguing that he had an interest in the outcome of "competing class actions, with overlapping classes, claims, parties and legal and factual issues." *Id*. at *13. Judge Colleen McMahon denied the motion to intervene, finding that "[p]rior to the certification of a class and the appointment of class counsel, [the proposed intervenor's] interest in being in control of the Clearview AI lawsuits is too attenuated to justify intervention as of right." *Id*. at *15. She elaborated as follows:

> "Unless and until (1) a class is certified; (2) [the proposed intervenor] is found to be an appropriate class representative, and (3) his counsel are deemed appropriate class counsel, the only legally cognizable interest he has is in his own claim. That claim is not pending in the Southern District of New York (all the actions that are here, like [the proposed intervenor's] in Illinois, being merely putative class actions, not certified class actions), he has no right to intervene in any of the actions pending here — even if all the actions in this district were identical to his." *Id*. at *17.

Other judges have similarly decided that a proposed intervenor does not have an interest in the outcome of an action with an overlapping putative class prior to any class

2AA-470

being certified. *See Travis v. Navient Corp.*, 284 F. Supp. 3d 335, 342-43 (E.D.N.Y. 2018) ("[A]ny interest in protecting the rights of proposed intervenors and their putative class is too speculative to warrant intervention as of right. At this point, no class has been certified [in either action]."); *Mejia v. Time Warner Cable, Inc.*, No. 15-CV-6445, 2017 U.S. Dist. LEXIS 120445, at *51 (S.D.N.Y. Aug. 1, 2017) ("[P]rior to the certification of a class, any interest the [proposed intervenors'] claim is too remote to justify intervention."). The same reasoning applies here. Because no class has been certified, the California Plaintiffs do not have a cognizable interest in the outcome of any New York Action and fail to satisfy the first requirement of intervention as of right.

Having failed to establish a cognizable interest, the California Plaintiffs similarly fail to establish that their hypothetical interest "would be impaired or impeded." Fed. R. Civ. P. 24(a). Any decision of this Court on the individual plaintiffs here is not binding in the Northern District of California and does not apply to any other plaintiffs, so any potentially contradictory rulings do not impair the California Plaintiffs' rights. Moreover, even if the Court certified a class in the Author Actions that would include the California Plaintiffs, "their rights would be deemed protected, and not impaired" because classes are only certified after finding that the representative plaintiff would adequately protect the class's interests. *Travis*, 284 F. Supp. 3d at 344-45.

Finally, the California Plaintiffs have not shown that the existing parties would not adequately represent their hypothetical interest. "[W]hen there is an identi[t]y of interest between a putative intervenor and an existing party to the action, a presumption of adequate representation attaches in the absence of evidence of collusion, adversity of interest, nonfeasance, or incompetence." *St. John's Univ., N.Y. v. Bolton*, 450 Fed. App'x 81, 84 (2d Cir. 2011). Here, the presumption attaches because plaintiffs in the New York Actions share an interest with the California Plaintiffs, which is to hold OpenAI accountable for allegedly infringing copyrighted works in training its LLMs. *See Travis*, 284 F. Supp. 3d at 346. The California Plaintiffs have not presented any evidence of collusion, adversity, nonfeasance, or incompetence to rebut this presumption. Instead, they allege that the existing parties do not adequately represent their interest because the Authors Guild, a plaintiff in the Author Actions, has publicly indicated an intention to license intellectual property rights to OpenAI. This is not a sufficient reason to cast doubt on the New York plaintiffs' ability to represent the California Plaintiffs' interests. First, the Authors Guild is only one of many plaintiffs. Second, even for that single plaintiff, an interest in licensing intellectual property rights does not undermine Author Guild's interest in or ability to vigorously litigate the case

and attempt to hold defendants accountable. Because "there is an identity of interest between a putative intervenor and a party, adequate representation is assured." *Wash. Elec. Coop.*, 922 F.2d at 98.

## C. Permissive Intervention is Denied

The second avenue for intervention is permissive intervention. Pursuant to Rule 24(b), the Court has discretion to permit a party to intervene that "has a claim or defense that shares with the main action a common question of law or fact." Rule 24(b) further provides that, "[i]n exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." "This is the 'principal consideration' when deciding whether to grant permissive intervention." *Travis*, 284 F. Supp. 3d at 346 (quoting *U.S. Postal Serv. v. Brennan*, 579 F.2d 188, 191 (2d Cir. 1978)); *see U.S. v. Pitney Bowes, Inc.*, 25 F.3d 66, 73 (2d Cir. 1994). In addition, "[t]he court considers substantially the same factors whether the claim for intervention is 'of right' under Fed. R. Civ. P. 24(a)(2), or 'permissive' under Fed. R. Civ. P. 24(b)(2)." *"R" Best Produce, Inc. v. Shulman-Rabin Mktg., Corp.*, 467 F.3d 238, 240 (2d Cir. 2006). The U.S. Court of Appeals for the Second Circuit has "recognize[d] the broad discretion of the district court when considering permissive intervention." *AT&T Corp. v. Sprint Corp.*, 407 F.3d 560, 561 (2d Cir. 2005).

The California Plaintiffs do not satisfy the requirements of permissive intervention. First, the same factors motivating the Court's denial of intervention as of right—the lack of cognizable interest, the lack of impairment of any interest, and the adequacy of representation—also motivate denial of permissive intervention.  Second, it is clear that granting intervention here will prejudice the adjudication of the original parties' rights. The California Plaintiffs explicitly state that they seek intervention "for the limited purpose of filing this Motion to Dismiss, Stay, or Transfer." (ECF No. 71 at 11.) A dismissal, stay, or transfer of this case would certainly prejudice the original parties. *See Travis*, 284 F. Supp. 3d at 346-47 ("[I]ntervention by proposed intervenors would, as a practical matter, delay or prejudice" the original parties where intervenors sought "to intervene for the purpose of moving to dismiss, stay, or transfer this action under the first-to-file rule."); *Calderon*, 2020 U.S. Dist. LEXIS 9492, at *24 ("Courts have previously recognized that intervention for the sole cause of dismissing, staying, or transferring an action — the very action sought here — is prejudicial to the original parties' right to proceed before the court of their choosing."). Third, intervention and dismissal or transfer would disrupt the expedited timeline agreed to by the parties and

6

ordered by this Court in the Author Actions, where discovery has already commenced and a schedule for summary judgment briefing has been established.

Accordingly, the Court denies the California Plaintiffs' motions to intervene for the purpose of transferring, staying, or dismissing the New York Actions.

Dated: New York, New York
   April 1, 2024

SO ORDERED:

Sidney H. Stein, U.S.D.J.

7

2AA-473

**Notice of Appeal to a Court of Appeals**
**From a Judgment or Order of a District Court.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AUTHORS GUILD, *ET AL.*, | File Number 1:23-CV-8292 (SHS) |
| Plaintiffs, | **NOTICE OF APPEAL** |
| -v- | |
| OPEN AI, INC., *ET AL.*, | |
| Defendants. | |
| JONATHAN ALTER, *ET AL.*, | |
| Plaintiffs, | |
| -v- | 23-CV-10211 (SHS) |
| OPEN AI, INC., *ET AL.*, | |
| Defendants. | |
| NICHOLAS A. BASBANES and NICHOLAS NGAGOYEANES, | |
| Plaintiffs, | |
| -v- | 24-CV-84 (SHS) |
| MICROSOFT CORPORATION, *ET AL.*, | |
| Defendants. | |
| THE NEW YORK TIMES COMPANY, | |
| Plaintiff, | |
| -v- | 23-CV-11195 (SHS) |
| MICROSOFT CORPORATION, *ET AL.*, | |
| Defendants. | |

Notice is hereby given that California Plaintiffs Paul Tremblay et al., ("California Plaintiffs"), hereby appeal to the United States Court of Appeals for the Second Circuit from an order (ECF No. 100) denying California Plaintiffs' motions to intervene for the purpose of transferring, staying, or dismissing the New York Actions. Entered in this action on the 15th day of April 2024.

Dated: April 15, 2024                         _____/s/ Christopher J. Hydal_____
                                              Chrisopher J. Hydal

                                              Christopher J. Hydal
                                              **JOSEPH SAVERI LAW FIRM, LLP**
                                              40 Worth Street, Suite 602
                                              New York, NY 10013
                                              Telephone: (646) 527-7310
                                              Facsimile: (212) 202-7678
                                              Email: chydal@saverilawfirm.com

California Plaintiffs Tremblay et al.

1

**2AA-475**